**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ ) | | |
| HENRY W. SEGAR, *et al.* | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 77-0081 |
|  | ) | (EGS) |
| JOHN ASHCROFT, *et al.* | ) | |
|  | ) | |
| Defendants. | ) | |
| _____ ) | | |

<u>**MEMORANDUM OPINION**</u>

Pending before the Court is plaintiffs' Motion for an Injunction enjoining the defendants Drug Enforcement Agency ("DEA" or "Agency") from promoting DEA Special Agents to the Senior Executive Service ("SES") unless the Agent has applied and been rated and ranked as a qualified applicant pursuant to the SES promotion procedures stipulated to by the parties and approved by this Court on March 12, 2002.  Upon consideration of the numerous, substantial, and often exceptional briefs filed by the parties, oral arguments held on March 17 and 25, 2004, a ten-day non-jury trial during which the Court heard from more than a dozen witnesses, the relevant case history and case law, and the entire record, including hundreds of exhibits, the Court concludes for the reasons discussed herein that plaintiffs' Motion for an Injunction must be **DENIED**.  As a result of this conclusion, the Court further finds that no stipulation as to the procedures for promoting DEA Agents to the SES is in effect.

Therefore, as explained below, consistent with this Court's Orders of February 6, 1981 and February 17, 1982, and in order to comply with the Opinion issued by the U.S. Court of Appeals for the District of Columbia Circuit in *Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984), this Court will craft a remedy to address DEA's past discrimination against black agents.  To that end, and barring any appeal, the Court schedules a status conference with the parties on May 2, 2006, at 11:00 a.m. to address further proceedings.[1]

I.    **Background**

   A.    **The Court's Initial Finding that DEA had Discriminated Against Black Agents**

   This lawsuit against DEA was filed on January 14, 1977, by a putative class consisting of African-American Special Agents, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-17 ("Title VII").  The complaint alleged that DEA discriminated against class members in "all aspects of the employment process," including initial grade assignments, types

---

   [1] On the eve of the conclusion of a lengthy trial on the merits of plaintiffs' motion, the defendants filed a Motion to Terminate Jurisdiction Relating to SES Selection, arguing that there has been no disparate impact at the SES level and that therefore the Court's jurisdiction related to the SES should terminate.  The Court determined that it would be inconsistent with the fair administration of justice to embark on discovery and briefing with respect to defendants' eleventh-hour motion and informed the parties that it would turn to the defendants' motion once the plaintiffs' motion was resolved.  The parties are advised that they should be prepared to discuss further proceedings with respect to defendants' motion at the status conference.

of appointment, type of work performed, training, discipline, supervisory evaluations, awards and promotions, and salary.  *See Segar v. Civiletti,* 508 F. Supp. 690, 692 (D.D.C. 1981).  In 1979, Judge Aubrey Robinson, Jr. of this Court held a bifurcated trial on the liability issues alleged in plaintiffs' Complaint. *Id.* at 693.

In a well-reasoned opinion issued after the trial, the Court made a number of findings related to DEA's employment practices; especially relevant for the present purposes are the Court's findings with respect to promotions.  The Court found that at the DEA, promotions at the lower grades, GS-7 to GS-12, were non-competitive.  *Id.* at 695.  In order to be promoted at the higher grades, however, agents had to compete on a regional or agency-wide basis, satisfy time-in-grade requirements, be rated and ranked by a review board and placed on the best qualified list, and ultimately be selected by the appropriate official.  *Id.* While the rating and ranking was based on a numerical system that assigned values for an agent's length of experience, breadth of experience, performance evaluation, and education and training, the Court found that the rating and ranking boards were given no guidance as to how to assign points for each category and, thus, points were alloted on the basis of the board members' judgment. *Id.*

Upon consideration of expert statistical evidence and individual testimony presented by both sides, Judge Robinson

3

ultimately concluded that DEA had discriminated against black agents, in violation of Title VII, with respect to salary, grade at entry, work assignments, the supervisory evaluation process, discipline, and promotions.  *Id.* at 712-715.  Regarding promotions, the Court found

> Plaintiffs' statistical evidence did not establish a prima facie case regarding positions filled through the Career Board process.  The statistics did establish, however, that a significant disparity exists in promotions from GS-11 to GS-12.  The statistics involving promotions to GS-13 through GS-18 levels are insignificant, primarily due to the necessarily small number of agents considered in the regression analyses.  Thus, the statistics alone did not establish a prima facie case of discrimination in promotions, with the exception of promotions from GS-11 to GS-12.

> The non-statistical evidence firmly established discrimination in promotions, however.  Work assignments, supervisory evaluations, and disciplinary actions all significantly affect an agent's promotional ability.  In all of these areas, defendants discriminated against black agents.  Thus, the Court concludes that plaintiffs proved a prima facie case of discrimination in promotions.

> Defendants failed to rebut plaintiffs' showing of discrimination.  They have validated neither the Career Board scoring system nor the non-competitive promotion procedures... Thus, the Court concludes that defendants discriminated against black agents in promotions.

*Id.* at 714-15.

In accordance with its opinion, the Court ordered the DEA to cease its discriminatory practices and "immediately commence validity studies in order to implement effective, non-discriminatory supervisory evaluation, discipline, and promotion systems[,]... [and] to insure that said systems have neither a disparate impact on black agents nor effectuate disparate

treatment of black agents[.]" *Id.* at 715.  The Court further
ordered the parties to address how to remedy the discrimination
in salary, grade at entry, and promotion.  *Id.*

**B.   The Court's Remedial Order**

Following his determination that the defendants had violated
Title VII, and after considering the parties' proposals for
further relief, Judge Robinson issued an Order on February 17,
1982, granting plaintiffs' specific relief. *Segar v. Smith*, 1982
WL 214 (D.D.C. 1982).  The Court ordered the defendants to pay
backpay to remedy the salary discrimination, based on the
regression analyses introduced at trial and according to
guidelines established by the Court.  *Id.* at *4-5.  The Court
further ordered the DEA to promote one black agent for every two
non-black agents to grades GS-14 through 18, "until members of
the plaintiff class constitute ten percent (10%) of the agents at
that grade level, or until five years after the date of this
Order, whichever is sooner."  *Id.* at *6.  The Court provided that
if, in any year or after the five-year period ended, plaintiff
class members did not make up ten percent of any grade level,
plaintiffs could request additional relief from the Court.  *Id.*
The Court also ordered frontpay.  *Id.* at *6-8.

The Court's remedial Order also established reporting
requirements for DEA's Equal Employment Opportunity ("EEO")
office, and established a monitoring committee, known as the
Equal Employment Opportunity Monitoring Committee ("EEOMC" or

"Committee"), made up of eight members of the plaintiff class. The Committee was responsible for monitoring the DEA's compliance with the Court's order. *Id.* at *8. According to the Court's order, the EEOMC members were permitted to work up to twenty hours per month on Committee business, DEA was to appoint one person each from the offices of personnel, general counsel, and the EEO to act as liaisons with the EEOMC, the Committee was to be given the results of the EEO's studies and reports and any other employment information requested by the Committee, and had the authority to investigate complaints by special agents concerning DEA's compliance with the Court's Order. *Id.* at *8-9.

The Court further provided that any plaintiff class member could elect to assert an individual claim for backpay while a GS-7 or GS-9, or for reinstatement with backpay. *Id.* at *9. Finally, the Court determined that the various obligations it was imposing on DEA were ordered pursuant to the Court's equitable powers under Title VII, and the Court retained jurisdiction over the case to ensure compliance with its Order until "such time as the Court concludes that the rights of plaintiffs have been accorded and satisfied by defendants." *Id.*

### C.   **The U.S. Court of Appeals for the District of Columbia Circuit Upholds the District Court's Liability Determination but Vacates Promotion Mandates**

The DEA appealed both the District court's liability determination and its remedial scheme to the U.S. Court of Appeals for the District of Columbia Circuit. *Segar v. Smith*,

738 F.2d at 1259.  The Court of appeals explicitly recognized that the trial court had based its findings of discrimination at the higher grades "on inferences from proven discrimination at the immediately preceding levels and ... in the factors that bear most directly on promotions[,]" and the Court soundly rejected DEA's challenge to the District court's liability determination. *Id.* at 1264.

> On balance, we find no reversible error in the District Court's overall assessment of the evidence.  The court properly attributed probative weight to plaintiffs' statistical analyses, and properly rejected the three aspects of DEA's case on rebuttal-the need for gross disparities, the insufficiency of the statistical studies, and the purported failure to account for prior law enforcement experience.  In light of these findings, the court appropriately held that DEA had engaged in a pattern or practice of discrimination against black special agents ... and properly held that DEA's initial grade assignments, supervisory evaluations, imposition of discipline, and promotion process had disparate impacts on black agents... We therefore affirm the District Court's liability determination in its entirety.

*Id.* at 1288.

As for the District court's remedial scheme, the DEA argued on appeal that the class-wide backpay award violated the individualized hearings required by *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977), and compensated plaintiffs for nonactionable discrimination prior to 1972, and that the promotion goals and timetables exceeded the trial court's authority under Title VII and violated the equal protection clause of the Constitution.  *Segar*, 738 F.2d at 1289.

The appellate court recognized that Title VII affords the

courts broad authority to craft equitable relief following a
determination of discrimination.  *Id.* at 1288-89.  The court
quoted the Conference Report, which accompanied the 1972
amendment to Title VII: "The provisions of this subsection are
intended to give the courts wide discretion exercising their
equitable powers to fashion the most complete relief possible."
*Id.* at 1289 (quoting Section-by-Section Analysis of H.R. 1746,
accompanying the Equal Employment Opportunity Act of 1972-
Conference Report, 118 Cong. Rec. 7166, 7168 (1972)).  The court
also noted that the Supreme Court has recognized the broad scope
of the courts' remedial power.  *Segar*, 738 F.2d at 1289
(citations omitted).

Turning to the DEA's contentions, the Court of appeals first
found that the District court had not erred in ordering class-
wide relief without individualized hearings.  *Id.* at 1289-91.
The appellate court remanded the backpay award for
reconsideration by the trial court, however, because the court's
formulation was tied to the regression analysis, which included
to some degree nonactionable pre-1972 discrimination.  *Id.* at
1293.

Next, while recognizing that generally promotion goals and
timetables can be used to remedy discrimination, *Id.*, the Court
of appeals vacated the trial court's order that one black agent
be promoted for every two white agents to GS grades above GS-12,
because the District court "did not consider whether less severe

8

remedies might prove equally efficacious in this case." *Id.* at

1294.  The reviewing court concluded:

> On remand we encourage the District Court to consider other
> remedial options to ensure that black agents attain their
> rightful places at the upper levels of DEA.  We note in
> particular that a promotion bottleneck appears to exist at
> the GS-12 level.  While black agents manage to arrive at
> this level eventually, few progress beyond this point.  In
> remedying promotion discrimination at this point and at all
> levels, the court is of course free to establish promotion
> guidelines and to monitor DEA's progress in meeting those
> guidelines, *or to fashion any other appropriate relief.*

*Id.* at 1295 (emphasis added).

### D.    Following the Court of Appeals' Decision, the Parties Enter a Series of Stipulations or Consent Decrees to Remedy Discrimination at DEA

On June 26, 1985, the parties informed the District court

that the Supreme Court had denied certiorari of the Court of

appeals' decision, that the case was therefore back before Judge

Robinson on remand, and that the parties were working to settle

those issues remanded by the Court of appeals.  *See* Stipulation

Regarding Status, Civ. No. 77-0081 (filed June 26, 1985).

On February 17, 1987, the parties stipulated to, and the

Court approved, an agreement between the parties on the remedial

issues remaining before the Court.  *See* Stipulation and Order

with Respect to Outstanding Claims Regarding Relief, Civ. No. 77-

81 (filed Feb. 17, 1987).  On the issue of promotions, the

defendants agreed not to discriminate against black special

agents "in any phase of the process through which promotions are

determined and awarded at DEA" and to "continue as rapidly as

possible with the development and validation of effective, nondiscriminatory personnel practices in accordance with the Court's Order dated February 6, 1981, the February 17, 1982 Order, the Joint Stipulation approved July 31, 1981, and the Stipulation approved April 28, 1983."  *Id.* at 6.

As a review of the docket in this matter will attest, although there were periods of delay - often due to defendants' requests for extensions or because the parties continued to litigate a variety of new disputes - over the course of the next fifteen years, the parties continued to file, and the Court continued to approve, a series of Stipulations regarding various issues, including promotion procedures.  *See, e.g.,* Order Re: Establishment of Promotion System, Civ. No. 77-0081 (filed March 25, 1990); Stipulation and Order for Approval of Final Working Group and New Promotion System, Civ. No. 77-0081 (filed July 10, 1991); Stipulation Implementing A Promotion Process for Selecting DEA Criminal Investigators for Positions in the Senior Executive Service, Civ. No. 77-0081 (filed March 12, 2002).

It is the validity and interpretation of one of these stipulated promotion procedures, specifically the Stipulation Implementing A Promotion Process for Selecting DEA Criminal Investigators for Positions in the Senior Executive Service, that is the source of the instant dispute.

E.    **The Stipulation Implementing Promotion Procedures for the DEA Senior Executive Service**

The Stipulation submitted to the Court states that on February 6, 1981, the Court ordered DEA to conduct validity studies and implement non-discriminatory employment practices, including promotions.  *See* Stipulation Implementing A Promotion Process for Selecting DEA Criminal Investigators for Positions in the Senior Executive Service, Civ. No. 77-0081 (filed March 12, 2002)(No. 104)(hereafter "SES Stipulation") at 1.  It also provides:

> [T]he attached SES Special Agent Selection Process developed by the DEA, once ordered by the Court, will enact a system developed and constructed to provide DEA with a valid, non-discriminatory mechanism for selecting DEA special agent executives and to provide agency selection officials with the highest quality candidates from which to choose.
>
> The Working Group and the Equal Employment Opportunity Monitoring Committee, which consists of and represents plaintiff class members ("the Segar Committee"), each of which was appointed by this Court to monitor and review DEA's employment practices, have reviewed the SES Special Agent Selection Process.  Through this process, DEA has addressed the Working Group's and the Segar Committee's comments and concerns and has implemented their suggestions. The Working Group and the Segar Committee have approved the SES Special Agent Selection Process as drafted and submitted to this Court as Attachment A hereto.  *Id.* at 1-2.

The SES Stipulation was signed by the then-United States Attorney for the District of Columbia, Roscoe C. Howard, Jr., and the parties' attorneys at that time, Jennie O'Flanagan for the plaintiffs and Mark Nagle and Laurie Weinstein for the defendants.  This Court approved the Stipulation on March 12,

2002.[2]

The document attached to and implemented by the SES

Stipulation is titled "Review of Applications from Staff for SES

Special Agent Positions" ("Stipulated Procedures") and describes

a process through which candidates for promotion to the SES

"must" submit their application to their SES-level supervisor,

and that supervisor "must" complete a recommendation and

evaluation form for the candidate.  Stipulated Procedures at 1.

The applications are then reviewed by a "Rating and Ranking

Panel," which develops a "best qualified list" of candidates and

submits the list to the Deputy Administrator of DEA.  *Id.* at 3.

The Deputy Administrator then reviews the names on the list and

may remove an applicant from the list for any Office of

Professional Responsibility or disciplinary issues; the reasons

for any such removal from the list must be documented in writing.

*Id.*  Finally, according to the Stipulated Procedures, the DEA

Administrator "will make his selection or non-selection from the

list of candidates provided by the Deputy Administrator."  *Id.*

On page one of the Stipulated Procedures, the title of the

document includes a footnote.  The footnote reads:

> These procedures are meant to systematize the process of
> selecting individuals for Special Agent SES positions.
> However, nothing in these procedures are [sic] meant to
> reduce the authority of the Administrator in selecting

---

[2] The Court signed and dated the Stipulation March 10, 2002,
but it was filed in the clerk's office and appears on the docket
on March 12, 2002.

persons to fill DEA positions.

*See* Stipulated Procedures at 1, n.1.  Whether the parties

intended this footnote to mean that the DEA Administrator could

promote someone to the SES who had not applied through the

process described in the Stipulated Procedures - i.e., by

applying, being rated and ranked, and appearing on the best

qualified list - is the crux of the dispute that this Court must

resolve.

### F.    The Plaintiffs' Motion for an Injunction

After the Stipulated Procedures were enacted, then-DEA

Administrator Asa Hutchinson made a number of promotions to the

SES from among candidates who had applied and been rated and

ranked in accordance with the process described in the Stipulated

Procedures.  *See* Plaintiffs' Proposed Findings of Fact and

Conclusions of Law ("Pl. PFFCL") at 57 (citing to the record);

Defendants' Findings of Fact and Conclusions of Law ("Def.

PFFCL") at 42-43; Transcript of Asa Hutchinson ("Tr. Hutchinson")

at 198-99.  It is undisputed, however, that on August 28, 2003,

DEA Administrator Karen Tandy promoted Special Agent Mary Cooper

to the SES and that Ms. Cooper had not submitted an application

or been rated and ranked and placed on the list sent to the

Administrator.  Pl. PFFCL at 60; Def. PFFCL at 57.

On March 12, 2004, plaintiffs filed a Motion for a Temporary

Restraining Order to enjoin DEA from promoting any Special Agents

to the SES who had not applied for promotion through the

Stipulated Procedures process and to rescind Special Agent Mary Cooper's promotion to the SES.  This Court held a hearing on plaintiffs' motion on March 17, and continued the hearing to March 25, 2004.  The Court concluded that the meaning of the footnote in the Stipulated Procedures was ambiguous and determined that extrinsic evidence of intent was necessary to resolve the issues presented by plaintiffs' motion.  On March 29, 2004, pursuant to Federal Rule of Civil Procedure 65(a)(2), the Court consolidated the hearing on plaintiffs' Motion for a Preliminary Injunction with a trial on the merits of plaintiffs' claims.  Order, Civ. No. 77-0081 (March 29, 2004).

A non-jury trial was conducted on October 26-28, November 2, 5, 30, and December 13-14, 2004, and January 13, 2005, at which time the parties presented extrinsic evidence regarding their intent and understanding of the footnote, and the circumstances surrounding the development and implementation of the Stipulated Procedures.  The parties made closing arguments on June 13, 2005.

II. **Discussion**

   A. **Applicable Law and the Burden of Proof**

A consent decree, such as the stipulation implementing DEA's SES promotion procedures, is essentially a contract.  *See Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1125 (D.C. Cir. 1983) ("construction of a consent decree is essentially a matter of contract law); *Kilpatrick v. Paige,* 193 F. Supp. 2d 145, 152 (D.D.C. 2002) ("A settlement agreement is a contract

and, as such, it must fulfill the elements of a contract.").  An enforceable contract requires "(1) agreement as to all material terms; and (2) intention of the parties to be bound."  *See Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 564 (D.C. Cir. 1999) (citing *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995); *Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985)).  In other words, there must be a "meeting of the minds" with respect to the material terms of the contract before the parties will be bound by it.  *See Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) ("[T]o establish a contract the minds of the parties must be in agreement as to its terms.") (internal quotation marks omitted); *see also Jack Baker*, 664 A.2d at 1239 ("Where the parties fail to agree to all material terms, no contract is formed.").

As the party seeking relief and arguing the existence of an enforceable contract, it is plaintiffs' burden to show, by a preponderance of the evidence, that there was a "meeting of the minds" with respect to the Stipulated Procedures.  *See Ekedahl v. COREStaff, Inc.*, 183 F.3d 855, 858 (D.C. Cir. 1999); *Bldg. Servs. Co. v. AMTRAK*, 305 F. Supp. 2d 85, 92 (D.D.C. 2004).

### B.   Plaintiffs' Position with Respect to the Footnote

Plaintiffs insist that at the time the footnote was drafted and the stipulation was entered, both plaintiffs and DEA intended the Stipulated Procedures to be the only means for promotion to

the SES.  Plaintiffs further maintain that both parties meant the
footnote only to reserve the Administrator's authority to
laterally transfer SES agents to other SES positions and to fill
specific SES positions with any of the qualified applicants (as
opposed to the highest-ranked applicant, for example).[3] Pl. PFFCL
at 27-33.

Finally, plaintiffs offer two arguments in the alternative.
First, plaintiffs insist that even if the Court finds that the
parties attached different meanings to the footnote, based on the
contract construction theory of "misunderstanding," DEA is bound
by plaintiffs' understanding because DEA knew or should have
known of the interpretation plaintiffs attached to the footnote.
Pl. PFFCL at 88-90 (citing *Centron DPL Co. v. Tilden Fin. Corp.*,
965 F.2d 673, 675 (8th Cir. 1992); *Downey v. Clauder*, 811 F.
Supp. 338, 339-40 (S.D. Ohio 1992) (rejecting that there was no
meeting of the minds where party knew or had reason to know of
the other party's intended meaning of the agreement); *United
States v. Haas & Haynie Corp.*, 577 F.2d 568, 573-74 (9th Cir.

---

[3] During the trial, there was conflicting testimony regarding
whether, under the Stipulated Procedures, the Administrator was
to get all three lists, i.e., the moderately qualified,
qualified, and best qualified, or only the best qualified list.
*See, e.g.,* Tr. 10/27/04 at 71-73.  Plaintiffs argue that only the
best qualified list is to be provided to the Administrator.  *See*
Pl. PFFCL at 94, n.37.  Because the Court finds that there was no
meeting of the minds and therefore the procedures are not
enforceable, the Court will not devote precious judicial
resources to determine what list or lists the Administrator was
to receive.

1978) (holding that binding contract was formed where neither party knew of the meaning attached by the other but one had reason to know of the meaning attached by the other); *Merced County Sheriff's Employees' Ass'n v. County of Merce*d, 188 Cal. App. 3d 662, 670-74 (Cal. Ct. App. 1987) (where parties' negotiations made clear that party should have known the other party's intended meaning, the knowing party was bound by that meaning); *Joyner v. Adams*, 361 S.E.2d 902, 905 (N.C. Ct. App. 1987) (remanding for determination whether "the parties knew or had reason to know of the other's meaning of the disputed language"); 1 Restatement (Second) of Contracts § 20(2) (1981).

Second, plaintiffs insist that even if the Court finds that the footnote is susceptible to two reasonable but conflicting interpretations, the ambiguity must be construed against DEA, as the footnote's drafter.[4]  *See* Pl. PFFCL at 107-08 (citing *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486 (D.C. Cir. 1997) (construing contract against drafter); *Mesa Air Group, Inc. v.*

---

[4] DEA does not dispute that it alone drafted the language in the footnote, although, inexplicably, DEA cannot identify the person at DEA who actually supplied the language in the footnote. *See* Pl. Ex. 167 ¶ 3 (Stipulations); 120 ¶¶ 11, 12 (Def.'s Resp. to Pl. Req. for Admissions); Tr. 10/27/04 at 165:1-4 (Hutchinson); Tr. 12/13/04 at 152:18-22 (Marshall), 239:11-14 (Ryan); Tr. 11/30/04 at 63:6-64:23 (Kraft); Pls.' Cross-Designations of Dep. Test. & Objections to Defs.' Designated Dep. Test., Ex. A at 78:5-79:3 (Fulmore Dep.) (Docket No. 242); PX 164 at 195:16-196:5 (Kraft Dep.); PX 165 at 88:15-19 (Walden Dep.); *see* Tr. 11/05/04 at 101:9-12, 102:20-21 (Mathis); *cf.* Tr. 11/05/04 at 147:1-8 (AUSA Weinstein stating that no one admitted to writing the footnote).

*Dep't of Transp.*, 87 F.3d 498, 506 (D.C. Cir. 1996); *Intercounty Constr. Corp. v. District of Columbi*a, 443 A.2d 29, 32 (D.C. 1982) (if there is no one definite reasonable interpretation, "the ambiguities remaining in the contract will be 'construed strongly against the drafter . . . .'") (quoting *1901 Wyo. Ave. Coop. Ass'n v. Lee*, 345 A.2d 456, 462 (1975); 2 Restatement (Second) of Contracts § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").

## C.   Defendants' Position with Respect to the Footnote

Defendants, on the other hand, insist that there was no meeting of the minds and that the Stipulated Procedures are not enforceable. *See* Def. PFFCL at 71 (citing *A.M. Castle & Co. v. United Steel Workers of America*, 898 F. Supp. 602, 608 (N.D. Ill. 1995)). *See also, e.g., Kilpatrick v. Paige*, 193 F. Supp. 2d 145, 154 (2002) (no agreement); *Estate of Taylor v. Lilienfield*, 744 A.2d 1032, 1035 (D.C. 2000) (no contract arises,and any apparent contract is void, if the minds of the parties do not meet honestly and fairly without mistake or mutual misunderstanding upon all issues involved); *In Re Wright*, 51 B.R. 669, 674 (Bankr. D.D.C. 1985)(contract voided and rescinded).

18

In response to plaintiffs' misunderstanding argument, defendants insist that where a party is "consciously ignorant," that party may not seek enforcement based on their mistake.  *See* Def. PFFCL at 81-82 (citing Restatement (Second) of Contracts § 154 ("A party bears the risk of mistake when ... (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient.").  Instead, defendants maintain that the evidence deduced at trial clearly established not only that defendants did not mislead plaintiffs or have reason to suspect that plaintiffs misunderstood the footnote, but that the evidence in fact demonstrates that plaintiffs were made aware of the footnote and chose not to seek clarification of its meaning from anyone at the DEA. *See, e.g.,* Def. PFFCL at 23-35.

### D.      Findings of Fact

At the outset, the Court notes that it credits the majority of plaintiffs' evidence. Throughout the trial, the Court found the plaintiffs' DEA witnesses to be truthful, credible, and knowledgeable.  Moreover, the Court recognizes that these plaintiff class members have good reason to remember conversations and events and to have paid close attention to the development of the promotion procedures. After all, as the Court determined after the trial in 1979, the DEA had historically practiced wide-spread race discrimination against black special

agents at almost every aspect of the employment process. However, the evidence, as credible as it is, simply does not support a legal conclusion that the parties each intended the Stipulated Procedures, including the footnote, to mean that the DEA Administrator could never promote a non-applicant to the SES.

The following recitation of the facts is based in large part on the parties' Proposed Findings of Fact, modified by the Court as necessary.[5]

In summary, after considering all the evidence, including the credibility of the witnesses, the Court finds:

a. At the time the SES Promotion Procedures were stipulated to by the parties and entered by the Court as an Order, the plaintiffs believed that _any_ special agent promoted to the SES had to have applied through the procedures and been selected from a list provided to the Administrator;

b. Although plaintiffs' interpretation of the footnote was reasonable, plaintiffs never confirmed with anyone at the DEA that their understanding of the footnote was that of the defendants;

c. While there seems to be some variation as to what the defendants intended the footnote to mean, at least two key people

_____

[5] The Court relies upon different parts of the record, which are identified as follows: Plaintiffs' Exhibits are cited as PX or Pl. Ex., Defendants' Exhibits are cited as DX or Def. Ex., Deposition testimony is Dep., and Transcripts from the trial are designated Tr. and given by date, page, and line number.

acting on DEA's behalf - Administrator Hutchinson, the DEA
Administrator at the time the Stipulated Procedures were entered,
and Laurie Weinstein, the attorney for the DEA at the time the
Stipulated Procedures were entered, understood and intended the
footnote to retain some discretion for the Administrator to
select for promotion a special agent who had not applied through
the process or appeared on a list;

d. Plaintiffs have not sustained their burden of proof that
plaintiffs and defendants shared a common understanding of the
footnote's meaning;

e. Plaintiffs cannot rely on a theory of misunderstanding or
mistake in this case because the defendants brought the footnote
to plaintiffs' attention and plaintiffs recognized the potential
for the footnote to undermine the otherwise exclusive procedures
for SES promotion; yet rather than confirm the meaning of the
footnote with the DEA, plaintiffs and plaintiffs' counsel made
assumptions and conferred only with each other as to the
footnote's meaning.

**1.      History of the SES and Development of the New
         Promotion Procedures**

1. Before the implementation of the SES Promotion Procedures,
the process the DEA had employed to promote Special Agents into
senior management positions was both unwritten and opaque —
essentially the process was a mystery to the Special

Agents. *See* Tr. 10/28/04 at 85:5-10 (Walker) ("Complete mystery, Your Honor. Somebody would get a phone call. And I remember asking people, how do you get promoted. And the people that I asked couldn't really tell me."), 118:9-16 (Reed) ("No one knew how one got on the list to be a SES."); *see also id.* at 62:22-64:9 (Walker). Prior promotion practices entailed the Career Board preparing a SES "short list" and forwarding it to the Administrator, who would usually select a person for promotion from that list, but was not required to do so. Tr. 12/13/04 at 140:7-141:18 (Marshall). The method used to compile the SES short list was entirely subjective—there were no standardized criteria, no rating and ranking, and no required qualifications. Tr. 10/26/04 at 77:23-81:12 (Gamble).

2. Faced with the Court's Orders requiring the implementation of a validated SES promotion process, the DEA concluded that it would be technically infeasible to validate its historical practices, which had "no formal promotion criteria," did not advise candidates of how they were being measured, and lacked any formal evaluation system. PX 3 at SES4416-18.

Accordingly, the DEA did not attempt to validate its existing SES promotion practices and instead chose to develop a non-discriminatory system that would have formal criteria and could be content validated as required by the Court's Orders. *Id.*; *see also* PX 8; PX 12 at SES4839-40 ("Given the numerically insignificant total [number] of SES positions selected in any

22

year, the procedures implemented by the agency must be content valid.").

3.   Mr. John Kraft, whom the DEA hired to develop the content validated, non-discriminatory SES Promotion Procedures, began drafting the Procedures in May 1996. Tr. 11/30/04 at 6:22-7:20 (Kraft). Language similar to that found in footnote one to the Procedures was not in any of Mr. Kraft's proposals and did not appear in the Stipulated Procedures until December 2000. PX 39; PX 40.

4. No version of the Procedures prior to December 2000 discusses or suggests that the Administrator could promote to the SES a Special Agent who had not applied using the Stipulated Procedures.[6]  These pre-footnote Stipulated Procedures make clear that while the Administrator can only promote to the SES Special Agents who had applied pursuant to the Stipulated Procedures, the Administrator had the flexibility to fill SES positions by competitively promoting someone from the Best Qualified List, laterally reassigning a current SES-level Special Agent, placing a Special Agent in a temporary or developmental assignment, or

---

[6] *See, e.g.*, PX 8; PX 9; PX 11; PX 19 at SES2964, 68-72 (stating that "applicants apply during open period" and consistently using the term "applicant"); PX 22; PX 23; PX 25; PX 27; PX 125; PX 126; PX 127; PX 128; PX 156G; Tr. 11/30/04 at 77:24-79:5 (Mr. Kraft discussing PX 11), 84:8-85:21 (Mr. Kraft discussing PX 125), 85:22-86:12 (Mr. Kraft discussing PX 23), 88:19-89:24 (Mr. Kraft discussing PX 126), 90:16-91:14 (Mr. Kraft discussing PX 156G, part of PX 126); PX 164 at 39:23-25, 41:6-8 (Kraft Dep.) (Mr. Kraft discussing Dep. Ex. 6/PX 8), 46:2-6 (Mr. Kraft discussing Dep. Ex. 7/PX 9).

leaving the position vacant. *See, e.g.*, PX 23 at SES3150; PX 27 at S 003054, 98; PX 125 at SES3014; PX 126 at SES2472.

5. In February 1997, DEA Chief Counsel Ryan and DEA Associate Chief Counsel Walden advised that the Stipulated Procedures—which did not include the footnote or suggest in any way that the Stipulated Procedures would permit the Administrator to promote someone who had not applied — were legally sufficient. Tr. 12/13/04 at 207:9-208:23 (Ryan); PX 14 at SES4829; PX 165 at 54:20-55:12 (Walden Dep.).

6. Administrator Constantine met with Mr. Kraft, Chief Counsel Ryan, and several other executive staff members on December 30, 1997, to discuss the Stipulated Procedures. Contemporaneous notes of this meeting demonstrate that Administrator Constantine said he wanted to be able to open the process to GS-14 level Special Agents to permit them to apply, if necessary, PX 24 ¶ 4; DX 14 at SES2165; Tr. 11/30/04 at 87:14-88:14 (Kraft); Tr. 12/13/04 at 70:22-25, 73:9-10 (Ryan), but do not mention any discussion whatsoever of the Administrator being able to promote someone who had not applied, PX 24; DX 14.

7. Shortly after the meeting, Mr. Kraft revised the Procedures to reflect the changes requested by Administrator Constantine, *i.e.*, to ensure that GS-14 level Special Agents could apply for promotion, Tr. 11/30/04 at 88:19-89:9 (Kraft); *see* PX 126; PX 156G, and consistent with Administrator Constantine's request, these revised December 1997 Procedures

permit GS-14s to apply. PX 126 at SES2481. Like the meeting
notes, PX 24; DX 14, these revised Stipulated Procedures mention
nothing about promoting a person who had not applied, PX 126; Tr.
11/30/04 at 88:19-89:9, 89:18-24 (Kraft), even where they address
how to deal with a situation where not enough candidates are
qualified, PX 156G at SES2578; Tr. 11/30/04 at 90:16-91:14
(Kraft). Indeed, Mr. Kraft admits that at this point, he had not
discussed with anyone at the DEA any alternative means for
promoting someone to the SES who had not applied. Tr. 11/30/04 at
92:9-11 (Kraft).

8. On January 15, 1998, Administrator Constantine approved
the Procedures, which neither contained the footnote nor any
language purporting to authorize the Administrator to promote a
Special Agent who had not applied. *Id.* at 9:6-11; 92:6-8 (Kraft);
PX 164 at 173:9-12, 174:2-4 (Kraft Dep.).

9. The *Segar* Working Group ("Working Group" or "Work Group")
is a Court-created panel of experts tasked with ensuring that the
DEA complies with the Court's remedial orders by overseeing the
development and implementation of validated and non-
discriminatory employment procedures. Tr. 10/26/04 at 40:2-10
(Goldstein); Tr. 11/30/04 at 92:21-24 (Kraft); PX 12 at SES4839;
PX 13 at SES4831; *see* 7/31/81 Joint Stipulation Regarding
Procedures to be Followed in Implementing the Court's Order of
Feb. 6, 1981; 4/24/81 Defs.' Status Report to the Court. Before
the DEA could implement any of the new non-discriminatory

25

procedures, the Working Group had to approve them. Tr. 11/30/04 at 92:17-20 (Kraft); PX 12 at SES4840; PX 13 at SES4831.

10. In January 1998, the Working Group received the Stipulated Procedures, recently approved by Administrator Constantine, from the DEA. Tr. 11/30/04 at 92:6-16 (Kraft). Dr. Irwin Goldstein, who has been plaintiffs' representative on the Working Group for about twenty years, Tr. 10/26/04 at 39:17-19 (Goldstein), testified that the Procedures properly listed the Administrator's options for filling SES positions: "pick anyone from this list for promotion," "pick an SES person for a lateral transfer into the position," "pick a GS 15 to fill the position on a temporary basis [developmental assignment]," or leave the position "vacant." *Id.* at 43:13, 44:5-45:20 (Goldstein); PX 126 at SES2472; *see also* PX 156G at SES2578 (listing methods for filling positions when not enough candidates are qualified). Promoting a Special Agent to the SES who had not applied was not an identified option; rather, to be promoted to the SES, the Procedures required Special Agents to apply using the Procedures. PX 126 at SES2453-54, 70-72, 80-81.

11. Dr. Goldstein understood that there was no other means of promoting Special Agents into the SES, Tr. 10/26/04 at 45:17-20 (Goldstein), and no one ever told Dr. Goldstein that once the Procedures were implemented there would be a means for promoting

someone who had not applied. *Id.* at 46:21-25 (Goldstein). Mr. Kraft discussed the Procedures with the Working Group, Tr. 11/30/04 at 93:2-8 (Kraft), and he *never* told the Working Group that the Administrator could promote someone who had not applied — before (or after) the footnote was added, *id.* at 93:12-19 (Kraft); PX 164 at 164:4-165:2 (Kraft Dep.).

12. The Working Group approved the Procedures in 1998. Tr. 10/26/04 at 47:3-7,73:21-74:6 (Goldstein); Tr. 11/30/04 at 93:9-11 (Kraft); PX 149.  Significantly, the Procedures, as approved by the Working Group, did not contain the footnote or any suggestion that the Administrator could promote someone who had not applied.

13. The EEOMC first received the SES Promotion Procedures to review in July 1999. Tr. 10/26/04 at 81:23-83:18 (Gamble); Tr. 10/27/04 at 124:11-20 (Fenner); PX 27; PX 28 at S 001189.

14. The DEA was the sole author of the Procedures.  By the time the DEA first shared the Procedures with plaintiffs, the Procedures had been approved by Administrator Constantine, the Working Group, and the U.S. Attorney's Office. PX 25 at S 000702; PX 26 at S 003510; Tr.10/27/04 at 126:12-127:14 (Ms. Fenner discussing PX 25). Although the DEA sought the EEOMC's concurrence before submitting the Procedures to the Court, plaintiffs had no role in drafting the Procedures. Tr. 10/27/04 at 109:10-13, 218:15-20, 219:21-220:2 (Fenner).

27

15. The EEOMC discussed the Procedures internally and with Dr. Goldstein. *Id.* at 125:17-129:16 (Fenner). Mr. Gamble, a member of the EEOMC in 1999, testified that he and the EEOMC understood that the Procedures established a process whereby the Administrator would promote (or not promote) Special Agents to the SES from the pool of Special Agents who applied and were rated and ranked, pursuant to the Procedures, Tr. 10/26/04 at 82:17-83:18, 84:18-85:8 (Gamble); *see also* PX 27 at S 003055, 57, and that if the Administrator chose not to promote from the pool to fill a particular position, he could fill the position with a lateral transfer of a Special Agent currently in the SES or re-open the application process. Tr. 10/26/04 at 84:23-85:8 (Gamble); *see also* PX 27 at S 003054, 56.  Dr. Goldstein informed the EEOMC that the Working Group had approved the Stipulated Procedures, thereby providing assurance that the Procedures were validated and non-discriminatory, as required by the 1982 Relief Order. Tr. 10/27/04 at 126:12-15 (Fenner); *see* Tr. 10/26/04 at 40:2-10 (Dr. Goldstein testifying about the purpose of the Working Group).

16. After reviewing the Procedures and meeting with Dr. Goldstein, the EEOMC sent a list of 23 comments, questions, and suggestions regarding the Procedures to the DEA. PX 31; Tr. 10/27/04 at 127:15-129:19 (Ms. Fenner discussing PX 31); Tr. 10/28/04 at 134:12-20 (Mr. Reed discussing PX 31). All of the EEOMC's comments address how the process set forth in the

Procedures would operate. *See* PX 31. For example, the EEOMC was concerned about how plaintiff class members would fare in the rating and ranking process, especially given that the DEA often did not place them in career enhancing or "springboard" GS-14 and 15-level positions. Tr. 10/27/04 at 125:24-126:11, 128:5-129:12 (Fenner); PX 31. The EEOMC also asked about the eligibility of GS-14-level Special Agents under the Procedures. PX 31 ¶ 19. None of the EEOMC's concerns indicate that the EEOMC understood the Procedures as permitting an alternative process whereby the Administrator could promote to the SES a Special Agent who had not applied for promotion pursuant to the Procedures. PX 31; Tr. 10/27/04 at 128:18-129:16 (Fenner).

17. The Court finds that plaintiffs' testimony regarding their understanding of the Procedures provided to them in 1999 is consistent internally, consistent with the documentary evidence, logical, and credible.  Accordingly, the Court finds that the EEOMC believed these Procedures set forth the exclusive process for the promotion of Special Agents to the SES.

18. DEA officials were scheduled to meet with the EEOMC on August 11, 2000, to discuss a number of issues, including the EEOMC's comments on the Procedures. PX 34 at SES0526. On August 7, in preparation for that meeting, DEA Chief Counsel Ryan and other members of the DEA executive staff briefed Deputy Administrator Julio Mercado on the SES Promotion Procedures. PX 33 (same document as DX 22); Tr. 12/13/04 at 80:22-81:8 (Ryan).

19. Ms. Ryan's notes from this meeting indicate DEA's understanding of the Procedures as of August 2000; namely, once implemented, the SES Promotion Procedures would *not* permit the Administrator to promote a Special Agent to the SES who had not applied. Tr. 12/13/04 at 82:4-83:8, 217:3-10 (Ryan); PX 33; PX 162 at 57:21-24, 58:3-59:25 (Ryan Dep.). Ms. Ryan's notes state, "Can A[dministrator] select someone outside of SES pool? Ans[wer]: Once process validated, NO." PX 33 at SES2162; Tr. 12/13/04 at 84:8-85:10 (Ryan). There is no suggestion in Ms. Ryan's notes that anyone at this briefing disputed this understanding (which was identical to plaintiffs' understanding), or suggested that the Procedures should be changed in any way to produce a different answer to this key question. PX 33. In contrast, the notes did reflect a need to "readdress eligibility of a GS-14" in response to the question, "Can A[dministrator] select a GS-14?" — the issue that former Administrator Constantine raised and the issue raised in the EEOMC's comments. PX 31 ¶ 19; PX 33 at SES2162.

20. On August 9, 2000, DEA Chief Counsel Ryan sent a memorandum to EEOMC Chairperson Fenner with the DEA's responses to each of the EEOMC's 23 questions concerning the operation of the SES Promotion Procedures. Tr. 10/27/04 at 129:17-130:2 (Fenner); PX 34.

21. On August 11, 2000, the EEOMC met with the DEA to
discuss the EEOMC's concerns regarding the Procedures. Tr.
10/27/04 at 130:19-131:3 (Fenner); PX 34 at SES0526.
Ms. Fenner's notes from that meeting demonstrate that the EEOMC
and the DEA engaged in a point-by-point discussion of the EEOMC's
April 3, 2000 Memorandum. PX 35 at S 001149-50; Tr. 10/27/04 at
130:22-131:12 (Fenner). At the meeting, someone from the DEA made
a "passing comment" to Ms. Fenner "to look for something in the
revisions concerning the Administrator's authority to promote or
select for the SES." Tr. 10/27/04 at 132:8-134:4, 134:24-135:9
(Fenner). The reference to a revision appears in Ms. Fenner's
notes between references to rating and identifying benchmarks and
the developmental category. PX 35 at S 001150.  Ms. Fenner
testified credibly and with certainty that she was not warned of
a major change, and was not told what the change would be; she
was merely told—without further discussion-that there would be a
revision. Tr. 10/27/04 at 133:22-23, 134:6-13, 134:24-135:20
(Fenner); Tr. 10/28/04 at 45:22-46:9 (Fenner).

**2.   The Addition Of Footnote One**

22. As of August 2000, it appears that both the EEOMC and
the DEA understood and intended the Procedures *not* to permit the
Administrator to select a Special Agent for promotion to the SES
who had not applied using the Procedures.  However, the Court
finds that this understanding and intent changed with the
addition of the footnote.

23. On November 2, 2000, the DEA conducted an internal meeting to brief the new Administrator, Mr. Marshall, on the EEOMC's April 3, 2000 comments regarding the SES Promotion Procedures. Tr. 11/30/04 at 93:20-22, 94:19-23 (Kraft); PX 38; DX 25. The Administrator, Chief Counsel Ryan, Associate Chief Counsel Walden, Mr. Kraft, and other members of the Administrator's staff attended the meeting. DX 25; Tr. 12/13/04 at 224:13-225:8 (Ryan). No EEOMC members were present. Tr. 12/13/04 at 224:22-225:8 (Ryan).

24. As the DEA's August 9, 2000 Memorandum, PX 34, forecasted, the eligibility of GS-14s to apply for promotion to the SES was discussed at this meeting. *Id.* at SES0534; PX 38 ¶ 4; DX 26. This issue had been in play throughout the development of the SES Promotion Procedures, Pl. PPFF ¶¶ 13-14, and by November 2000, the Procedures already incorporated Administrator Constantine's directive that the Procedures allow GS-14s to apply for promotion, PX 27 at S 003055-56, 107.  The summaries of the November 2, 2000 meeting reflect Administrator Marshall's decision to leave the SES Promotion Procedures unchanged on this point, PX 38 ¶ 4; DX 26; *see also* Tr. 11/30/04 at 95:9-14 (Kraft), despite the EEOMC's concerns regarding this issue, *see* PX 31 ¶ 19; PX 46 at S 001843; *see also* PX 57 at SES1705 (in 2001 the SAC Advisory Committee also opposed making GS-14s eligible for promotion to the SES).

32

25. Although the DEA concedes that a "person or persons working for or on behalf of the DEA was the original author of the footnote," PX 167 ¶ 3 (Stipulations), and that "[t]he footnote does not contain any words added or modified by any person . . . who either was a member of the plaintiff class or was working for [or] on behalf of the plaintiff class," PX 120 ¶¶ 11, 12 (Defs.' Resp. to Pls.' Req. for Admis.), none of the DEA witnesses involved in the development of the Procedures recalls who wrote the footnote and no one will admit to writing the footnote.[7]

26. Mr. Kraft, the author of the Procedures, first saw the footnote in December 2000, Tr. 11/30/04 at 20:8-10 (Kraft), when someone handed him a piece of paper containing the footnote language and told him to add it as a footnote.[8]   *Id.* at 63:7-64:23 (Kraft). He had not expected to receive it, had not discussed the language in any meeting, had no knowledge of

_____

[7] Tr. 10/27/04 at 165:1-4 (Hutchinson); Tr. 12/13/04 at 152:18-22 (Marshall), 239:11-14 (Ryan); Tr. 11/30/04 at 63:6-64:23 (Kraft); Pls.' Cross-Designations of Dep. Test. & Objections to Defs.' Designated Dep. Test., Ex. A at 78:5-79:3 (Fulmore Dep.) (Docket No. 242); PX 164 at 195:16-196:5 (Kraft Dep.); PX 165 at 88:15-19 (Walden Dep.); *see* Tr. 11/05/04 at 101:9-12, 102:20-21 (Mathis); *cf.* Tr. 11/05/04 at 147:1-8 (AUSA Weinstein stating that no one admitted to writing the footnote).

[8] During Mr. Kraft's deposition, he believed former Associate Chief Counsel Walden gave him the footnote language, PX 164 at 195:16-196:5 (Kraft Dep.), but Mr. Walden adamantly denies having written the footnote, PX 165 at 33:21-34:9 (Walden Dep.).

its origin, and received no explanation of its meaning. *Id.* at 63:21-65:13 (Kraft). He inserted the footnote without question and, even though he had spent four years drafting the Procedures, he never discussed the footnote with anyone—the EEOMC or the Administrator—before it became part of the March 2002 Order. *Id.* at 65:23-68:6 (Kraft).

27. Former Chief Counsel Ryan testified that she first saw the footnote when it appeared in the December 13, 2000 draft of the Procedures, and she made no changes to it. Tr. 12/13/04 at 239:11-20, 240:11-14 (Ryan). She does not recall discussing the footnote with anyone at the DEA before March 2002—not even the Administrator who allegedly had requested the footnote, *id.* at 240:15-241:17 (Ryan)—nor is she aware of anyone discussing the footnote with the Administrator. *Id.* at 241:13-17 (Ryan).

28.  In a December 14, 2000 Memorandum from Ms. Fulmore to Chief Counsel Ryan and Assistant Administrator of Human Resources Mathis, Ms. Fulmore forwarded a revised version of the SES Promotion Procedures that, for the first time, included the footnote. PX 39; *see also* PX 40. Her memorandum calls Ms. Ryan's attention to "changes . . . listed in the attached Summary of the Meeting with the Administrator on November 2, 2000," PX 39 at SES4233 (referencing the summary at SES4235-36); *see also* PX 40 at SES0737, which lists nine issues and the Administrator's resolution of each issue and does not mention the footnote,

34

PX 39 at SES4235-36. Without any elaboration or emphasis, Ms. Fulmore's memorandum also notes that "[o]ne addition not listed in the attached summary. . . . [is] the footnote at the beginning of each document." PX 39 at SES4233; PX 40 at SES0737.

29. In early January, Ms. Fulmore also created a table listing all of the changes to the Procedures; this summary of changes also does not include the footnote or any mention of an exception to the process. PX 45A&B at SES0855; PX 163 at 104:1-105:4, 105:12-17, 107:5-7, 107:22-108:11 (Fulmore Dep.); *see* PX 43 (request by Mathis for table).  Instead, the list of issues closely tracks the Summary of the Meeting with the Administrator on November 2, 2000. *Compare* PX 45A&B at SES0855, *with* PX 39 at SES4235-36.

30. On January 12, 2001, Chief Counsel Ryan sent the SES Promotion Procedures to EEOMC Chairperson Fenner, along with a cover memorandum explaining that Administrator Marshall had been informed of the EEOMC's concerns with "the proposed examination," that he had "approved" some changes suggested by the EEOMC, and that the enclosed "copy of the SES Examination . . . contains the changes that Mr. Marshall has approved and a summary of the changes." PX 46 at S 001842. Ms. Ryan draws the EEOMC's attention to an included "summary of changes," *see* Pl. PPFF ¶ 43, but the summary of changes does not mention the footnote, nor does the memorandum ever mention the footnote. PX 46 at S 001842-43.

35

31. Although the DEA was required to obtain the Working
Group's approval of the Procedures as validated and non-
discriminatory and in compliance with the 1982 Relief Order,
no one from the DEA ever suggested to the Working Group that the
Procedures had been changed from the proposal approved by the
Working Group in April 1998, *see* PX 149, to permit the
Administrator to promote someone who had not applied. Tr.
10/26/04 at 56:21-57:14 (Goldstein).

32. On January 31, 2001, Ms. Fulmore transmitted a packet of
materials, including the December 13, 2000 Procedures, which
included the newly added footnote, to the Working Group. PX 47.
Like the cover memorandum Ms. Ryan sent to the EEOMC, Ms.
Fulmore's cover letter mentioned the attached summary of changes
chart and suggested that all changes pertained to the EEOMC's
concerns; it did not mention the addition of the footnote. *Id.* at
S 003947.

33. A few days later, on February 6, 2001, Ms. Fulmore sent
another letter to the Working Group that also addressed the
December 13, 2000 Procedures. This letter, approved by
Associate Chief Counsel Walden, repeatedly described the recent
changes to the Procedures as "minor." PX 48 ¶ 3; PX 165 at 99:2-
13 (Walden Dep.) (discussing Mr. Walden's 2/5/01 approval of Dep.
Ex. 19/PX 48 at SES1062); Tr. 10/26/04 at 56:1-57:14 (Goldstein).

34. The EEOMC understood the Procedures to set forth a
formal, standardized application, rating and ranking, and

promotion process, which was designed to be the exclusive means by which Special Agents could be promoted to the SES. *See, e.g.*, Tr. 10/26/04 at 85:5-21 (Gamble); Tr. 10/28/04 at 119:23-121:14 (Reed); Tr. 1/13/05 pt. 2 at 17:21-18:24, 30:16-22 (Walker); PX 46. Mr. Gamble, Ms. Fenner, Mr. Walker and Mr. Reed, who were all members of the EEOMC during the development of the Procedures,[9] all consistently testified that a Special Agent could be promoted to the SES only by negotiating the process outlined in the Procedures. Tr. 1/13/05 pt. 1 at 67:21-24, 70:8-15 (Gamble); Tr. 10/27/04 at 109:23-111:3 (Fenner); Tr. 10/28/04 at 73:17-74:20, 75:8-17, 91:25-92:4 (Walker), 119:23-121:14 (Reed); *see also* Tr. 10/28/04 at 152:22-153:7 (Reed). As expressed by Ms. Fenner, the EEOMC's understanding was that "this process will be the only process used to make promotions to the SES. . . . [T]here would be no other process."  Tr. 10/27/04 at 110:18-111:3 (Fenner).

35. The DEA's addition of the footnote did not change the EEOMC's understanding of how the Procedures were to operate. Tr.

---

[9] Tr. 10/26/04 at 75:23-76:20 (Mr. Gamble stating he was a member from 1996 to January 2000, and then from June 2002 to the present); Tr. 10/27/04 at 107:5-13 (Ms. Fenner stating she was a member from May 1993 to January 2004 and chair from October 1998 to January 2004); Tr. 10/28/04 at 62:9-21 (Mr. Walker stating he was a member from 1997 to 2004; from September 11, 2001 through November 2002, he was a member but could attend few meetings), 118:17-119:4 (Mr. Reed stating he was a member of the EEOMC from January 1994 to the present, except for the period from June 2002 to April or May 2003).

10/28/04 at 72:8-14 (Walker), 148:18-22 (Reed); Tr. 1/13/05 pt. 1 at 69:15-70:2 (Gamble); *see also* Tr. 10/28/04 at 146:1-5 (Reed). As Mr. Walker testified, "the footnote didn't mean anything. . . . [I]t didn't change the spirit, the content, the intent of what we were trying to accomplish here." Tr. 10/28/04 at 72:25-73:5 (Walker).

36. The EEOMC understood the first sentence of the footnote to reiterate the fact that the Procedures established a systemized process for promoting Special Agents to the SES. *See, e.g.*, Tr. 10/27/04 at 113:6-14 (Fenner); Tr. 10/28/04 at 121:24-122:4, 136:10-19 (Reed); Tr. 1/13/05 pt. 1 at 72:1-3 (Gamble); Tr. 1/13/05 pt. 2 at 20:8-21:2 (Walker); *see also* Tr. 10/27/04 at 21:16-22:7 (O'Flanagan).

37. The EEOMC understood the second sentence, in turn, to reiterate the discretion that the Administrator retained *within* the process for filling DEA positions. The Administrator had the discretion to fill positions by promoting Special Agents using the Procedures, which granted the Administrator flexibility to promote anyone on the list of best qualified candidates, to widen the pool of candidates by holding another open season and receiving more applications, to allow grades lower than GS-15 to apply for promotion to the SES (thereby allowing a GS-14 to apply), to have a special call-out for "hard to fill" positions and specifically designate the qualifications applicants should have, or to select a Special Agent who had previously applied

for, but refused, an SES position. *See, e.g.*, Tr. 10/26/04 at
84:18-85:3, 90:12-91:19, 93:14-18 (Gamble); Tr. 10/27/04 at
21:16-22:7 (O'Flanagan), 111:5-18 (Fenner); Tr. 10/28/04 at
55:18-56:7 (Fenner), 69:13-70:2 (Walker), 151:7-152:5 (Mr. Reed);
Tr. 1/13/05 pt. 1 at 70:16-72:16, 81:22-85:2 (Gamble); Tr.
1/13/05 pt. 2 at 20:8-22:20 (Walker); *see also* Tr. 10/26/04 at
102:7-103:10 (Mr. Gamble discussing PX 84, July 12, 2002 Draft
Application Handbook); PX 64, Reviewer Instructions at 1-3
(discussing "agency's discretion" for "fill[ing]" positions),
Applicant Instructions at 1 (same); PX 68 at SES3589. Rather than
promoting from the pool of eligible applicants, according to the
EEOMC's understanding, the Administrator also retained the
discretion to fill any SES position by laterally transferring
(reassigning) a pre-existing SES member.[10]   *See* Tr. 10/26/04 at
84:18-85:3 (Gamble); Tr. 10/27/04 at 111:5-18 (Fenner); Tr.

---

[10] DEA witnesses agree that this range of options is
available to the Administrator. *See, e.g.*, Tr. 11/05/04 at
131:17-20 (Ms. Mathis acknowledging that the Procedures permitted
the Administrator to open up the process and permit a GS-14 to
apply); Tr. 11/30/04 at 104:2-7 (Mr. Kraft stating that the
Procedures allowed the Administrator to declare a special open
season at any time and make an announcement for any particular
skills she was looking for); Tr. 12/13/04 at 173:18-174:16
(former Administrator Marshall, admitting that, under the
Procedures, the Administrator could have opened up the
application process to anyone to apply), 173:18-174:16
(former Administrator Marshall testifying that reassigning
laterals to SES positions was always something that was within
his discretion), 245:1-246:2 (former Chief Counsel Ryan stating
that the Administrator could declare a special open season for a
shortened period for a specific job described in the
announcement).

10/28/04 at 69:13-70:2 (Walker), 151:16-152:5 (Reed); Tr. 1/13/05 pt. 2 at 21:3-22:20, 24:14-25:1 (Walker). Moreover, the Administrator could choose not to fill the position.[11]  PX 64, Reviewer Instructions at 3. In *all* instances, the discretion to fill DEA positions that the EEOMC understood the footnote to preserve was discretion *within* the process set forth in the Procedures.

38. Contemporaneously with the development of the SES Promotion Procedures, the EEOMC and the DEA were also engaged in discussions regarding the promotion process to the GS-14 and GS-15 levels ("14/15 Promotion Process"), Tr. 10/27/04 at 116:4-117:11 (Fenner); Tr. 10/28/04 at 65:12-66:7 (Walker); PX 25; PX 26, which is a competitive and mandatory promotion process, Tr. 10/26/04 at 70:24-72:3, 72:17-20 (Goldstein); *see also* PX 61 n.1, that, like the Stipulated Procedures, resulted from this Court's Orders, *see* 1981 Opinion, 508 F. Supp. 690. The EEOMC understood the Procedures to accomplish the same goal as the 14/15 Promotion

---

[11] At the time the footnote was added, the Administrator had yet another option for filling SES positions that did not involve promotions: the Procedures permitted the Administrator to use a SES position as a "developmental assignment" and fill it with a GS-15 or a GS-14 on a temporary basis without actually promoting that GS-15 or GS-14 to the SES. Such developmental assignments had to be done competitively and be of limited duration. PX 46 at S 001960; *see also* Tr. 10/26/04 at 45:12-15 (Goldstein); Pl. PPFF ¶¶ 11, 17. Concerned that such assignments could be used as a *de facto* method of promotion, the EEOMC requested that all developmental assignments be strictly and specifically limited in duration. *See* PX 54 at S 000708. The DEA later chose to remove developmental assignments as an option for filling SES positions under the Procedures. PX 57 at SES1707.

Process to provide a single standardized, transparent process for promotion.[12] *See* Tr. 10/28/04 at 65:1-66:11, 70:3-71:1 (Walker); Tr. 1/13/05 pt. 2 at 18:10-19:15 (Walker).

39. The EEOMC's understanding of the Procedures and the footnote was informed by the DEA's longstanding insistence, in the context of the 14/15 Promotion Process, that the DEA had the ability to fill GS-14 and GS-15 positions by reassigning laterals rather than through promoting. Tr. 10/26/04 at 54:4-55:3 (Goldstein); Tr. 10/27/04 at 22:18-23:23 (O'Flanagan); Tr. 10/27/04 at 206:19-207:12, 207:22-208:6 (Fenner); Tr. 10/28/04 at 137:23-139:2 (Reed). With respect to the 14/15 Promotion Process, the EEOMC was concerned that plaintiff class members were missing out on key assignments because the DEA would fill such positions with laterals rather than filling them by promotions. Tr. 10/27/04 at 116:4-22, 206:19-207:12 (Fenner). The DEA insisted "that [the EEOMC] had no say-so on how [the DEA] fill[s] positions laterally." *Id.* at 116:4-117:5 (Fenner). Similarly, the EEOMC raised this issue of lateral transfers and initial assignments of plaintiff class members numerous times during

---

[12] The DEA also recognized the relationship between the 14/15 Promotion Process and the Procedures. *See* PX 61 at SES1712 n.1, SES1714 (summarizing the 14/15 Promotion Process and comparing and contrasting it with the SES Promotion Procedures); *see also* PX 5 at SES4368-69 ("We believe that we can proceed with the validation of a SES promotion process in the most efficient and rapid manner after we have learned from any mistakes in the [GS]-14/15 process.").

discussions of the SES Promotion Procedures. *See, e.g.*, Tr. 10/26/04 at 103:15-105:12, 112:24-113:1 (Gamble); Tr. 10/27/04 at 113:20-114:1, 116:4-117:11, 128:20-129:12, 130:22-132:7 (Fenner); PX 31 ¶ 5; PX 54 at S 000710. Given that context, the EEOMC apparently assumed that, just like the 14/15 Promotion Process, *see, e.g.*, Tr. 10/26/04 at 54:4-55:3, 70:14-23 (Goldstein); Tr. 10/27/04 at 22:18-23:23 (O'Flanagan), 116:4-117:5 (Fenner), the SES Promotion Procedures were the exclusive means to promote, but also permitted the Administrator to retain the discretion to laterally reassign Special Agents within the SES ranks to particular SES positions, Tr. 10/27/04 at 208:2-6 (Fenner); Tr. 10/28/04 at 136:12-139:2 (Reed); Tr. 1/13/05 pt. 1 at 69:15-72:12 (Gamble); Tr. 1/13/05 pt. 2 at 18:10-22:20 (Walker).

40. The DEA developed the SES Promotion Procedures to comply with this Court's Orders requiring the DEA to implement validated, non-discriminatory promotion procedures to remedy prior discrimination and prevent future discrimination. Tr. 10/27/04 at 109:14-22 (Fenner); Tr. 10/28/04 at 64:21-25 (Walker). Consequently, both the EEOMC and the DEA understood that the purpose of the Procedures was to establish a non-discriminatory and validated promotion process for the SES. *See* Tr. 10/27/04 at 22:9-17, 39:5-22 (O'Flanagan), 109:14-22 (Fenner); Tr. 11/30/04 at 77:8-11, 101:16-19 (Kraft); PX 165 at 19:7-20:1 (Walden Dep.); PX 166 at 40:12-17 (Weinstein Dep.).

42

41. For precisely this reason, the new Procedures were designed to "eliminate the mystery" of the prior discriminatory practices and provide a "systematic transparent open process to get promoted to the SES level." Tr. 10/28/04 at 64:21-65:8 (Walker). As Ms. O'Flanagan, plaintiffs' former counsel, testified, it would be contrary to the very purpose of the Procedures to permit the DEA to promote outside of the formalized process they set forth:

> I think that the nondiscriminatory promotion process has been an incredibly long process. And that the systems have been—or from an EEOMC's perspective, they've been fighting this battle for their entire careers here. And they wanted to get an SES process . . . to be a nondiscriminatory process. And it was extremely important to them to get that. To have . . . access through an objective system, a nondiscriminatory system, to get to the upper echelon of the DEA. . . . And to think that we would agree to a process which is—I don't want to, you know, use the word "optional", but that the administrator could choose to follow or not follow is completely—it's ludicrous.

Tr. 10/27/04 at 55:11-25 (O'Flanagan); *see also id.* at 31:4-11 (O'Flanagan); Tr. 1/13/05 pt. 2 at 18:10-19:15, 44:2-13 (Walker).

42. Moreover, because the EEOMC knew that the comprehensive Procedures were being developed pursuant to a judicial directive, the addition of the footnote did not change its understanding of the Procedures as establishing an exclusive and validated promotion process:

> [O]ne of the reasons [the footnote] wouldn't have concerned me is because the process—the Court had said back in 1981 that DEA was to put in place a validated employment system. And what I thought was being put in

43

place was a validated employment system dealing with
employment practices within the DEA.

Tr. 10/27/04 at 90:1-21 (Gamble).

43. Consistent with the Court's Orders, the Procedures
developed by the DEA outlined a detailed process designed to
minimize disparate impact and to maintain a representative SES
workforce. Tr. 11/30/04 at 71:14-16, 72:3-12, 74:10-76:21
(Kraft). The Procedures require those seeking promotion to the
SES to submit an application in which they describe their
qualifications in four areas—leading programs; leading people;
leading and building law enforcement coalitions; and insuring
best government business practices, PX 64, Applicant Instructions
at 1—all of which relate to the attributes actually required for
the position. Tr. 11/30/04 at 71:17-72:2 (Kraft). The Procedures
also require each applicant's supervisor to submit an evaluation
of the applicant, in which the supervisor may comment on the
applicant's description of himself or herself. PX 64, Reviewer
Instructions at 1-2. A rating and ranking panel then reviews and
scores each applicant's package. PX 64, Applicant Instructions at
2. Each applicant is rated by a pair of raters, with a third
rater coming in to resolve any large scoring discrepancies. Tr.
11/30/04 at 75:13-76:12 (Kraft). Additionally, raters fill out a

"familiarity index" to prevent a rater's personal familiarity with a candidate from resulting in unfairness.[13]  *Id.* at 76:13-18 (Kraft). After this carefully constructed and standardized rating procedure is completed, a best qualified list of applicants is forwarded to the Administrator for his selection or non-selection. PX 64, Reviewer Instructions at 3, Applicant Instructions at i, 2.

44. Dr. Goldstein testified that the SES Promotion Procedures could not be validated, as required by the Court's Orders, if a Special Agent who had not applied and gone through the process outlined in the Procedures could be promoted. Tr. 10/26/04 at 51:11-52:8, 61:7-21 (Goldstein). Standardization and uniformity of the process ensures reliability and validity and minimizes disparate impact. *Id.* at 51:10-52:8 (Goldstein); Tr. 11/30/04 at 74:10-77:2 (Kraft); PX 164 at 43:16-23, 105:2-106:1 (Kraft Dep.).  When these standards are not followed, there is potential for adverse impact. *See* Tr. 11/30/04 at 72:3-12 (Kraft); *see also id.* at 72:13-22 (Kraft); PX 164 at 101:10-102:3 (Kraft Dep.).

---

[13] The familiarity index is a critical component to the promotion systems of the DEA and is used not only in the SES Promotion Procedures, but also in the 14/15 Promotion Process: "[T]here would be no trust in the process without the ability to deal with these familiarity issues." Tr. 10/28/04 at 99:24-100:20 (Walker); *see also* Tr. 10/26/04 at 100:2-12 (Gamble); Tr. 11/30/04 at 36:4-37:7, 45:9-17, 76:13-18 (Kraft); PX 77 ¶¶ 5, 10, at SES7596.

45. What is clear from plaintiffs' testimony is that the
plaintiffs believed the Stipulated Procedures to be the exclusive
means of promotion to the SES, based on a number of assumptions,
including that the DEA was acting in good faith throughout the
development and implementation of the procedures.   That
plaintiff class members believed that the application process
outlined in the Stipulated Procedures was the only way to get
promoted to the SES was made repeatedly, and often poignantly,
clear throughout the trial.   For example, when asked by the Court
for his reaction to the news that Mary Cooper had been promoted,
Special Agent R.C. Gamble testified

> I was -- I really felt as if something had been taken
> away. And the reason I say that, Judge, is that my
> credibility, my integrity, there was a lot at stake
> that went into putting this process in place. There
> were grade 15 agents that were reporting to me as agent
> in charge. And I had sold them on this process, that
> this is a validated process, it's going to work, it's
> going to level the playing field.  Not only by blacks,
> but everyone will know when the season is open how to
> compete for the job. It's not going to say you will get
> the job, but at least you would be sitting. And you
> would know where you are. And if you didn't do well,
> you know that you got to do well because it's going to
> come from that top tier, you know, that's where we're
> going to be selecting from. And so I felt that there
> was a -- all the work, all the effort to try and hammer
> out a meaningful process was compromised. It no longer
> -- the integrity that was in place, it was no longer
> there anymore. Because no one could trust that DEA
> would have a system that would afford fairness to
> everyone to at least get to that same level. And so,
> you know, I did, I felt hurt. And Dempsy Jones, who was
> also a plaintiff class that participated in it with me,
> we talked a little bit about, you know, the
> ramifications as to what does this really mean.

Tr. 10/26/04 at 114:14-115:11.  Similarly, Special Agent William

J. Walker, when asked how he had learned of Agent Cooper's

promotion, testified

> ...I was temporarily assigned to a course. I came back
> and the agents were sitting around in my office. And I
> thought somebody had gotten hurt because they were just
> sitting there with this devastating look on their
> faces. And I said, what happened? And they told me Mary
> Cooper got promoted. And I said, okay, what's the
> problem?
>
> Q. Did you know her at the time?
>
> A. Oh, yes, I knew Agent Cooper from New York. I knew
> who she was. And I didn't really appreciate why
> everybody was surprised by it. And then they said,
> well, you know she doesn't have a score. And I said,
> no, she has to have a score. And I related that I was
> on the committee and the way this worked.  This group
> of agents, there were no plaintiff class members in the
> room. And we went back and forth. And I assured them
> that she had to have a score. That's the only way to
> get promoted.  And they assured me that she didn't have
> a score. So I made some phone calls and I found out
> that she didn't have a score.  So that's how I found
> out. I found out through word of mouth that she got
> promoted.
>
> Q. And having yourself gone through the process of
> submitting your application and obtaining a score, what
> did you think when you learned that someone who had not
> applied had been promoted?
>
> A. Well, I still thought that their information was
> wrong. I didn't -- it took me, it took me a while to
> realize that this had, in fact, happened. I was
> confident that the agents did not realize that she
> would have had to have had this constructive time. I
> think everybody knew that she was only an ASAC for
> seven months. But, in my mind, she would have met the
> criteria by having a Form 50 or a Form 52 for prior GS
> time acting. I was confident, Your Honor, that she had
> met the criteria and that they were mistaken. And then
> when I realized that they weren't, I felt confident
> that there would be -- it would be fixed somehow.

47

Q. You talked about whether she had the time and grade. Was it the case -- even if it was the case that she had the time and grade, if she didn't have a score, could she still be promoted?

A. No. So I made some assumptions that, A, she had the time, B, she had a score. So when I realized that she didn't have the time then I knew she couldn't have a score because it's sequential. You must have the time, then you get the score. My thought then was that we're going back to where we came. I mean, how could this happen, was my response. I just didn't believe it.

Tr. 10/28/04 at 101:13-103:13.

This Court finds that the EEOMC's understanding of the Procedures as the exclusive process for promotion into the SES was a reasonable interpretation, particularly in light of the history of this litigation and the extent to which both sides appeared to be working toward a "level playing field." Ultimately, however, plaintiffs' interpretation was not confirmed by the DEA.

### 3.  DEA Put Plaintiffs on Notice of a Revision to the Procedures Concerning the Administrator's Authority

46.  On August 11, 2000, at an EEOMC Quarterly Meeting,[14] an Agency representative notified EEOMC Chair Rosalynde Fenner that the next draft of the SES procedures would contain a revision concerning the Administrator's right to promote persons into the

---

[14] The eight members of the EEOMC and John Kraft were present for the Quarterly Meeting on August 11, 2000. Tr. 10/27/04 at 227:22-228:14.  At the time of the Quarterly Meeting on August 11, 2000, the following Special Agents were members of the EEOMC: Roy Adams, Ruth E. Beaver, Charlie Brown, Jr., Rosaynde M. Fenner, June W. Jones, Arthur W. Reed (see also Tr. 10/28/04 at 132:23-24), Robert J. Smith, and William J. Walker.  Pl. Ex. 36 at S003525.

SES.[15]  Tr. 10/27/04 at 132:8-133:3; Tr. 10/27/04 at 133:4-13
(by Fenner: ". . . I was told to look for something in the
revision . . . that there's going to be something in the revision
about the administrator's authority to promote, select a SES. .
.); Tr. 10/27/04 at 133:22-25; Tr. 10/27/04 at 135:3-17 (the
agency made the statement concerning the revision, possibly the
agency attorney); Tr. 10/27/04 at 230:7-14; Tr. 10/27/04 at
230:15-18 (DEA made statement *after* the EEOMC had opportunity to
voice their concerns); Tr. 10/27/04 at 232:7-9 (agency was going
to make the revision); Tr. 10/27/04 at 227; Tr. 10/27/04 at
232:17-233:2 (Fenner admitted that the revision was going to be
"in addition to what we had discussed"); Tr. 10/27/04 at 239:13-
16 ("I was told to look for something in the revisions concerning
the administrator's authority to make promotions and select at
the SES").  Ms. Fenner testified:

> During our meeting about our concerns, the
> meeting was coming to a close.  And I was
> told to look for –because we were talking
> about all of our concerns, that there was
> going to be some revisions to the development
> of the document.  And I was told to look for
> something in the revisions concerning the
> administrator's authority to promote or
> select for the SES. And I just made a note of
> it.

---

[15] Special Agent Fenner served as a member of the EEOMC from
May of 1993 until January of 2004.  Tr. 10/27/04, 106:20-107:8.
Ms. Fenner headed the Committee as the Chairperson of the EEOMC
for six years from October of 1998 through January 2004. Tr. 10-
27-04 at 107:11-13.

Tr. 10/27/04 at 132:8-133:3.

47.  Special Agent Fenner documented that the Agency would make a "Revision- The Admin[istrator]'s authority [/] right to promote/select SES," in her notes of the meeting.  Def. Ex. 23 at S001150; Pl. Ex. 35 at S001150; Tr. 10/27/04 at 230:1-6 (Fenner took notes contemporaneously with the meeting).

48.  According to Ms. Fenner, the revision had nothing to do with lateral reassignments of current SES members at the time that DEA made the remark.  Tr. 10/27/04 at 233:3-15.  Ms. Fenner stated:

> That's what I wrote.  That's what was said.
> It had nothing to do with anything dealing
> with laterals.  It was for me to remind
> myself to look for something with regard to
> the administrator's authority.  I wrote
> promote slash select and SES because this is
> what we were there talking about.

Tr. 10/27/04 at 233:16-25.

49.  On January 12, 2001, the Office of Chief Counsel delivered the proposed plan to EEOMC Chair Fenner.  Pl. Ex. 46; Tr. 10/27/04 at 235:23-236:08; Tr. 12/13/04 at 102:17-102:7.  A cover letter authored by the Chief Counsel, Cynthia Ryan, indicated that all revisions to the plan were highlighted in bold and italics. Pl. Ex. 46; Tr. 12/13/04 at 102:11-18.  The footnote was in bold and italics. Pl. Ex. 46; Tr. 12/13/04 at 105:3-4. Ms. Fenner acknowledges that in the memorandum from Ms. Ryan, DEA flagged each change by putting them in bold and italics. Tr. 10/27/04 at 238:14-239:7.  At the same time, the Agency provided

plaintiffs with a table of changes that were made as a result of the negotiations in August 2000, in response to the concerns of the EEOMC.  Pl. Ex. 46.

50.  EEOMC Chair Fenner noticed the footnote in the draft that the Agency provided on January 12, 2001.  Tr. 10/27/04 at 111:19-112:04, 112:15, 23-25, 113:1-2.  Ms. Fenner knew at the time that she read the footnote that it related to the revision that Agency representatives told her to "look for" on August 11, 2000, and she identified the footnote as the "Revision" that related to the authority of the Administrator.  Tr. 10/28/04 at 14:9-15:9.  Ms. Fenner "understood in the footnote that the authority referenced in the second sentence of the footnote related to the Administrator's discretion" and "that was a discretion involving nobody overriding his decision-making concerning the SES."  Tr. 10/28/04 at 18:24-19:5.  Ms. Fenner, however, still had questions about the meaning of the second sentence.  Tr. 10/27/04 at 113:03-118:5 ("The second sentence I had some questions about.").       51.  EEOMC Representative Reed also saw the January 12, 2001 Memorandum with the draft containing the highlighted footnote.  Tr. 10/28/04 at 135:4-13.  In January of 2001, Mr. Reed had no doubts in his mind concerning the meaning of the footnote, which he interpreted as a reference to the Administrator's authority to laterally transfer a person within the SES.  Tr. 10/28/04 at 145:21-25, 136:20-137:2 (second sentence of the footnote means that DEA "reserves the right to

utilize the mobility agreement"). The EEOMC, however, did hold discussions about the meaning of the footnote. Tr. 10/28/04 at 146:1-5. Defendants were not present for these discussions. Id. at 146:6-9. The representatives of the EEOMC had varying interpretations of the footnote in these discussions. Id. at 146:3-4. After discussing the footnote, the EEOMC reached a consensus opinion as to what the footnote meant. Tr. 10/28/04 at 146:1-5 ("We all discussed [the footnote] in the EEOMC. We had varying interpretations. However, the predominant theory and view was that the process isn't changed.")

52. As a result of having questions about the second sentence of the footnote, Ms. Fenner sought the advice of her attorney. Tr. 10/27/04 at 113:03-118:5. At the time of the negotiations, plaintiffs were represented by Ms. Jennie O'Flanagan, Esq., an associate at the law firm of Wilmer Cutler Pickering, L.L.P. Id. at 4:25-5:13.[16]

53. EEOMC Chair Fenner had at least two conversations about the footnote with plaintiffs' attorney, Ms. O'Flanagan.[17] In the

---

[16] Ms. O'Flanagan represented the plaintiff class from November 1999 to February 2004. Tr. 10/27/04 at 4:25-5:13. In addition to Ms. O'Flanagan, William T. Lake, Esq., and Steven Cherry, partners at Wilmer Cutler Pickering, L.L.P., also represented the class. Pl. Ex. 27 (Michael Fisher, Esq. also represented plaintiffs); Pl. Ex. 36 at S003525. Ms. O'Flanagan recalls having frequent discussions with her client, Ms. Fenner. Tr. 11/5/04 at 8:2-19.

[17] Plaintiffs' attorney, Ms. O'Flanagan, does not recall "discussions specifically about the footnote." Tr. 10/27/04 at 26:6-11, 50:09-53:4. Ms. O'Flanagan has no specific recollection of discussing the footnote with Ms. Fenner. Tr. 11/5/04 at 10:12-17.; Tr. 11/5/04 at 11:5-24, 16:12-15. Ms. O'Flanagan has no

first conversation, Ms. Fenner asked Ms. O'Flanagan to find out

and explain the meaning of the second sentence.

> I told [Ms. O'Flanagan] that I didn't quite
> understand exactly what the second sentence
> meant and could she find out for me and
> explain to me what it meant.
>
> Tr. 10/27/04 at 113:3-118:5.
>
> I asked [Ms. O'Flanagan] what the second
> sentence legally meant.  What were you guys
> trying to say with this footnote.  That was
> my question to her.
>
> Tr. 10/28/04 at 21:13-23.

Ms. O'Flanagan had a copy of the footnote when Ms. Fenner

discussed the footnote with her.  Tr. 10/27/04, 237:7-9.  Ms.

Fenner testified:

> Q. As best you recall, could you explain to
> the Court what you said to Ms. O'Flanagan and
> what she said to you in that initial call?
>
> A.  Initially, I – once I saw the footnote, I
> told her that I understood what the first
> sentence meant.  But, however - nothing in
> those procedures meant, you know, to reduce
> the authority of the administrator in
> selecting persons to fill DEA positions.  I
> needed a legal explanation, I thought.
> Because I wasn't quite sure what the agency
> was trying to do.  So she told me that it
> must not be important because it is in a
> footnote and it's not in the text, and that
> she would get an answer for me and get back
> to me.

---

specific recollection of talking to defendants about the
footnote. Id. at 15:5-12 ("But, we definitely talked about the
process").

Tr. 10/27/04 at 113:3-118:5.  Ms. O'Flanagan assured Ms. Fenner
that she would "call the AUSA and/or DEA" to find out the meaning
of the footnote.  Id. at 113:3-118:5.

54.  Notwithstanding these assurances, Ms. O'Flanagan did
not consult with an "AUSA and/or DEA," but formed her
understanding of the footnote *solely* on the Court order,
discussions with the EEOMC, discussions with the Work Group, and
review of the documents setting out the process.  Tr. 10/27/04
at 22:9-17, 17:16-18:2, 34:24-35:6, at 44:8-12; *see also* Tr.
10/27/04 at  19:14-24 (Ms. O'Flanagan's understanding of footnote
was based on "documents themselves and my discussions with the
EEOMC and Irv Goldstein prior to the submission of the
stipulation.").  In fact, however, Dr. Goldstein testified that
he had not even read the footnote prior to the submission of the
stipulation.  Tr. 10/26/04 at 55:5-16; 62:7-10.  Dr. Goldstein
did not testify that he had had any discussions with Ms.
O'Flanagan about the footnote.

55.  Ms. O'Flanagan concluded that the procedures limited
the Administrator to selecting candidates from only a Best
Qualified List, and that the footnote meant that the
Administrator retained the discretion to laterally reassign
existing members of the SES.  Tr. 10/27/04 at 18:6-18,21:18-22:2,
36:7-13, 46:5-47:3.

56.  At the time that Ms. O'Flanagan formed her
understanding, she had not familiarized herself with the only

governing statute on DEA SES appointments, 5 U.S.C. § 3151, or
the method of SES selections at DEA in place during the
negotiations (*i.e.* the prior existing appointment authority of
the DEA Administrator). Tr. 10/27/04 at 38:11-15 (Ms. O'Flanagan
was not aware of existing authority); Id. at 38:21-39:04 ("I had
not read a particular statute"); Id. at 40:2-9 (not aware that in
the prior system, Administrator made off-list selections); Id. at
40:11-20 (became aware that DEA was not under the same
requirements as other government offices only after Special Agent
Cooper was selected in August 2003); Id. at 44:13-17
(understanding of authority is not based on any understanding she
had of the existing DEA SES authority); Id. at 44:18-21 (Q: "But
you were not aware of the statute that provided the Administrator
discretion? [O'Flanagan:] A.  I'm not even exactly sure of what
statute you're talking about now. . .").

57.  Ms. O'Flanagan consulted with Dr. Goldstein only
generally about the draft SES procedures.  Tr. 10/27/04 at 29:7-
11,35:12-20.  DEA provided the December 13, 2000, draft
procedures containing the footnote to the Work Group on January
31, 2001.  Def. Ex. 101; Pl. Ex. 47.  Dr. Goldstein, however, did
not read or even notice the footnote when it was first provided
to the Work Group. Tr. 10/26/04 at 62:7-10, 52:18-54:2. Dr.
Goldstein read the footnote for the first time only six months
before testifying on October 26, 2004. Id. at 52:18-54:2; *see* Pl.
Ex. 47 at S003954, S003977, S004026 (flagging each place that

footnote appeared in bold and italics); Pl. Ex. 48 (DEA letter to
Work Group, dated February 6, 2001, asking for comments on draft
containing footnote).  Dr. Goldstein also did not have any
understanding of the controlling statute concerning the authority
of the DEA Administrator to make SES selections. Tr. 10/26/04 at
67:3-18.  He made an assumption about the DEA SES process
"without knowing what statutory authority the administrator had
at the time." *Id.*; Id. at 62:11-36:1, 69:6-13 (acknowledging that
he was ". . . not familiar with what the DEA administrator's
authority was before this system was developed.").  Dr. Goldstein
had no context with which to interpret the words "reduce the
authority" that appear in the second sentence of the footnote.
Id. at 69:14-18.  Dr. Goldstein also understood that the term
"fill a position" in a personnel sense, such as "to fill DEA
positions," included promotions.  *See* Id. at 66:12-67:1.
Notwithstanding being ill-informed on the DEA SES, Dr. Goldstein
adhered to a belief that the procedures limited the Administrator
to making SES selections only from the candidates whose names
appeared on a Best Qualified List. Id. at 44:21-25.

58.  Plaintiffs' counsel, Ms. O'Flanagan, was not aware that
Dr. Goldstein had not read the footnote.  Tr. 10/27/04 at 35:24-
36:5; Tr. 10/26/04 at 44:21-25.  Ms. O'Flanagan also did not seek
an explanation from plaintiffs' representative on the *Segar* Work
Group of possible differences between the DEA SES and other
government agency's SES procedures.  Tr. 10/27/04 at 45:15-19.

56

59.   According to Ms. Fenner, Ms. O'Flanagan related her conclusions about the footnote to Ms. Fenner in a subsequent conversation.[18]  In that conversation, Ms. Fenner claims Ms. O'Flanagan told Ms. Fenner that the second sentence of the footnote "meant the authority to laterally make assignments and to fill DEA positions."  Tr. 10/27/04 at 113:3-118:5.  In the conversation, Ms. O'Flanagan likened the authority to fill DEA SES positions to the Agency's *competitive* promotion systems for the subordinate grades, GS-14 and GS-15.  *Id.*  Ms. O'Flanagan did not tell Ms. Fenner where she got her information concerning her understanding of the footnote.  Id. at 237:13-238:2.

60.   Nevertheless, EEOMC Chair Fenner assumed that Ms. O'Flanagan obtained her understanding from the Assistant U.S. Attorney or the DEA.  Id.

> Q.   . . . Ms. O'Flanagan told you that she had gotten [her understanding of the footnote] from the AUSA or the DEA?
>
> A.   Based on our conversation, she told me that that is where she was going to look for a response to my question.  She didn't come back and say, I got this from the AUSA, or, I got this from DEA.  She left our conversation saying that that's where she was going to seek the information.  So it's an assumption that that's where she got her information from.

---

[18] Like Ms. O'Flanagan, Dr. Goldstein also conferred directly with the EEOMC concerning the SES procedures.  Dr. Goldstein informed Ms. Fenner and the EEOMC that the Work Group "approved the procedures."  Tr. 10/27/04 at 124:21-126:15.

Id.  Ms. Fenner accepted Ms. O'Flanagan's explanation of the
meaning of the footnote. Id. at 113:3-118:5.  Ms. Fenner did not
question why Ms. O'Flanagan told her that the footnote related to
laterals despite Ms. Fenner's knowledge of the August 11, 2000
meeting with Aency representatives  Tr. 10/28/04 at 22:18-23:04.
Specifically, Ms. Fenner testified:

> Q.   I asked you yesterday if in the August
> 11, 2000 notes that you had created during
> the meeting that you had with the agency if
> that notation you made concerning revision
> dealt with laterals. Do you remember me
> asking you that?
>
> A.   Yes.
>
> Q.   And do you remember telling me that it
> did not?
>
> A.   No, not when I wrote that note down, it
> did not.

Id. at 22:18-23:4.  Ms. Fenner also never raised a question
regarding the footnote with John Kraft, or confirmed her or Ms.
O'Flanagan's understanding with any Agency representatives.  Id.


### 4.   Administrator Hutchinson Believed the Footnote Retained the Administrator's Discretion to Promote to the SES in Certain Circumstances

61.   On June 30, 2001, Administrator Marshall retired.  Asa
Hutchinson was appointed as the DEA Administrator on August 8,
2001.[19]  Tr. 10/27/04 at 139:4-8.  Upon his appointment, Agency

---

[19] Asa Hutchinson served as the DEA Administrator from August
2001, through January 2003, when he accepted the position of
Undersecretary for the Department of Homeland Security.  Tr.
10/27/04 at 139:1-8.

representatives briefed Administrator Hutchinson on the status of
the SES validation process and the draft SES documents.  Def. Ex.
47; Pl. Ex. 52 (October 5, 2001, package from HR to Mr.
Hutchinson contained a May 2001, draft of the SES examination
plan with the footnote on pages SES6561, SES6582, and SES6593).
During the discussions with Agency representatives, Mr.
Hutchinson recognized that the ultimate selection authority under
the new proposed SES procedures would be retained by DEA.  Id. at
142:6-8.

> It was made clear in the course of those
> discussions that there has been a historic,
> and I believe it's a statutory authority of
> the administrator in terms of --. . . And so
> the discussion was that this, even though it
> set up a process for selecting SES special
> agent positions, it still reserves a historic
> discretion of the administrator.

Id.  Mr. Hutchinson's intent with regard to the entry of the
stipulation with regard to the Administrator's authority was
"[t]hat it would not diminish the historic authority, but it
would more carefully define the process for SES applications and
selections and make sure there was a broad field to look to.  And
that I would consider it not a reduction, the ultimate authority,
but some requirements before you would use that ultimate
authority."  Id. at 150:6-14.  Mr. Hutchinson understood that as
Administrator, he could "fill DEA positions" either through a
promotion or a lateral transfer.  Id. at 144:5-16, 167:13-21.

62.  Administrator Hutchinson involved himself personally in
trying to resolve the outstanding issues of the plaintiffs in

*Segar*, Id. at 140:7-11, and met with the EEOMC on a quarterly basis during the EEOMC's meetings, Id. at 140:12-141:1.  EEOMC Chair Fenner described Administrator Hutchinson as pretty accessible as an Administrator to the EEOMC and very approachable concerning any questions or concerns that she had with regard to the SES procedures. Tr. 10/28/04 at 19:20-25; Tr. 10/27/04 at 142:21-23 (meeting between plaintiffs and Mr. Hutchinson included Rosalynde Fenner, Roy Adams, and R.C. Gamble); Tr. 10/28/04 at 62:22-63:11.  Mr. Walker stated that Mr. Hutchinson was the most optimistic of all administrators, "who made it clear to us that he wanted this to end while he was the Administrator." Id. at 67:23-68:02.   Administrator Hutchinson discussed with plaintiffs how the procedures would work, including "how there would be a qualified list and a Best Qualified List."  Tr. 10/27/04 at 143:13-144:3.  He also discussed the authority of the Administrator.  Id. at 197:9-25.

63.  Mr. Hutchinson understood the procedures to be a mechanism to "broaden the pool of people to be considered," which was the beneficial impact of the procedures.  Id. at 144:17-145:19.  Although the Administrator retained the authority to make off-list selections, Mr. Hutchinson did not believe that the system was "business as usual" because:

> I felt like that as administrator you had to
> -- you should stick with that qualified list
> and best qualified list and the burden is on
> you and you better be prepared to explain it
> if you went outside of that list.  It was
> very important.  And I think it was very

60

> meaningful for the agency that anybody could
> apply.  You had this list.  And part of it is
> not just acting in good faith on the
> administrator to make sure you went to those
> lists first and had great hesitation to move
> beyond those lists, but also I think you had
> an obligation to be able to explain it to
> anybody that inquired as to why you went
> outside that list.

Id. at 145:19-146:8; *see also* Id. at 146:9-147:12 (administrator

had to resort to the lists *first* and finding no one best suited,

he or she could depart from the lists and appoint the best suited

person for the position, and should provide a justification); Id.

at 121:2-10 (although stipulation may not have articulated any

requirement for the Administrator to first consider the lists

before making an off-list selection, Administrator Hutchinson

understood that the Administrator in practice would first

consider the lists).

64.   Administrator Hutchinson understood that an off-list

selection should be made in unique circumstances, that were

justifiable and did not require an Administrator to first

advertise the position. Id. at 152:10-18.

> If you could have only one person in the
> entire agency that can fill this role, there
> might be of absolutely no benefit to
> readvertise just so you can get one person to
> submit to the process.

Id. at 154:17-25,157:19-21 ("Sometimes it's hard to articulate

exceptional circumstances.  Sometimes there will be things that

you will come up that you are not even aware of"); Id. at 158:10-

159:4.  According to Administrator Hutchinson, retaining

discretion to make an off-list selection when the circumstances so justify does not infuse arbitrariness into the selection decision, Id. at 166:1-8, and there is a distinction between retaining discretion and having an arbitrary system. Id. at 195:10-21.  According to Mr. Hutchinson, the DEA SES examination plan is a "validation process [that] set up a broad way of presenting names to the [A]dministrator.  And so that eliminates and reduces – eliminates [his or her] judgment arbitrariness.  It still retains some discretion."  Id. at 194:20-195:21.

65. On or about October 25, 2001, the EEOMC submitted written concerns to Administrator Hutchinson regarding the draft SES examination plan that they received ten months prior on January 12, 2001.  Def. Exs. 53-54; Pl. Ex. 54; *see also Tr.* 10/28/04 at 20:4-5 (Fenner).  At the time that EEOMC Chair Fenner submitted the concerns to Administrator Hutchinson, she understood that it was important to list all of the Committee's concerns. Tr. 10/28/04 at 20:6-10.  At the time that Ms. Fenner submitted the comments, she had already read the footnote, as had other members of the EEOMC, to including William Walker and Arthur Reed.  Id. at 21:5-8, 71:3-19 (Walker); Id. at 104:1-7 (Walker)[20]; Id. at 121:21-23 (Reed).  Plaintiff R.C. Gamble, the

---

[20] Despite being absent from Committee meetings from September 2001 to November 2002, EEOMC representative Walker never asked anybody what the footnote meant.  Tr. 10/28/04 at 104:14-16 ("I have my own interpretation of what the footnote meant.  I didn't need to ask somebody what it meant").  Rather, Mr. Walker drew conclusions about the footnote that were independent from anything told to him by DEA.  Tr. 10/28/04 at

"unofficial" member of, and advisor to, the EEOMC, also read draft SES procedures prior to submission to Court for approval.[21] Tr. 1/13/05 at 69:4-14.   The EEOMC went through the draft of the procedures "page by page, paragraph by paragraph, line by line and [the EEOMC] noted the things that [they] had concerns with. And [they] transmitted them back to the agency." Tr. 10/28/04 at 147:2-8.   The DEA incorporated the EEOMC's suggestions and recommendations into subsequent versions of the Stipulated Procedures.   Tr. 10/27/04 at 219:1-19.

66.   Despite having concerns and varying interpretations about the footnote in January of 2001, Ms. Fenner and the EEOMC raised no question about the footnote with Administrator Hutchinson in the Committee's written comments of October 2002. Def. Exs. 53.

67.   On November 28, 2001, Agency representatives articulated Administrator Hutchinson's position to the SAC Advisory Committee when they presented the Committee with the latest draft of the SES examination plan, along with a summary of the proposed process.   Def. Exs. 58; 59 at 77-0081 SES2171.   DEA Agency representatives provided the members of the SAC Advisory

---

105:17-19 ("I'm an educated man.  I think I can read something and come to a conclusion.").

[21] Mr. Gamble claims that he assumed the footnote referenced lateral reassignments, which is a conclusion he drew independent from any interaction with defendants. Tr. 1/13/05 at 70:16-71:25; see also Tr. 1/13/05 at 70:16-71:1 (tying second sentence to "mobility policy").

Committee with a hand-out for the meeting entitled "Summary of Proposed SES Selection Procedures."  Def. Ex. 58, at SES6884[22]; Tr. 12/13/04 at 106:11-16.  Paragraph five of the summary articulated defendants' understanding that the Administrator had retained the authority to consider persons for vacant SES positions who had not applied for promotion.  *Id.*

> 5.    The Administrator may consider people
>       who did not apply for those positions
>       which are hard to fill, such as some
>       overseas positions.

Def. Ex. 57, at SES6884.   The word "fill" is commonly understood to include promotion or transfer.  Tr. 10/27/04 at 144:9-16 (Hutchinson); Id. at 167:13-20 (Hutchinson); Tr. 11/2/04 at 48:3-9 (Leonhart); Id. at 49:17-21 (Leonhart); Id. at 49:22-50-3 (Leonhart); Tr. 11/5/04 at 104:14-16 (Mathis); Tr. 11/30/04 at 55:18-23 (Kraft); Tr. 10/26/04 at 66:12-67:18 (Goldstein); Tr. 10/28/04 at 22:3-7 (O'Flanagan); Id. at 145:13-19 (Reed); Tr. 1/13/05 at 58:7-14 (Sayles).

68.  R.C. Gamble was present at the SAC Advisory Committee meeting.  Def. Ex. 59 at 77-0081 SES2171; Tr. 12/13/04 at 105:21-106-5.  Chief Counsel Cynthia Ryan was also present at the meeting, at which she took contemporaneous notes of a discussion about the Administrator's authority.  Def. Ex. 59 at 77-0081

---

[22] Similar to the Stipulated Procedures at Pl. Ex. 64, the title to the hand-out that Mr. Gamble was given also contained a footnote to the title that stated: "Nothing in these procedures is meant to reduce the authority of the Administrator in selecting persons to fill SES positions."  Def. Ex. 58, at SES6884.

SES2171; Tr. 12/13/04 at 105:21-106-5, 118:16-18.  At the meeting, someone asked how many years a GS-15 should spend at that grade before applying for an SES promotion (*i.e.* minimum time-in-grade requirement).  Def. Ex. 59 at 77-0081 SES2171; Tr. 12/13/04 at 106:17-107-1.  R.C. Gamble responded "2 years."  Def. Ex. 59 at 77-0081 SES2171; Tr. 12/13/04 at 107:12-14.  Ms. Ryan, however, corrected Mr. Gamble that there was no statutory minimum eligibility to be an SES with the exception that the person needed to be a career employee in the federal service. Id. at 107:14-17; Def. Ex. 59 at 77-0081 SES2171 (notes document comment, "No min[imum] requirement except that must be [at] DEA 1 year" which was a legal requirement).  After Ms. Ryan corrected Mr. Gamble about the absence of any time-in-grade requirement, he and the rest of the SAC Advisory Committee were told the "Policy maintains [the] A[dministrator]'s broad authority."  Def. Ex. 59 at 77-0081 SES2171; Tr. 12/13/04 at 118:19-119:15 (no one questioned this statement).

69.  On December 7, 2001, DEA gave Ms. Fenner the final, revised copy of the SES examination plan to provide the EEOMC with another opportunity for review and comment.  Pl. Ex. 55 at S003366 (footnote appears at pages S003369 and S003379).  On December 20, 2001, EEOMC Chair tentatively approved the draft SES Selection Procedures for the EEOMC and plaintiffs.  Def. Ex. 47. Administrator Hutchinson approved the draft procedures on January 3, 2002.  Tr. 12/13/04 at 121:19-21.  On January 18, 2002, Ms.

Fulmore requested that Ms. Ryan forward the SES examination plan to the U.S Attorney's Office for appropriate action.  Def. Ex. 67.

### 5.   AUSA Weinstein Believed the Footnote Retained the Administrator's Statutory Authority

70.  AUSA Laurie Weinstein[23] became the lead attorney for defendants in the matter of *Segar* in or around the fall of 2001. Tr. 11/30/04 at 179:7-15.  AUSA Weinstein became involved with the SES procedures toward the end of 2001 or early 2002.  *Id.* at 180:4-12.  On or around January 23, 2002, DEA counsel notified AUSA Weinstein by letter that an enclosed draft of the SES procedures were ready for her review.  *Id.* at 180:4-17, 182:6-11; Pl. Ex. 61.  Upon reviewing the Agency letter, Ms. Weinstein questioned DEA counsel concerning whether the agreement "would in any way affect the administrator's exercise of executive authority."  Tr. 11/30/04 at 183:23-184:6 (noting that she was familiar with the issue of restricting executive branch authority from two prior cases at the U.S. Attorney's Office, and from her extensive work in institutional reform litigation).

71.  AUSA Weinstein "wanted to make sure that [defendants] were not going to sign something that was going to inappropriately bind a future administration."  Id. at 184:5-6.

---

[23] Ms. Weinstein has been an Assistant United States Attorney in the Office of the United States Attorney for the District of Columbia since March 2000.  Tr. 11/30/04 at 177:08-13.  Prior to serving as an Assistant United States Attorney, Ms. Weinstein spent 12 years in the Civil Rights Division of the U.S. Department of Justice.  Id. at 177:14-19.

Ms. Weinstein had knowledge at the time of the U.S. Department of Justice directives, known collectively as the "Meese Memorandum," which advised that "Department of Justice personnel should not enter into agreements that would affect executive branch authority that was constitutionally or statutorily granted in Federal Court cases." *Id.* at 184:7-20.[24]

72. AUSA Weinstein discussed her concern about binding future Administrators with DEA counsel Charles Walden. Id. at 184:21-24. AUSA Weinstein testified that Mr. Walden directed her attention to the footnote. *Id.* Ms. Weinstein then reviewed the footnote, specifically the sentence which states that "nothing in these procedures are meant to reduce the authority of the Administrator in selecting persons to fill DEA positions." *Id.* at 185:11-16. Upon reading the footnote, AUSA Weinstein was satisfied that the footnote retained the Administrator's authority to make SES selections consistent with the statutory authority of 5 U.S.C. § 3151. *Id.; see also* Id. at 186:19-187:06.

---

[24] The concerns of the Meese Memorandum are presently codified in the Code of Federal Regulations at 28 C.F.R. § 0.160. Pursuant to Section 0.160(a), the settlement authority of the Assistant Attorney General is limited in cases "when the proposed settlement otherwise limits the discretion of a department or agency to make policy or managerial decisions committed to the department or agency by Congress or by the Constitution."  Id. In those circumstances, the proposed settlement must be referred to the Deputy Attorney General or the Associate Attorney General. Id.   The power to appoint and promote DEA employees to the SES is a managerial decision conferred upon the Attorney General by Congress.  5 U.S.C. § 3151.

73.  After speaking with DEA counsel in or around January
23, 2002, AUSA Weinstein understood the footnote to mean:

> [T]hat this was a process that was being adopted to
> provide certain procedures for the SES selection
> process.  But that, in fact, the administrator's
> ultimate executive branch authority to select persons
> for SES was not going to be affected.

Id. at 187:2-6 (noting at Tr. 11/30/04 at 187:11-188:5 and Tr.
11/30/04 at 189:21-190:5, that she also consulted with her
supervisor, the Deputy Chief of the Civil Division, who confirmed
her understanding).

74.  On February 7, 2002, EEOMC Chair Fenner notified
Administrator Hutchinson that the EEOMC and plaintiffs agreed to
the Stipulated SES Procedures.  Def. Ex. 48; Pl. Ex. 62; Tr.
10/28/04 at 128:9-12 (Reed); *See also* Def. Ex. 67 (EEOMC wanted
DEA to implement prior to obtaining a Court order).

75.  AUSA Weinstein signed the stipulation on March of 2002
for defendants. Tr. 11/30/04 at 228:24-1.  Ms. O'Flanagan signed
the procedures on behalf of plaintiffs. Pl. Ex. 64, at 2.

76. Based on the above findings of fact, the Court concludes
that there was no "meeting of the minds" with respect to the
footnote.  Plaintiffs and plaintiffs' counsel were put on notice
that the footnote existed and was intended to address the
Administrator's authority, yet plaintiffs and/or plaintiffs'
counsel did not confirm that they shared the DEA's understanding
of the footnote's meaning.  Meanwhile, on behalf of DEA,
Administrator Hutchinson and AUSA Weinstein intended the footnote

68

to retain discretion to promote from outside the Stipulated Procedures, at least in some limited circumstances.[25]

**E.    Conclusions of Law**

**1.    The March 2002 Stipulation and Order Are Governed by Contract Law**

1.    By asking this Court to find defendants in noncompliance with the "Stipulation Implementing a Promotion Process for Selecting DEA Criminal Investigators for Positions in the Senior Executive Service," plaintiffs are in effect seeking the enforcement of a settlement agreement.  "An action to enforce a settlement agreement is, at bottom, an action seeking the equitable remedy of specific performance of a contract."  *Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483, 493 (D.D.C. 2005).

2.    "The party moving for enforcement of a settlement agreement bears the burden of showing, by clear and convincing evidence, that the parties in fact formed a binding agreement in resolution of all the disputed issues in the underlying litigation."  *Id.* at 4.  The Court's March 12, 2002 Order

---

[25] At trial, both parties offered evidence regarding the DEA's actions after the Stipulated Procedures were enacted and prior to the promotion of Mary Cooper to the SES. Plaintiffs argue that the fact that prior to Ms. Cooper's promotion, DEA only promoted to the SES special agents who had applied through the Stipulated Procedures, supports their argument that the footnote is merely a *post hac* rationalization for Administrator Tandy's determination to promote her friend, Ms. Cooper, to the SES. Since the Court has determined that there was no meeting of the minds, the Stipulated Procedures are not enforceable and therefore, the Court need not address Ms. Cooper's promotion in the context of the Stipulated Procedures.

purports to settle the parties' dispute concerning the implementation of a promotion process for use in selecting DEA Special Agents to the SES.  Pl. Ex. 64.  As such, although it does not settle all of the underlying issues in the *Segar* litigation, the Stipulation, nonetheless, is a settlement agreement as it concerns the DEA's SES.[26]

3.  "A settlement agreement is a contract and, as such, it must fulfill the elements of a contract."[27]  *Kilpatrick v. Paige*, 193 F. Supp. 2d at 152; *Makins v. District of Columbia*, 277 F.3d 544, 547 (D.C. Cir. 2002) (State contract law generally governs the enforcement of settlement agreements); *Samra*, 355 F. Supp. 2d at 491 ("'Whether parties have reached a valid settlement is a question of contract law.'")(citations omitted).  Plaintiffs also acknowledge that the issue before this Court "is resolved by relying on contract principles."  Plaintiffs' Points and Authorities in Support of the Admission of the Qualifications of Applicants Competing Against Mary Cooper at 1 (citing *United*

_____

[26] The Stipulation also purported to discharge defendants' obligation to "implement effective, non-discriminatory . . . promotion systems" that "have neither a disparate impact on black agents nor effectuate disparate treatment of black agents" pursuant to this Court's Order in *Henry W. Segar, et al., v. Benjamin R. Civiletti, et al.,* 508 F. Supp. 690, 715 (D.D.C. 1981).

[27] "When there is a genuine dispute about whether the parties have entered into a binding settlement, the district court must hold an evidentiary hearing that includes the opportunity for cross-examination."  *United States v. Mahoney*, 247 F.3d 279, 285 (D.C. Cir. 2001) (citations omitted).

*States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975)).  The applicable substantive law for the contract is the law of the District of Columbia.  *See, e.g., Potomac Elec. Power Co. V. Mirant Corp*, 251 F. Supp. 2d 144, 148 (D.D.C. 2003).

   **2.   Without a Meeting of the Minds, the Stipulation is Not a Legally Binding Settlement Agreement**

   4.   In the District of Columbia, a complete enforceable contract exists only when there is (1) an agreement as to all the material terms; and (2) an intention of the parties to be bound. *United States v. Mahoney*, 247 F.3d 279, 285 (D.C. Cir. 2001); *Kilpatrick*, 193 F.Supp.2d at 152. "There must thus be an honest and fair 'meeting of the minds' as to all issues in a contract." *Simon v. Circle Assocs., Inc.*, 753 A.2d 1006, 1012 (D.C. App. 2000) (quotation omitted); *see also Core-Vent Corp. v. Implant Innovations, Inc.*, 53 F.3d 1252, 1256 (Fed. Cir. 1995).  The party asserting the existence of an enforceable contract, which in this case is the plaintiffs, has the burden of proving that there has been an agreement, or a "meeting of the minds," as to all material terms.  *See Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. App. 1995); *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995).

   5.   When the Court interprets contract terms, the objective law of contracts controls.  *Potomac Electric Power Co.*, 251 F. Supp. 2d at 148.  That law dictates that

          [T]he written language embodying the terms of
          an agreement will govern the rights and

> liabilities of the parties, irrespective of
> the intent of the parties, unless the written
> language is not susceptible of a clear and
> definite undertaking, or unless there is
> fraud, duress or mutual mistake.

*Id. See also Bragdon v. Twenty-Five Twelve Assoc. Ltd.*

*P'ship*, 856 A.2d 1165, 1170 (D.C. 2004); *Simon*, 753

A.2d at 1012.

6.   In the present case, plaintiffs contest defendants'

appointment of Special Agent Mary Cooper to the SES as a

violation of the Stipulated agreement.   Tr. 10/26/04 at 3:23-4:1.

As relief, plaintiffs seek this Court's recision of Ms. Cooper's

appointment and a declaratory judgment that the DEA Administrator

may never again select an individual for promotion to the SES who

had not voluntarily applied pursuant to the procedures

incorporated into the Stipulated Procedures. Id. at 14:23-15:3.

7.   Defendants, however, rely upon the plain words of the

Stipulation, and specifically "footnote one" of Attachment A of

the Stipulation, entitled "Review of Applications from Staff for

SES Special Agent Positions: Instructions for Special Agents in

Charge and Office Heads." Id. at 15:19-16:16; *see* Pl. Ex. 64,

Attachment A.  "Footnote one" states:

> These procedures are meant to systematize the
> process of selecting individuals for Special Agent
> SES positions.  However, nothing in these
> procedures are meant to reduce the authority of
> the Administrator in selecting persons to fill DEA
> positions.

Id., n.1.  According to the defendants, "footnote one" contained the express reservation of authority that ensured that the DEA Administrator had the ability and flexibility to make SES selection decisions based upon the needs of the Agency, such as the decision to promote Special Agent Cooper. Tr. 10/26/04 at 15:19-16:16; *see* Pl. Ex. 64, Attachment A, n.1.

8.  Plaintiffs contend that *both parties* intended the afore-mentioned footnote to refer only to the Administrator's authority to "fill DEA positions" by moving current SES members within different SES assignments, known within the DEA as "lateral reassignments," or, as it concerns promotions, the authority of the Administrator to choose the initial assignment of a newly promoted agent once he or she has committed to promoting them to the SES. Id. at 9:23-10:1 (distinguishing the words "fill" and "promote" as two exclusive terms).  Thus, the parties disputed the meaning of "footnote one" to the agreement.

9.  This Court determined that the meaning of "footnote one" and, in particular, the second sentence of "footnote one," lent itself to two reasonable interpretations, and therefore is ambiguous.  Whether the footnote, which is a provision in the agreement, is ambiguous, is a question of law to be determined by the Court.  *Potomac Electric Power Co.*, 251 F. Supp. 2d at 148. Because the footnote goes to the heart of the Administrator's selection authority, it is material to the agreement.

10.  Ambiguity of terms plays a role in determining whether there has been a meeting of the minds as to the agreement of the parties.  "Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract."  *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 369-70 (D.C. 1990).  *See generally, In re Office Products Co. Securities Litigation v. U.S. Office Products Co., et al.*, 251 F. Supp. 2d 58 (D.D.C. 2003).  *See also*, Restatement (Second) of Contracts, § 20, Effect of Misunderstanding.

11.  Significantly, the existence of a party's internal disagreement on the meaning of a consent decree makes it "most unlikely that the parties to the decree ever reached an agreement..." *United States v. Western Electric Co., Inc.*, 797 F.2d 1082, 1091 (D.C. Cir. 1986).  Similarly, in *Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981), the D.C. Court of Appeals noted that the "failure to . . . even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking."  *Id.*, cited in *Ekedahl v. Corestaff, Inc.*, 183 F.3d 855 (D.C. Cir. 1999).

12.  In cases where there is a dispute as to the meaning of a contract provision, as in the present case, courts may consider extrinsic evidence to make an initial determination of whether a term in an agreement is ambiguous.  *Hershon v. Gibraltar Bldg. & Loan Ass'n., Inc.*, 864 F.2d 848, 852 (D.C. Cir. 1989)

(interpreting contract under Maryland law).  Just like in the
century old case of the ship named "Peerless," the Court may
"admit extrinsic evidence to show the existence of two ships
named 'Peerless' and [then] to identify the one referred to" in
the contract.  *Id.* (citations omitted).

13.  In clarifying ambiguous language, the Court must
determine what a "reasonable person in the position of the
parties would have thought the disputed language meant." *Potomac
Electric Power Co.*, 251 F. Supp. 2d at 149.  In doing so, the
Court assumes that an "objective reasonable person assessing the
contract's language knows 'all the circumstances before and
contemporaneous with the making of the agreement.'" *Id.*  The
Court may also look to the parties' actions at the time of
contract formation. *Davis*, 664 A.2d at 838; *Nofziger
Communications, Inc. v. Birks*, 989 F.2d 1227, 1230 (D.C. Cir.
1993).

14.  There is a limit to the admission of extrinsic
evidence, however.  At the point where the "offered evidence
fails to convince a judge that the contract is ambiguous or when
it 'varies, alters, or contradicts the clear meaning of the
writing,' such evidence must be excluded . . ." *Hershon*, 864
F.2d at 852 (citations omitted).  "[A] contract is not ambiguous
merely because the parties later disagree on its meaning," *Kass
v. William Norwitz Co.*, 509 F. Supp. 618, 623 (D.D.C. 1980), or

"could have drafted clearer terms," *Potomac Electric Power Co.*, 251 F. Supp. 2d at 148-149.

15.   Rather, the Court must read "the contract as a whole, interpreting all parts of the contract together." *Kass*, 509 F. Supp. at 624.  The proffered interpretation must "give[] all provisions a reasonable, lawful, and or effecting meaning." *Id.* at 623.  Further, words used in a contract are given their "common, ordinary, and popular meaning." *Athridge v. Aetna Casualty & Surety Co.*, 351 F.3d 1166, 1172 (D.C. Cir. 2003) (courts "should not seek out ambiguity where none exists"); *see also Kass*, 509 F. Supp. at 625 (disputed phrase should be given "'the plain meaning which common speech imports'").  The Circuit Court has even cautioned that "clever lawyers with strong motivation can always imagine multiple meanings for any word in any context.  That is not enough under District of Columbia law." *Athridge*, 351 F.3d at 1172 (finding no ambiguity).

16.   Plaintiffs' interpretation of "footnote one" is inconsistent with the defendants' interpretation. *Compare* Defendants (Def.) Findings of Fact ¶¶ 39-45; 58-61 (DEA's intent and interpretation of footnote) *with* ¶¶ 47-57 (plaintiffs' intent and interpretation or footnote).  At trial, however, plaintiffs offered no evidence that a responsible Agency official *shared in* plaintiffs' intent and interpretation of the footnote. Plaintiffs, therefore, have failed to carry their basic burden in this case, to establish that there was a meeting of the minds as

to the intent and interpretation of the footnote concerning the authority of the Administrator to make promotions.  Because the authority of the Administrator to make selections cannot be divorced from the agreement, there can be no valid contract between the parties.

17.  Plaintiffs have offered testimony in support of their interpretation of the footnote.  Id. at ¶¶ 47-57.  Plaintiffs' witnesses "consistently" testified that they interpreted "footnote one" to mean that the DEA Administrator had the discretion and authority to "fill DEA positions" through either a lateral transfer or through the Selection Procedures.  *See*, *e.g.*, Tr. 10/26/04 at 53:24-54:2 (Goldstein); Id. at 84:21-85:3 (Gamble); Tr. 10/27/04 at 24:7-9 (O'Flanagan); Id. at 111:10-11 (Fenner); Tr. 10/29/04 at 69:19-21 (Walker).  Not a single witness, however, testified that their interpretation of the footnote came from the DEA or the U.S. Attorney's Office.

18.  Only one of plaintiffs' witnesses acknowledged that she obtained an interpretation from a source other than the document itself.  That, too, however, was an interpretation that did not originate with defendants.  EEOMC Chairperson, Rosalynde Fenner, testified that, as soon as she received the draft of the Selection Procedures containing "footnote one," she called her counsel, Ms. O'Flanagan.  Def. Findings of Fact ¶¶ 47; 49-50; 56-57.  According to Ms. Fenner, she asked Ms. O'Flanagan what the footnote meant.  Id. at ¶ 50; *see also* Tr. 10/27/04 at 206:14-

207:7.  Ms. O'Flanagan reported back to Ms. Fenner that the footnote simply meant that the DEA could lateral transfer an existing SES into an open position if it chose not to promote someone through the process.  Def. Findings of Fact ¶ 56; *see also* Id. at 206:19-207:2.

19.  Ms. O'Flanagan, however, did *not* testify that her interpretation was based on information received from either the DEA or the U.S. Attorney's Office.  Id. ¶¶ 51-55.  In fact, Ms. O'Flanagan expressly acknowledged that her interpretation came from sources other than DEA or the U.S. Attorney's Office – she stated more than once that her interpretation came from (1) her discussions with the EEOMC; (2) her discussions with Irv Goldstein; (3) her review of the documents themselves; and (4) her discussions with other Wilmer Cutler attorneys.  *Id*.  *See also* Tr. 10/28/04 at 17:23-18:2; Tr. 10/27/04 at 22:15-17 (listing the same sources of interpretation).

20.  Notably absent from plaintiffs' presentation of their evidence is any indication that the DEA shared its interpretation of "footnote one."  At best, plaintiffs' evidence shows that plaintiffs received their interpretation of the footnote from their counsel, who appears to have developed her interpretation without consideration of the DEA's interpretation.

21.  Defendants claim a much different intent and understanding of the footnote.  Def. Findings of Fact ¶¶ 39-45; 58-61.  As two former, presidentially-appointed, DEA

78

Administrators testified, DEA intended the footnote as an express reservation of the pre-existing, or historic, statutory authority of the Administrator to make unencumbered SES promotion decisions.  Id. at ¶¶ 29; 32-33; 39-45 (Marshall's approval in 2000 was contingent on the addition of the language in second sentence of the footnote that preserved Administrator's selection authority); ¶¶ 58-61 (Hutchinson adopted Marshall's intent in 2001 with respect to "historic" "statutory authority.")  The statutory selection authority includes both the Administrator's authority to make promotion and reassignment decisions.  5 U.S.C. § 3151(b)(1)(B) ("the Attorney General may – . . . (B) *appoint, promote, and assign* individuals to positions established within the FBI-DEA Senior Executive Service, without regard to the provisions of this title governing appointments and other personnel actions in the competitive service")(emphasis added).  *See also* Def. Findings of Fact, ¶¶ 21-23; 25; 27; 29; 32-45; 58-61; 64-65; 67-70; 73-107.

22.  Plaintiffs, therefore, cannot show that DEA intended or interpreted the footnote as plaintiffs did at the time of the contract formation.  As stated in *Kass*, the Court must read "the contract as a whole, interpreting all parts of the contract together."  509 F. Supp. at 624.  Plaintiffs' interpretation that defendants intended footnote one as a reference only to initial and secondary SES assignments, or laterals, and not promotions, is contradicted by defendants' positioning of the footnote in the

Agreement.  *See* Pl. Ex. 64, Attachment A.  The footnote is positioned in the document's title, "Review of Applications from Staff for SES Special Agent Positions," thereby applying the footnote to the entire agreement.  Had DEA intended the footnote to relate to laterals, it could have positioned the footnote on page 3 of the procedures where the procedures mention laterals in the text of the document.  Id., Attachment A, at 3.  Plaintiffs' interpretation, therefore, does not "give[] all provisions a reasonable, lawful, and or effecting meaning," *See Kass*, 509 F. Supp. at 623.

23.  Further, plaintiffs' interpretation contorts the words "to fill DEA positions," making it contrary to the terms' "common, ordinary, and popular meaning."  *See Athridge*, 351 F.3d at 1172; *Kass*, 509 F. Supp. at 625.  Both parties have testified that "to fill" means "to promote" or "to laterally reassign." *See, e.g.*, Tr. 10/27/04 at 144:9-16 (Hutchinson); Id. at 167:13-20 (Hutchinson); Tr. 11/2/04 at 48:3-9 (Leonhart); Id. at 49:17-21 (Leonhart); Id. at 49:22-50-3 (Leonhart); Tr. 11/5/04 at 104:14-16 (Mathis); Tr. 11/30/04 at 55:18-23 (Kraft); Tr. 10/26/04 at 66:12-67:18 (Goldstein); Tr. 10/28/04 at 22:3-7 (O'Flanagan); Id. at 145:13-19 (Reed); Tr. 1/13/05 at 58:7-14 (Sayles).  Plaintiffs, therefore, have failed to establish that DEA intended the words "to fill DEA positions" to exclude filling positions through promotions.  Without a meeting of the minds,

plaintiffs have failed to carry the burden in this case of establishing an enforceable contract.

24.   Without a meeting of the minds, there is no enforceable contract.   "In such situations the court 'will not enforce either [parties'] version, but will instead allow remedies of rescission and restitution, and send the parties their separate ways." *A.M. Castle & Co. v. United Steel Workers of America*, 898 F. Supp. 602, 608 (N.D. Ill. 1995).   *See, e.g., Kilpatrick*, 193 F. Supp. 2d at 154 (no agreement); *Estate of Taylor v. Lilienfield*, 744 A.2d 1032, 1035 (D.C. 2000) ("no contract arises (and any apparent contract is void) if the minds of the parties do not meet honestly and fairly without mistake or mutual misunderstanding upon all issues involved"); *In Re Wright*, 51 B.R. 669, 674 (Bankr. D.C. 1985)(contract voided and rescinded).

25.   The "Stipulation Implementing a Promotion Process for Selecting DEA Criminal Investigators for Positions in the Senior Executive Service" is, therefore, void, and the parties are placed back in the position that they were in prior to entry of the Stipulation.   Since there is no agreement, this Court need not reach the issue of whether Ms. Cooper's selection should be voided.

### 3.   Plaintiffs May Not Rely on a Theory of Mistake or Misunderstanding to Enforce the Stipulated Procedures

26. Even assuming that plaintiffs mistakenly believed that the Stipulated Procedures did not permit the Administrator to

promote anyone to the SES who had not first applied, the law is clear on this point.  A party to a contractual agreement who is mistaken as to a provision of the agreement may not seek relief from the provision or the agreement if they were "consciously ignorant" of the facts (or law) underlying the mistake.  *Harbor Ins. Co. v. Stokes*, 45 F.3d 499, 502, (D.C. Cir. 1995) (relying on the Restatement (Second) of Contracts § 154).  It follows that plaintiffs also may not seek enforcement of their mistaken interpretation.

27.  Under the Restatement (Second) of Contracts § 154,

> A party bears the risk of mistake when . . .
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient.

Restatement (Second) of Contracts § 154.  The Court of appeals in *Harbor Ins. Co.*, addressed the issue of "conscious ignorance" as one of risk allocation:

> Every time parties enter a contract, they act with incomplete information. They make judgments about the desirability of acquiring (and waiting for) additional information, and of creating specific contractual provisions to handle particular eventualities. Where they have been explicitly concerned about an issue, but decide to press forward without further inquiry or explicit provision, it is reasonable to suppose that they intend the contract to dispose of the risk in question, *i.e.*, to bar any reopening at the behest of the party who, it turns out, would have done better without the contract.

45 F.3d at 502. The Court further acknowledged that a party's unilateral mistake cannot "relate to one of the uncertainties of which the parties were conscious and which it was the purpose of the compromise to resolve and put at rest." *Id.* (citations omitted).

28.  The record is clear that the pre-December 2000 drafts of the Selection Procedures did not contain footnote one.  Def. Findings of Fact ¶¶ 39-40.  As a result of DEA Administrator Marshall's instructions to his staff, DEA added footnote one in the December 13, 2000, draft, which DEA then provided to the EEOMC on January 12, 2001.  Id. at ¶ 41.  Prior to this draft being circulated, EEOMC Chairperson Fenner was told to look for a change in the next draft regarding the Administrator's authority to "promote/select" persons to the SES.  Id. at ¶ 36-38.

29.  The January 12, 2001 draft of the Selection Procedures contained footnote one.  Id. at ¶ 46.  The January 12, 2001 draft also contained a cover letter to EEOMC Chairperson Fenner stating, "[a]dditions and revisions are in bold italics."  *Id.*  Footnote one was in bold and italics.  *Id.*

30.  Following her receipt of the draft containing footnote one, EEOMC Chairperson Fenner spoke with her counsel, Ms. O'Flanagan, about the meaning of the footnote.  Id. at ¶¶ 47; 49-50; 56.  Ms. O'Flanagan, however, could not recall such a conversation.  Id. ¶ 50.  According to Ms. Fenner, she asked Ms. O'Flanagan what the footnote meant and Ms. O'Flanagan told Ms.

Fenner that she would look into the issue and get back to her.
Id. at ¶¶ 39-40.  Ms. O'Flanagan, however, did not take even the
most basic precautionary steps to understand the Agency's
retention of authority in the footnote by either consulting
Section 3151 of Title 5 of the U.S. Code (5 U.S.C. § 3151) or by
researching the existing authority of the DEA Administrator in
making SES selections for promotion, or by consulting DEA or the
AUSA assigned to the case.  Id. at ¶ 53.  Because Ms. O'Flanagan
did not consult the statute, she was unaware that the DEA
Administrator derived the authority to make promotions to the SES
from a statute that set up a noncompetitive service, and that her
comparison to the competitive promotion system of employees at
the GS-13 and GS-14 grade levels was, therefore, flawed.  Because
Ms. O'Flanagan did not consult with DEA or the AUSA assigned to
the case, she was unaware that the purpose of the footnote was to
preserve the Administrator's unique selection authority.  Id. at
¶ 56.

     31.  Ms. Fenner claims that she and Ms. O'Flanagan again
spoke about the issue and Ms. O'Flanagan explained that footnote
one preserved the Administrator's authority to "fill" SES
positions through lateral assignment only.  Again, however, Ms.
O'Flanagan could not recall any conversation regarding the
footnote.  Tr. 10/27/04 at 52:7-8.

     32.  Although the interpretation of the footnote provided to
Ms. Fenner by Ms. O'Flanagan was the "consensus" view of its

meaning among EEOMC members, members of the EEOMC had differing
interpretations.  None of these interpretations, however, came
directly from DEA personnel.  Def. Findings of Fact ¶¶ 47-57.  In
fact, no member of the EEOMC ever asked any DEA representative
the DEA's interpretation of footnote one.  *Id.*  Rather, the EEOMC
simply assumed that its interpretation, as provided by its
counsel, was correct.  *Id.*

33.  Counsel for plaintiffs, Jennie O'Flanagan, approved the
Stipulation and Selection Procedures as submitted to the Court on
behalf of plaintiffs.  Pl. Ex. 64; Def. Findings of Fact, ¶ 72.
Plaintiffs themselves approved the Selection Procedures in a
memorandum from Rosalynde M. Fenner, Chairperson of the Equal
Employment Monitoring Committee ("EEOMC") to Asa Hutchinson, DEA
Administrator.  Pl. Ex. 62; Def. Findings of Fact, ¶ 72.
Plaintiffs accepted the Stipulation knowing that the footnote was
in the Agreement.  Id. at ¶¶ 47-57; 62-63; 66; 71-72.

34.  Plaintiffs manifested a concern about the meaning of
the footnote.  Despite this concern, plaintiffs opted to rely
upon incomplete and inaccurate information concerning its
meaning.  Plaintiffs, therefore, assumed the risk that their
interpretation was incorrect and mistaken.

### III. Conclusion

For the reasons discussed above and based on the evidence
presented at trial, the Court concludes as a matter of law that
there was no meeting of the minds with respect to the footnote

and whether the Administrator could promote a Special Agent to the SES who had not applied for such a promotion; therefore, the Stipulated Procedures are not a binding, enforceable consent decree.  As a result, the parties are back in the position they were in before the Stipulated Procedures were entered, and DEA must satisfy the Court that it has complied with this Court's order of February 6, 1981, affirmed by the Court of appeals in *Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984), to "implement effective, non-discriminatory ... promotion systems." *Segar v. Civiletti*, 508 F. Supp. 690, 715 (D.D.C. 1981).  To that end, and until such time as the parties are able to agree on a binding consent decree or this dispute is otherwise resolved, the Court will require defendant DEA to inform the Court and plaintiffs thirty days prior to any SES promotion of its intent to promote to the SES anyone who has not applied and been rated and ranked, and placed on a list of qualified applicants provided to the Administrator.  Furthermore, in order to ensure compliance with this Court's 1984 order, and the mandate of the Circuit Court, DEA shall not make any such promotion without prior approval from the Court.[28]  An appropriate Order accompanies this memorandum

---

[28] After affirming this Court's conclusion that DEA had discriminated against black agents in violation of Title VII, the Circuit Court stated: "On remand we encourage the District Court to consider other remedial options to ensure that black agents attain their rightful places at the upper levels of DEA. ... In remedying promotion discrimination at this point and at all levels, the court is of course free to establish promotion guidelines and to monitor DEA's progress in meeting those guidelines, or to fashion any other appropriate relief." *Segar*

opinion.



**Signed:    Emmet G. Sullivan**
**United States District Judge**
**March 9, 2006**

---

*v. Smith*, 738 F.2d 1249, 1295 (D.C. Cir. 1984).