## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HENRY W. SEGAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 77-0081 (EGS/JMF) |
| | ) | |
| ERIC H. HOLDER and | ) | |
| MICHELE M. LEONHART, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR COMPLIANCE AND TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT

The Plaintiff Class ("Plaintiffs," the "Class," or the "EEOMC") hereby moves this Court to order defendants Drug Enforcement Administration (the "DEA") and DEA Acting Administrator Michele M. Leonhart (together, "Defendants") to comply with existing orders and show cause why they should not be held in contempt for violating this Court's Orders of 1981, 1982, and 1999.

More than thirty years after the commencement of this action, the DEA remains in violation of this Court's orders and Title VII of the Civil Rights Act of 1964. The Class, composed of current and former African-American special agents of the DEA, continues to suffer from the DEA's discriminatory policies. As this Court first recognized in 1981, since the early 1970s (if not earlier), the DEA has engaged in systemic racial discrimination in its employment practices. Nearly three decades after this Court's initial holding, and despite multiple intervening decisions re-affirming both the DEA's continuing discrimination and

Defendants' obligation to implement validated, non-discriminatory promotions procedures, the

DEA has still not remedied many of its non-compliant procedures, and it has yet to provide

Plaintiffs with *any* of the individual monetary relief that this Court ordered more than a decade

ago.  The African-American agents of the DEA deserve – and are entitled by law to – the

opportunity to compete for promotions secure in the knowledge that they will be evaluated fairly

and without respect to race; 33 years after this action began, the DEA must finally implement

validated and non-discriminatory promotions procedures, and must compensate Plaintiffs for the

past discrimination that they have suffered under the DEA's unlawful promotions procedures.

Pursuant to Local Rule 7(m), the undersigned counsel conferred with Defendants'

counsel on numerous occasions since 2006 (and, indeed, on countless more occasions since

1999) in an effort to resolve this matter without resorting to motions practice.  In addition,

counsel discussed this Motion with Defendants' counsel on January 28, 2010, and on March 2,

2010.  The parties were unable to resolve the instant dispute or narrow the issues, and

Defendants' counsel has authorized Plaintiffs to represent that Defendants oppose this motion.

Respectfully submitted,

/s/
Steven F. Cherry, D.C. Bar # 431473
Jennifer M. O'Connor, D.C. Bar # 460352
Marc E. Johnson, D.C. Bar # 976490
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

DATE:  March 3, 2010                           *Attorneys for Plaintiffs*

- 2 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HENRY W. SEGAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 77-0081 (EGS/JMF) |
| | ) | |
| ERIC H. HOLDER and | ) | |
| MICHELE M. LEONHART, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR COMPLIANCE AND TO SHOW CAUSE WHY <u>DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT</u>**

**TABLE OF AUTHORITIES**

**CASES**

*Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir.  1993) ..........................24

*Buckley v. Mukasey*, 538 F.3d 306 (4th Cir. 2008)................................................................19, 20

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)..............................................................24

*Food Lion, Inc. v. United Food & Commercial Workers International Union*, 103 F.3d
    1007 (D.C. Cir. 1997) .........................................................................24

*Segar v. Ashcroft*, 422 F. Supp. 2d 117 (D.D.C. 2006) ............................................17

*\*Segar v. Civiletti*, 508 F. Supp. 690 (D.D.C. 1981), *aff'd in relevant part sub nom.*
    *Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984)................................................4, 24

*Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007).........................................................17

*\*Segar v. Reno*,  No. 77-0081 (D.D.C. Sept. 27, 1999)....................................7, 21, 25

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984)...............................................4, 5

*\*Segar v. Smith*, No. 77-0081, 1982 WL 214 (D.D.C. Feb. 17, 1982).....................5, 21, 24, 25

*Shillitani v. United States*, 384 U.S. 364 (1966).......................................................24

**AGENCY MATERIALS**

*Stansbury v. Gonzales*, EEOC No. 570-2006-00424X (EEOC Aug. 1, 2008).............................20

**STATUTES**

5 U.S.C. § 3151...........................................................................................4

42 U.S.C. § 2000e-5(k)...................................................................................23

**CONGRESSIONAL MATERIALS**

H.R. Rep. No. 100-608 (1988), *reprinted in* 1988 U.S.C.C.A.N. 634 ..........................................4

## SUMMARY OF THE CASE

The Plaintiff Class ("Plaintiffs," the "Class," or the "EEOMC") files this motion reluctantly, as a last resort to remedy defendant Drug Enforcement Administration's (the "DEA") decades-old non-compliance with this Court's orders.  The Class, which is composed of current and former African-American Special Agents of the DEA, initiated this class action more than thirty years ago to address the DEA's systemic employment discrimination against African-American agents.  This Court held, in 1981, that the DEA's policies and practices in six areas – salary, grade at entry, work assignments, supervisory evaluations, discipline, and promotions – were discriminatory and violated Title VII of the Civil Rights Act of 1964.  The following year, this Court ordered specific relief, including the implementation by the DEA of validated, non-discriminatory procedures for promotions to Grades 12 and above.  Over the quarter-century since the D.C. Circuit affirmed all relevant aspects of this Court's remedy order, the DEA has maintained and even instituted numerous policies and practices that violate both Title VII and this Court's orders in this case.  In addition, on those occasions when the DEA has joined Plaintiffs in settlement talks, the DEA has engaged repeatedly in delaying tactics, and reneged on multiple negotiated agreements.[1/]  On several occasions, the DEA's violations of existing orders have driven Plaintiffs to ask this Court to command the DEA's compliance.  On each such occasion, either this Court or the D.C. Circuit has ultimately ruled in Plaintiffs' favor.  Throughout this time, Plaintiffs have attempted to resolve the matters in dispute through good-faith negotiations, settlement proposals approved by the court-ordered Working Group, and diligent efforts at compromise.

---

[1/]      On several occasions, the DEA has used the appointments of new Administrators as opportunities to essentially re-start negotiations.  On other occasions, the DEA staff and counsel from the Department of Justice have negotiated Agreements with Plaintiffs, only to later inform Plaintiffs that the Administrator has declined to ratify those Agreements.

The parties' most recent round of negotiations began in 2006.[2]  Throughout the three years that followed, the parties participated in many hours of negotiations exchanged countless draft proposals, and ultimately reached agreements in principle to resolve four of the five outstanding issues of which Plaintiffs were then aware.  Specifically, the parties agreed to a new system for promotions to Grades 14 and 15; to a Career Development Program ("CDP"), which this Court ordered in its 1999 Opinion to remedy past discrimination; and to an oversight-and-monitoring system to ensure that the new procedures would not have a disparate impact on Class members.  The parties also agreed to clarifications of the previously stipulated procedures for promotions to the Senior Executive Service ("SES").  But at the last minute the DEA, under the leadership of Acting Administrator Michele Leonhart, disregarded deadlines (including self-imposed deadlines), ignored requests for documents and information (or responded with partial or non-responsive materials), and unilaterally erected new procedural roadblocks to resolution.

In the end, Ms. Leonhart effectively negated years of negotiations by categorically rejecting the core of the agreement relating to promotions to Grades 14 and 15, which had been the most complex and painstakingly-negotiated of the four agreements, and which the court-appointed Working Group had approved as a validated system that would satisfy the DEA's obligations under the 1981 and 1999 Orders.  Thus, the DEA continues to operate under GS-14/15 interim promotions procedures that have never been validated and that were implemented expressly as a stopgap pending implementation of final, validated procedures.  Moreover, as Plaintiffs' statistical experts confirm, these interim procedures have an ongoing disparate impact on African-American applicants for promotions to Grades 14 and 15.  The DEA also has yet to execute the agreements governing the other three issues addressed in the negotiations.

---

[2]      The parties had begun negotiating a resolution to the issue of Grade 14/15 promotions in 2000, but the DEA withdrew from the negotiations in 2004 in response to litigation over the DEA's violation of stipulated procedures for promotions to the SES.  The DEA agreed to resume negotiations in 2006, following the conclusion of the SES litigation in this Court.

In addition, Plaintiffs learned recently that in 2004 the DEA changed its policy for promotions to Grade 13 in a manner that Plaintiffs believe violates the Court's orders.  The DEA has failed to respond to repeated inquiries regarding this policy.  The DEA also continues to withhold data requested by Plaintiffs in order to determine the amount of individual monetary compensation for past discrimination to which class members are entitled pursuant to this Court's 1999 Order.  (Consequently, Defendants have failed to provide to Plaintiffs any monetary relief whatsoever).  Plaintiffs are thus left with no recourse but to return to this Court to obtain the relief to which this Court has repeatedly held that they are entitled.  Plaintiffs have already waited far too long for this relief; more than thirty-three years after this lawsuit began, the DEA should finally honor its obligations to its loyal African-American agents by implementing validated non-discriminatory promotions procedures and oversight systems, and by providing monetary relief to compensate individual Class members against whom the DEA has discriminated.

Plaintiffs therefore respectfully move this Court to order the DEA to comply with the Court's existing orders by (1) implementing the validated procedures for promotions to Grades 14 and 15, which were approved by the court-appointed Working Group, and to which the parties previously agreed, *see* Exhibit 1 (Grade 14/15 Agreement); (2) re-instituting its previous, procedures for promotions to Grade 13, which the Working Group had determined were content-valid and non-discriminatory; (3) putting into place the CDP and oversight-and-monitoring systems that were negotiated by the parties and approved by the court-appointed Working Group, *see* Exhibits 2 and 3 (CDP Agreement and Oversight and Monitoring Agreement with DEA Comments); (4) adopting and implementing the clarifications to the DEA's Senior Executive Service ("SES") promotions procedures, to which the parties previously agreed, *see* Exhibit 4

3

(May 4, 2009 SES Agreement); and (5) providing Plaintiffs with individual relief, as provided in this Court's 1999 Order, in accordance with the methodology developed by Plaintiffs and preliminarily agreed to by the DEA, *see* Exhibit 5 (Plaintiffs' Methodology for Calculating Individual Relief).  Plaintiffs also ask this Court to order Defendants to reimburse Plaintiffs' attorneys' fees and costs as required under Title VII.  Finally, Plaintiffs ask this Court to require Defendants to show cause why they should not be held in contempt for violating this Court's orders (Plaintiffs defer to the Court's determination regarding appropriate sanctions for Defendants' contempt).

## DISCUSSION

Nearly thirty years ago, this Court held the DEA liable for systemic discrimination against the Class in six areas of employment:  promotions to Grades 12 and above,[3/] salary, grade at entry, work assignments, supervisory evaluations, and discipline.  *Segar v. Civiletti*, 508 F. Supp. 690, 712−15 (D.D.C. 1981) (Robinson, J.) ("1981 Opinion"), *aff'd in relevant part sub nom. Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984) ("1984 Opinion").  With respect to promotions, the Court ordered the DEA to "immediately commence validity studies in order to implement effective, non-discriminatory . . . promotion systems."  *Id.* at 715.  The Court also ordered that the parties indicate to the Court "what action is necessary to . . . further remedy the discrimination in promotion."  *Id*.  As part of the implementation of this relief, the Court approved the establishment of the Working Group, a panel of experts on employment systems

---

[3/]      The Court's order refers to Grades 12-18.  *Segar v. Civiletti*, 508 F. Supp. 690 (D.D.C. 1981) ("1981 Opinion").  Grades 16-18 – the so-called "supergrades" – were renamed the "Senior Executive Service" ("SES") in 1988.  5 U.S.C. § 3151; H.R. Rep. No. 100-608 (1988), *reprinted in* 1988 U.S.C.C.A.N. 634.  This Court's order governing the supergrades now applies to the SES.  *See Segar v. Mukasey*, 508 F.3d 16, 18 (D.C. Cir. 2007).

and practices,[4/] and charged them with, *inter alia*, developing and recommending promotion

systems consistent with the 1981 Opinion. *Segar v. Smith*, Joint Stipulation Regarding

Procedures to be Followed in Implementing the Court's Order of February 6, 1981, No. 77-0081

(D.D.C. July 31, 1981).

On February 17, 1982, after considering the parties' proposals for further relief, the Court

entered an order granting the class specific relief. *Segar v. Smith*, No. 77-0081, 1982 WL 214

(D.D.C. Feb. 17, 1982) (Robinson, J.) ("1982 Order"), *aff'd in relevant part*, 1984 Opinion, 738

F.2d at 1296.  The 1982 Order required that "upon completion of the validity studies required by

[the 1981 Opinion]," the DEA "proceed to develop and implement new, nondiscriminatory

employment systems with respect to . . . promotions," and it directed that "[o]nce these new

systems are in place, defendants shall insure that the new systems neither have a disparate impact

on black agents nor effectuate disparate treatment of black agents" by creating, in collaboration

with the Working Group and the Class, an oversight-and-monitoring regime.  1982 Order, 1982

WL 214 at *2.  The 1982 Order also mandated the creation of the Equal Employment

Opportunity Monitoring Committee (the "EEOMC") to monitor the DEA's compliance with the

1982 Order.  *Id*. at *12.[5/]

The D.C. Circuit affirmed this Court's liability determination, and all relevant remedy

orders, in 1984.  1984 Opinion.  Over the ensuing years, the parties resolved a number of the

---

[4/]       The Working Group currently has three members:  Dr. Tressie Muldrow and Dr. Brian O'Leary, of the Office of Personnel Management, and Dr. Irwin L. Goldstein, of the University of Maryland.  Dr. Muldrow received her Ph.D. in Social Psychology from Howard University and completed her training in Industrial and Organizational Psychology at George Washington University.  Dr. O'Leary received his Ph.D. in Industrial and Organizational Psychology from the University of Maryland.  Dr. Goldstein is the current Senior Vice-Chancellor of Academic Affairs for the University System of Maryland.  He earned his Ph.D. in Applied Experimental Psychology from the University of Maryland and completed his training in Industrial and Organizational Psychology at Ohio State University.  Dr. Muldrow is the DEA's representative on the Working Group, and Dr. Goldstein is the Plaintiffs' representative.

[5/]       The EEOMC serves as the representative of the Class in this matter. *Segar v. Ashcroft*, Order, No. 77-0081 (D.D.C. July 30, 2002) (Facciola, M.J.).

outstanding issues in a series of joint stipulations entered with the Court, but made little or no progress on the core issue of implementing non-discriminatory procedures for promotions to Grades 14 and 15 and to the SES. *See*, *e.g.*, *Segar v. Meese*, Stipulation Regarding Implementation of Relief Orders with Respect to Discipline, No. 77-0081 (Sept. 22, 1988); *Segar v. Meese*, Stipulation of Settlement of Payment of Attorneys' Fees and Costs, No. 77-0081 (D.D.C. Oct. 19, 1987); *Segar v. Meese*, Stipulation Regarding Implementation of Relief Order with Respect to Supervisory Evaluation, No. 77-0081 (D.D.C. Mar. 2, 1987); *Segar v. Meese*, Stipulation and Order with Respect to Outstanding Claims Regarding Relief, No. 77-0081 (D.D.C. Feb. 17, 1987); *Segar v. Meese*, Stipulation and Order with Respect to Payment of Attorney's Fees and Costs, No. 77-0081 (D.D.C. Aug. 2, 1985). In 1990, the parties filed with the Court a joint stipulation, *Segar v. Thornburgh*, Joint Stipulation Regarding Procedures to be Followed in Implementing the Court's Relief Orders, No. 77-0081 (D.D.C. Jan. 29, 1990), which laid out the remaining steps necessary to implement compliant procedures for promotions.

The instant Motion addresses Defendants' failure to implement such procedures. As discussed in detail below, the DEA has yet to implement validated, non-discriminatory procedures for promotions to Grades 14 and 15, as required by this Court in 1982 and 1999. The DEA has also failed to adopt clarifications regarding the duration and composition of Best-Qualified Lists under existing SES promotions procedures, although these clarifications were finally agreed to by the parties in 2009. And in 2004, the DEA affirmatively abandoned its existing validated, non-discriminatory procedures for promotions to Grade 13 and, without consulting either Plaintiffs or the court-appointed Working Group, replaced them with a system that has never been validated. In addition, the DEA has yet to implement a court-ordered oversight-and-monitoring regime and formally adopt a CDP – both of which were approved by

the Working Group – to take effect once validated promotions systems are in place.  Finally, despite this Court's command, Defendants have not provided individual relief to Class members harmed by the DEA's illegal procedures for promotions to Grades 14 and 15.

**Promotion Procedures for Grades 14 and 15**

As the record clearly reflects, since 1981 the DEA has engaged in a series of delaying tactics to forestall implementation of validated non-discriminatory procedures for promotions to Grades 14 and 15.  Unfortunately, the DEA's delays required the EEOMC to take repeated actions to enforce the 1981 and 1982 Orders.  It was not until 1992 – ten years after this Court's 1982 Order and only after the EEOMC had on several occasions sought recourse to this Court to obtain the DEA's cooperation and compliance with the 1982 Order – that the DEA finally implemented the Special Agent Promotion Process ("SAPP"), a validated assessment system that would form the basis for a new process for promotions to Grades 14 and 15.  *Segar v. Reno*, Opinion at 2, No. 77-0081 (D.D.C. Sept. 27, 1999) (Robinson, J.) ("1999 Opinion").  However, the DEA continued to allow subjective input into such promotions in the form of supervisor "short lists," and data showed a continued disparate impact on Class members in promotions to Grades 14 and 15.  *Id*. at 4−18.  Therefore, in 1997, the EEOMC filed a motion for compliance, and on September 27, 1999, this Court held that the DEA's promotion system for Grades 14 and 15 remained non-compliant with Title VII.  *Id*. at 2, 22.  This Court therefore enjoined the DEA from continuing to use its existing, unlawful procedures for promotions to Grades 14 and 15, and stated that the DEA was "obligated to implement a Career Development Program ["CDP"] to reduce the acknowledged disparate impact of the SAPP."  *Id.* at 22−23.

Pending the implementation of a validated, non-discriminatory system, and mindful that the DEA had an ongoing need to fill open positions in Grades 14 and 15, the parties entered into

a stipulation implementing Interim Procedures for promotions to Grades 14 and 15. *Segar v. Reno*, Status Report and Joint Stipulation Permitting the Temporary Use of SAC and Office Head Recommendations in Promotions of DEA Special Agents to the GS-14 and GS-15 Grades, No. 77-0081 (D.D.C. Jan. 4, 2000) (the "Stipulation").  The Stipulation provided that the DEA would "expeditiously initiate the necessary efforts required to create and implement a permanent validated process for using SAC and Office Head input in promotion decisions." *Id.* at 2 (emphasis added).  The Stipulation then laid out procedures to be used "[i]n the interim," i.e., as a stopgap while the DEA engaged in "the necessary efforts" specified by the Stipulation. *Id.* The Stipulation thus made clear that the Procedures it outlined were temporary, and would be replaced by a validated promotions process that included SAC/Office Head recommendations.

Over the ensuing *decade*, the parties negotiated various resolutions to this issue.  On three separate occasions, the parties reached agreement on validated processes that had been approved by the Working Group; but each time, after the parties had verbally agreed to terms, the DEA reneged rather than executing the relevant stipulations and implementing the agreements.  First, in early 2000, Plaintiffs hired an outside contractor to develop a validatable promotions process, but the DEA unilaterally withdrew from that process before the contractor completed its work.  Then, in 2002, the parties negotiated a system in which SACs would convene diverse, three-member Local Ranking Panels ("LRPs") to evaluate applicants for promotions to Grades 14 and 15 whose SAPP scores had qualified them for the Best Qualified List ("BQL") for a given position.  The LRP assessment system was detailed, transparent, and validated.  It entailed training for senior officers who would administer it, and it included provisions for subsequent oversight.  The Working Group approved the LRP as a suitable replacement for the Interim Procedures, and in November 2002, the DEA itself submitted it to Magistrate Judge Facciola,

8

before whom this Court had ordered the parties to resolve the outstanding issues, for approval.

Judge Facciola then asked the parties to work out implementation issues, but six months later,

the DEA once again withdrew its assent to the agreed-upon process, citing (for the first time)

cost concerns that it now claimed were fatal to the system to which it had already agreed.

Next, the parties agreed to the formation of a Developmental Panel, which included Class

members and experts chosen by both parties, and which was tasked with developing validated

promotions procedures.  In August 2003, the Panel issued a report (the "DPR"), which outlined a

new system for promotions to Grades 14 and 15.  Under the DPR system, each Special Agent

would submit a standard Accomplishment Record along with his or her annual performance

ratings.  These records would be reviewed and verified by supervisors and then, when a Special

Agent applied for a promotion and qualified for the SAPP-based BQL, the records would be

evaluated by SACs or Office Heads, who would then recommend candidates for promotion.  On

March 5, 2004, the DEA submitted to Plaintiffs a Global Settlement Proposal that purported to

resolve all remaining issues in the case and that included a GS-14/15 promotions system based

on the DPR.  After forwarding the proposal to the Working Group for review (the Working

Group approved the proposal), Plaintiffs submitted written comments on the proposal on March

11, 2004.  The following day, the parties met before Magistrate Judge Facciola.  At the March

12, 2004 meeting, Judge Facciola asked the DEA to adopt the DPR system, but the DEA

declined to do so.  The parties were unable to finally resolve any outstanding issues at that

meeting, and shortly thereafter the DEA unilaterally terminated the mediations – and, indeed, all

negotiations – pending this Court's resolution of Plaintiffs' motion for an injunction filed in

response to the DEA's promotion of Agent Mary Cooper in violation of its stipulated procedures

for SES promotions.  *See infra* p. 17.

Two years later, following this Court's ruling in intervening litigation regarding promotions to the SES, *see infra* pp. 17−18, Plaintiffs contacted the DEA to resume negotiations. At a meeting on April 14, 2006, Plaintiffs understood the DEA to agree to adopt the DPR system for promotions to Grades 14 and 15, but once again, the DEA subsequently withdrew its agreement.  The parties then agreed to engage as a mediator Mr. Michael Lewis of JAMS, and from September through November, the parties had three mediation sessions with Mr. Lewis (Plaintiffs and the DEA each also met independently with Mr. Lewis).  The aim of mediation was to resolve four outstanding issues:  promotions to Grades 14 and 15, oversight and monitoring, the CDP, and individual relief.[6]  For the next three years, the parties engaged in continued discussions, which, while they moved too slowly, appeared to be headed towards a negotiated resolution.  In early 2008, based on the progress they had made, the parties agreed to a June 30, 2008 deadline for final resolution of the issues under discussion.  Throughout 2008, the parties again painstakingly negotiated a set of validated, non-discriminatory procedures for promotions into Grades 14 and 15, which were again approved by the Working Group.[7]  Acting Administrator Leonhart was personally involved in the process; she afforded the DEA's counsel limited negotiating authority, and the negotiations repeatedly bogged down due to her lack of availability to approve changes that she had insisted required her approval.

Notwithstanding these difficulties, the negotiations continued, and on December 9, 2008, Plaintiffs provided to the DEA a draft Memorandum of Understanding ("MOU"), accompanied by a consent decree and written agreements resolving the four issues (the "Agreements").  *See*

---

[6]     The parties later agreed to address individual relief in a separate course of negotiations, and instead took up the issue of SES promotions following the resolution of related litigation. *See infra* pp. 17−18.

[7]     The DEA had initially proposed to simply make permanent the Interim Procedures for promotions to Grades 14 and 15, but because these proposals could not be validated and have been shown to have a disparate impact, Plaintiffs rejected this proposal.

Exhibit 6 (MOU and Consent Decree).  The Agreements summarized systems to which the
parties had, in principle, already agreed, with the exception of a few outstanding disputes over
terms (for example, the only outstanding unresolved issue with respect to the GS-14/15
promotions proposal was the discrete question of what constituted a "significant" discrepancy in
the ratings under that proposal, such that re-rating would be warranted).  Throughout the six
months following their receipt of the MOU, the DEA ignored numerous deadlines (including
several that it had created), imposed new conditions on Plaintiffs, and neglected to respond to
repeated communications from Plaintiffs' counsel.  *See* Exhibit 7 (July 21, 2009 Letter from
Marc Johnson to Laurie Weinstein).  At the same time, in February 2009, at a meeting unrelated
to this litigation that was attended by several members of the Class, Ms. Leonhart commented
that she had "no choice" but to sign the MOU.  Early the next month, Defendants' counsel
confirmed in a letter to Plaintiffs' counsel that they understood Ms. Leonhart had told Plaintiffs
she remained "adamant that we are continuing with the [14/15 promotion process] we have
negotiated thus far."  *See* Exhibit 8 (March 3, 2009 Letter from Laurie Weinstein to Rebecca
Gelfond).  The DEA then requested that Plaintiffs make a formal presentation to Ms. Leonhart
before the DEA signed off on the MOU.  Plaintiffs made this presentation on May 12, 2009, but
the DEA still did not sign.

    After all of that, on June 10, 2009, counsel for the DEA informed Plaintiffs' counsel of
the DEA's complete reversal of its position with respect to GS-14/15 promotions.  The DEA
again abandoned years of hard work by both parties and their counsels, proposing for the first
time to exclude SACs from the formal promotions process altogether and to rely instead on a
completely un-validated process that was at once subjective and opaque.  This new system defied
both the 2000 Stipulation implementing the Interim Procedures – which required the DEA "to

create and implement a permanent validated process for using SAC and Office Head input in

promotion decisions" – and the 1982 Order requiring implementation of validated, non-

discriminatory procedures for promotions to Grades 12 and above.

   Over the next six months, Plaintiffs unsuccessfully attempted, through discussions

directly with the Department of Justice, to resolve the disagreement by bringing the parties back

to the procedures that the Working Group had approved.  Then, in February 2010, the DEA sent

Plaintiffs a letter again outlining the system the DEA had first suggested in June 2009.  *See*

Exhibit 9 (February 2, 2010 Letter from Laurie Weinstein to Marc Johnson).  This counter-

proposal sought to exclude formal SAC recommendations from the promotions process for GS-

14/15, and provided that candidates' numeric SAPP scores alone would determine who populates

a BQL list.  Agents with SAPP scores who wished to be considered for promotions would

annually submit "Professional Biographical History" forms, which would be reviewed for

accuracy by SACs.  Notably, the sample form provided by DEA includes a section for open-form

writing on "other job-related qualifications/career successes," thus allowing for substantial

variation among applicants in the type of information submitted.  Applicants for specific

vacancies would also be free to submit written narratives with their applications, but such

narratives would not be required, and their contents are not standardized or restricted in any

meaningful way.[8/]  The Career Board would then make its selection from the BQL based on

biographical information and individual narratives (if submitted).  The counter-proposal states

that "SACs will not be asked for any recommendations, nor will any be considered," *see* Exhibit

9 (February 2, 2010 Letter from Laurie Weinstein to Marc Johnson), but the majority of voting

members of the Career Board are SACs, and these SACs would not be recused from the selection

---

[8/]      Defendants' proposal states only that these written applications will allow applicants to
submit "factual, job-related narratives" that "present to the Career Board, in writing, particular
job-related skills and abilities specific to that vacancy."  *See* Exhibit 9 (February 2, 2010 Letter
from Laurie Weinstein to Marc Johnson).

process.  Thus, the counter-proposal (1) permits applicants to submit divergent sets of materials, including unvalidated "narratives"; (2) does not offer applicants any opportunity to contest SAC assessments of their biographical histories; (3) allows for unregulated SAC input into promotions; and (4) does not specify what criteria the Career Board should employ in ultimately making its determinations or provide any transparency into Career Board decision-making. Defendants did not consult with the Working Group in developing their counter-proposal, and the Working Group believes that it could not be validated.  *See* Exhibit 10 (Goldstein Affidavit). The counter-proposal therefore does not comply with the terms of the 1982 and 1999 Orders, which obligate the DEA to institute validated systems for promotions to Grades 14 and 15.

By contrast, the December 9, 2008 Agreement on 14/15 promotions procedures, which the Working Group approved, establishes a process based on standard, validated criteria that would provide meaningful guidance to applicants, SACs, and the Career Board at each step in the process, and would, in addition, create a record to reflect the bases for certain Career Board decisions.  The Agreement lays out a clear five-step procedure.  *See* Exhibit 1, at 2 (Grade 14/15 Agreement).  A close comparison of the Agreement with the DEA's counter-proposal reveals a number of critical distinctions, including the following:

1.     The "Accomplishment Record" outlined in the Agreement ensures that every application will include a standardized set of information provided in response to questions that address only validated, job-related issues.

2.     Under the Agreement, applicants are provided the opportunity to rebut a supervising ASAC or SAC's claims that the applicant's Accomplishment Record is not accurate, and the hiring SAC will receive both inputs.

3.     The Agreement allows input by both supervising and hiring SACs, the contents of which are clearly defined in the Agreement.

4.     The Agreement offers guidance to the Career Board, in the form of SAC/Office Head ratings of all applicants on the BQL for a given position.  These ratings are based on

standardized applicant information packets, and guided by a set of validated rating criteria.

**5.**    The Agreement requires the Career Board to provide a written justification if it decides to promote a candidate who was not recommended by the SAC/Office Head with the vacancy.


In short, the February counter-proposal does not replace the Agreement's validated promotion system with any comparable validated (or validatable) system.  Allowing the Career Board, without outside monitoring of their methods or data, to base decisions on information that would be inconsistent between candidates, lacks the consistency and transparency that are essential to a validatable system.  And the absence, in the counter-proposal, of an objective rating-and-ranking protocol would allow SACs and persuasive individuals on the Career Board to offer subjective opinions that have a potentially discriminatory effect.  The counter-proposal thus does not, as it purports to do, remove SACs from promotions decisions, but it does eliminate safeguards against unvalidated, potentially discriminatory SAC contributions.

Meanwhile, more than a decade after the parties stipulated that the DEA would "expeditiously initiate the necessary efforts required to create and implement a permanent validated process for using SAC and Office Head input in promotion decisions," the Interim Procedures remain in place.  Because the Interim Procedures were never validated, and were always intended as a temporary stopgap pending implementation of compliant procedures, the mere fact that they remain in effect is proof of the DEA's continuing violation of this Court's orders.

Furthermore, Plaintiffs' statistical experts' analysis reveals that, based on the most current available data, under the Interim Procedures selections to Grades 14 and 15 by the Career Board – the entity that the DEA proposed would have unfettered discretion in making

14

promotions to Grades 14 and 15 – have had a disparate impact on Plaintiff Class Members.  *See* Exhibit 11 (Siskin Report).  Among other things, the analysis found that "on average, a best qualified African American bid for a specific opening" at either the Grade 14 or 15 level "was less likely than a best qualified non-African American bid to be selected for that opening."  *Id.* at 2−3.  In addition, an African American bidder whose scores qualified him for a BQL for promotions to either Grade 14 or Grade 15 was less likely to be selected than a non-African American bidder on that BQL.  These findings are statistically significant:  the probability of a disparity equivalent to that in Grade 14 promotions occurring by chance was less than 1-in-538 million, and the probability of the disparity in Grade 15 promotions occurring by chance was 0.00024 or 1-in-4,122.  *Id.* at __.  Thus, despite Plaintiffs' diligent efforts, African-American agents seeking promotions to Grades 14 and 15 continue to suffer discrimination, and remain effectively blocked from even seeking promotions to the highest grades (15 and the SES) by the discriminatory procedures that prevent them from ever entering the "pipeline" for such promotions.

### Promotions to Grade 13

This Court's 1981 and 1982 Orders required the DEA to remedy its procedures for promotions to Grades 12 and above.  After the Court issued these Orders, the Working Group reviewed the DEA's promotions procedures at all levels.  At the time of the Working Group's review, promotions to Grade 13 were automatic for Special Agents who had spent three years at Grade 12 and received evaluations stating that they performed work at or above grade level.  The Working Group determined that the procedures for promotions to Grade 13 could be validated, and a subsequent analysis of data summarizing promotions under these procedures found no adverse impact on the Class.  *See* Exhibit 10 (Goldstein Affidavit).  Plaintiffs recently learned,

however, that in 2004, then-Deputy Administrator Leonhart issued a memorandum instituting a

new process for promotions to GS-13.  *See* Exhibit 12 (June 15, 2004 Memorandum from

Michele M. Leonhart re: "Revised Promotion Policy and Procedures").  Whereas the previous

system had employed objective criteria that applied uniformly across the DEA, the system in

place since 2004 is subjective, and invests individual SACs with substantial discretion in

awarding or denying applicants promotions.  The Working Group was never consulted during the

development of this policy, and the DEA never provided the procedures to the Working Group

for review.  *See* Exhibit 10 (Goldstein Affidavit).  After reviewing the Leonhart memorandum,

the Working Group determined that it did not describe a validated system, and noted that it

possessed a number of significant shortcomings.  *Id.*  Moreover, Plaintiffs understand that the

procedures are applied inconsistently among DEA divisions; the Working Group has stated that

if this is in fact the case, the procedures can not, by definition, be validated.  *Id.*  Some time in or

around 2006, the DEA conducted a survey of SACs in response to complaints regarding the new

system, and the Office of Inspection studied the issue.  Plaintiffs have obtained a copy of this

survey, *see* Exhibit 13 (Survey), but the DEA has refused to provide the results.

In light of these developments, Plaintiffs requested, by letter dated June 12, 2009, that

Defendant advise the EEOMC as to the DEA's current procedures for promotions to Grade 13,

provide to Plaintiffs any written guidelines or procedures governing such promotions, and

furnish Plaintiffs with any studies that address possible discriminatory effects of these

procedures and any reports summarizing the results of such studies, including the SAC survey

that was conducted and the study by the Office of Inspection.  *See* Exhibit 14 (June 12, 2009

Letter from Marc Johnson to Laurie Weinstein).  Plaintiffs also asked the DEA to inform

Plaintiffs whether these promotion procedures had been validated, and, if so, to provide Plaintiffs

with the relevant validation studies.  *Id.*  The DEA has not responded to Plaintiffs' repeated

requests for further information.

### SES Promotions

In May 1996, fifteen years after this Court held that the DEA's procedures for

promotions to the "supergrades" (later the SES) violated Title VII, the DEA finally began

drafting new procedures, and after years of drafting and discussions between the parties, the

DEA and EEOMC ultimately submitted to the Court procedures governing the promotion of

Special Agents to the SES ("the Procedures").  The Court approved the Procedures on March 12,

2002.  *Segar v. Ashcroft*, Stipulation Regarding Implementing a Promotion Process for Selecting

DEA Criminal Investigators For Positions in the Senior Executive Service, No. 77-0081 (D.D.C.

Mar. 12, 2002).  The Procedures entailed a detailed system in which applicants to SES positions

would be evaluated, rated, and ranked, with the highest-ranked applicants placed on a BQL,

which would constitute the universe of agents eligible for the relevant promotion.  But on August

28, 2003, DEA Administrator Karen Tandy promoted Special Agent Mary Cooper – who had not

applied for an SES position and, consequently, had not undergone the evaluation and ranking

protocol – to the SES.  *Segar v. Ashcroft*, 422 F. Supp. 2d 117, 125 (D.D.C. 2006) ("2006

Opinion and Order").  In March 2004, the EEOMC filed a motion for a temporary restraining

order – which this Court converted into a motion for a preliminary injunction, *Segar v. Ashcroft*,

Order, No. 77-0081 (D.D.C. Mar. 26, 2004) (Sullivan, J.) – to preclude such promotions.  Years

of litigation ensued, culminating in the D.C. Circuit's November 23, 2007 holding that the

Procedures were mandatory and binding on the DEA.  *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C.

Cir. 2007).  This Court subsequently ordered that any future promotions to the SES must

therefore come from the list of applicants who had been rated and ranked best-qualified for the

17

relevant position.  *See Segar v. Ashcroft*, Minute Order Granting Unopposed Motion for

Reconsideration, No. 77-0081 (D.D.C. Mar. 22, 2008); Plaintiffs' Unopposed Motion to Revise

This Court's March 9, 2006 Order to Conform to the D.C. Circuit's November 23, 2007 Opinion,

No. 77-0081 (D.D.C. Jan. 29, 2008).

During the most recent negotiations, after these orders were entered, the parties reached

agreement in principle on several minor clarifications to the Stipulated Procedures for

promotions to the SES.  *See* Exhibits 4 and 15 (SES Agreement and May 4, 2009 Letter from

Rebecca Gelfond to Laurie Weinstein).  Specifically, the parties agreed that applicants who

qualified for one BQL for promotion to the SES would be eligible to be considered for any future

vacancies.  This clarification was consistent with the overall procedures and with existing court

orders, but when the DEA abandoned the Agreement for Grades 14/15, the SES Agreement, too,

was left unsigned.

### Ongoing Discrimination Against African-Americans at Grades 13 and Higher

By their failure to implement or retain validated promotions procedures, Defendants

continue to violate decades of court orders.  In addition, a culture of discrimination toward

African Americans continues to pervade the Agency.  There are currently no African-American

voting members on the Career Board.  During the six years since Ms. Leonhart was elevated to

Deputy Administrator, only one African American SAC has served as a voting member of the

Career Board – he served for three years, following his selection by then-Administrator Asa

Hutchinson – and in the two-plus years that Ms. Leonhart has served as Acting Administrator,

she has appointed no African-American SACs to voting positions on the Career Board.

Furthermore, discrimination continues to impede African American Agents' chances to advance to the Grade levels for which the DEA's current promotions procedures are not validated.  For example:

- **Grade 13**:  Agent Kimball Hardeman filed an Equal Employment Opportunity ("EEO") complaint in June 2008, and filed suit in federal court in Arkansas in April 2009.  Agent Hardeman alleges that he was denied promotion to Grade 13 in 2007 even though he met the objective Agency-wide criteria described above, *see supra* p. 15, and, in addition, satisfied the subjective criteria instituted in 2004.  *See* Complaint, *Hardeman v. United States*, 09-CV-00312 (E.D. Ark. Apr. 29, 2009).[9/]  Since joining the DEA in 2000, Agent Hardeman rose rapidly through DEA ranks, and the outstanding annual evaluations he had earned throughout his career at the DEA confirm that Agent Hardeman was entitled to his promotion, and would have received it absent racial discrimination.  *Id.*

- **Grades 14/15:**  Agent Mary Buckley, while serving at Grade 14, was selected to temporarily fill a position that was normally a Grade 15 position.  But when the DEA sought to fill the position on a permanent basis, it selected someone other than Agent Buckley.  Agent Buckley filed suit in the Eastern District of Virginia, claiming that her promotion was improperly denied as a result of racial bias and in retaliation for Ms. Buckley's active participation in the EEOMC's work.  She ultimately prevailed in the Fourth Circuit.  *See Buckley v. Mukasey*, 538 F.3d 306 (4th Cir. 2008).

---

[9/]      The district court recently ruled on the DEA's motion to dismiss Agent Hardeman's complaint, granting the motion on procedural grounds with respect to Hardeman's promotion-related claim, and denying the motion with respect to his claim of a hostile work environment. 2010 WL 143755 (E.D. Ark. Jan. 11, 2010).

Thus, notwithstanding the DEA's bald assertions that it is now free of discrimination, African Americans continue to suffer from disparate treatment in promotions.

Defendants may argue that the DEA's recent track record with regards to discrimination is exemplary, citing a relatively low number of individual EEO complaints filed by employees of the Agency.  However, even accepting, *arguendo*, that the DEA is named as a defendant in relatively few EEO complaints, this is not due to a lack of discrimination at the DEA.  Rather, this stems from two DEA practices, both of which merit this Court's attention.

First, high-ranking individuals at the DEA have intimidated and retaliated against Class members – such as Agent Buckley – who filed individual complaints or participated actively in the instant class action.  *See generally Buckley v. Mukasey*, 538 F.3d 306.

Second, when Class members do file individual EEO complaints, the DEA routinely argues that those complaints may not proceed because they fall within the substantive ambit of this Class Action.  *See, e.g.*, *Stansbury v. Gonzales*, EEOC No. 570-2006-00424X, Decision on Class Certification, at 13−14 (Aug. 1, 2008) (rejecting the DEA's argument that Agent Stansbury's claims of discrimination in assignments within the SES should be dismissed because they were part of the *Segar* case and thus not properly brought as individual claims); Motion to Dismiss EEO Complaint of John H. Austin, Jr., EEOC No. 570-2009-00554X (May 13, 2009) (attached as Exhibits 16 and 17).  Thus, the DEA attempts to use the unresolved nature of this action to shield itself from individual EEO complaints, while simultaneously refusing to resolve this action, effectively relegating all such complaints to a legal limbo.

Finally, the number of EEO claims filed against the DEA has no bearing on the fact – discussed above and in detail in Plaintiffs' expert's report – that there is valid statistical evidence

that the DEA's *current* procedures for promotions to Grades 14 and 15 have an adverse impact on the Class.  *See* Exhibit 11 (Siskin Report).

**CDP/Oversight-and-Monitoring**

This Court ordered, in 1982 and 1999, respectively, that the DEA implement two supervisory protocols related to its promotions procedures:  an oversight-and-monitoring regime intended to ensure the procedures' compliance with court orders, 1982 Order, 1982 WL 214 at *2, and the CDP, which "would reduce the acknowledged disparate impact of the SAPP."  1999 Opinion at 22−23.  The parties addressed both issues during their most recent round of negotiations, and Plaintiffs' MOU was accompanied by corresponding Agreements, which the parties had negotiated and agreed to in principle.  The parties reached complete agreement on the CDP, *see* Exhibits 2 and 15 (CDP Agreement and May 4, 2009 Letter from Rebecca Gelfond to Laurie Weinstein), and were separated by only minor differences on oversight-and-monitoring.  *See* Exhibit 3 (Oversight and Monitoring Agreement with DEA Comments).  Nevertheless, the DEA persists in its decades-long refusal to implement the required oversight system and to formally adopt the written CDP.[10/]

**Individual Relief**

In 1999, as part of its ruling that granted Plaintiffs' 1997 Motion for Compliance, this Court asked the parties to brief the issue of individual monetary relief to compensate class members who had been injured by the DEA's discriminatory practices in promotions to Grades 14 and 15 since the implementation of the SAPP.  1999 Opinion.  Plaintiffs worked with statistical experts to devise a methodology for calculating individual relief and ultimately submitted to the DEA a proposal that covered the time period from the inception of the SAPP to

---

[10/]     On March 2, 2010, nearly one year after agreeing in principle to adopt a CDP that the parties spent years negotiating, counsel for the DEA stated for the first time that the DEA currently has a system in place that is identical to the CDP Agreement.  Bizarrely, Defendants now refuse to execute the Agreement on the grounds that they are already complying with it.

October 7, 2002.  *See* Exhibit 5 (Plaintiffs' Methodology for Calculating Individual Relief).
Plaintiffs made clear to the DEA that the proposal was only a preliminary one because individual
relief should be calculated up until the point the DEA's new, nondiscriminatory promotion
process is implemented.

From 2004 through late 2006, Plaintiffs repeatedly requested that the DEA provide data
for the post-October 7, 2002 period in order to complete their individual relief calculations.
After much delay, during the course of mediations in 2006, the DEA provided data, which
Plaintiffs' expert determined were incomplete.  On October 30, 2006, Plaintiffs informed the
DEA of what additional information would be required to determine individual relief, but never
received a substantive response from the DEA.  Throughout the mediations, the DEA never
submitted its own proposal for how individual relief should be calculated.  Instead, the DEA
stated that it was willing to accept Plaintiffs' method of calculating individual relief but that it
would first like to know the total dollar amount.

On May 13, 2008, Plaintiffs again requested data relevant to the individual relief
calculations; the DEA responded by providing data on October 17, 2008.  In a letter dated
December 9, 2008, Plaintiffs noted that the data it provided on October 17, 2008 were
incomplete, and requested complete data.  *See* Exhibit 18 (December 9, 2008 Letter from
Rebecca Gelfond to Laurie Weinstein).  Plaintiffs reiterated this request on January 28, 2010, but
despite Defendants' counsel's statements that the requested data would soon be forthcoming,
Plaintiffs have yet to receive a response on this issue from the DEA.  Thus, more than a decade
after this Court ordered the DEA to provide individual relief related to discriminatory GS-14/15
promotions, Plaintiffs have not seen a penny in such relief, and lack even the data necessary to
calculate the amount of relief to which they are entitled.

**REQUESTED RELIEF**

**A.      Compliance**

The DEA continues to flout this Court's authority and disregard the commands of Title VII, more than thirty years after Plaintiffs first complained of the DEA's unlawful conduct.  As a result, Plaintiffs continue to suffer from disparate impact caused by the DEA's discriminatory employment practices, and Plaintiffs have yet to receive the full measure of relief to which this Court has repeatedly found them entitled.  Plaintiffs therefore respectfully request that this Court order the DEA to comply with its obligations under this Court's existing orders and Title VII, and submit herewith a Proposed Order that would grant such relief.  Specifically, the Order requires the DEA to (1) execute and implement the December 9, 2008 Agreements regarding promotions to Grades 14 and 15 and Oversight and Monitoring; (2) execute and implement the May 4, 2009 Agreements regarding SES promotions and the CDP; (3) reinstitute the pre-2004 validated, non-discriminatory procedures for promotions to Grade 13; and (4) provide Plaintiffs the individual monetary relief ordered by this Court in 1999.

**B.      Fees**

Under Title VII, Plaintiffs are entitled to attorneys' fees and costs for prevailing in this action.  42 U.S.C. § 2000e-5(k).  The DEA has reimbursed Plaintiffs' fees and costs through May 31, 1996, but due to Defendants' history of recalcitrance and failure to comply with court orders, another fourteen years of litigation and negotiations have followed, during which time Plaintiffs' counsel have dedicated thousands of hours to this case.  In this period the parties have engaged in two trials, multiple TRO/PI proceedings, one appeal before the D.C. Circuit, and no fewer than four rounds of negotiations and mediations.  Plaintiffs, however, have not received payment for any associated fees or costs.  Plaintiffs respectfully request that this Court order the

DEA to reimburse Plaintiffs' fees and costs for the period from June 1, 1996 to the present and submit herewith a Proposed Order granting such relief.

### C. Contempt

#### 1. This Court Should Find Defendants in Contempt.

This Court, like all federal courts, possesses "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[I]t is firmly established that 'the power to punish for contempts is inherent in all courts.'") (quoting *Ex Parte Robinson*, 86 U.S. 505, 510 (1873)); *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). Civil contempt is appropriate where, as here, a defendant violates a "clear and unambiguous" court order. *Armstrong*, 1 F.3d at 1289 (citation omitted). The civil contempt power is appropriately "used to obtain compliance with a court order." *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C. Cir. 1997).[11]

As described in the preceding Discussion, the DEA is unquestionably not in compliance with numerous aspects of several orders issued by this Court and the D.C. Circuit, namely:

#### a. Promotions

This Court mandated, nearly three decades ago, that the DEA "proceed to develop and implement new, nondiscriminatory employment systems with respect to . . . promotions" to Grades 12 and above. 1982 Order, 1982 WL 214, at *2; *see also* 1981 Opinion, 508 F. Supp. at 714−15. Despite the clarity and unquestioned authority of these requirements, the DEA continues to violate them. The DEA has not implemented validated, nondiscriminatory systems for promotions to Grades 14 and 15. Moreover, although the validity of DEA's previous procedures for promotions to Grade 13 was not in question, the DEA unilaterally abandoned

---

[11]   Plaintiffs defer to the Court to determine appropriate sanctions.

those procedures in 2004, and replaced them with a new system that had not been validated by (or even submitted to) the Working Group.  The DEA has not so much as acknowledged this change to Plaintiffs in the intervening five years, much less taken the necessary steps to ensure that the change complied with this Court's orders.  Finally, the existing, stipulated procedures for promotions to the SES include several material ambiguities.  The parties agreed, in May 2009, to clarify these ambiguities, but the DEA has refused, since that time, to formally adopt these clarifications.

### b.      Oversight & Monitoring

This Court specified that "[o]nce these new [promotions] systems are in place, defendants shall insure that the new systems neither have a disparate impact on black agents nor effectuate disparate treatment of black agents."  1982 Order, 1982 WL 214, at *2.  Obviously, Defendant's failure to implement the necessary systems has precluded them from insuring that they have no disparate impact.  But the DEA has also declined to formally agree to a negotiated proposal that established the structure for this required Oversight & Monitoring system.  It is essential that such a system be in place at the time the new promotions procedures are implemented, so that the parties and the Working Group have the necessary data to ensure compliance with the procedures and with court orders without unnecessary delay.

### c.      Career Development Program

More than a decade ago, this Court held that the DEA was "obligated to implement a Career Development Program to reduce the acknowledged disparate impact of the SAPP."  1999 Opinion at 22−23.  As with the other elements of the Court's orders related to Defendant's promotions procedures, however, the DEA has failed to comply with this obligation:  although the parties agreed to the CDP, the DEA refuses to formally execute the agreement.

**d.** **Individual Relief**

Pursuant to the same 1999 Opinion and Order that mandated the CDP, the DEA is required to provide individual relief to Class members who were subjected to the DEA's non-compliant procedures for promotions to Grades 14 and 15.  Not only has the DEA not provided Plaintiffs a single cent of relief, it has also neglected to provide the complete data requested by Plaintiffs as necessary to the calculation of this relief.  The DEA is blatantly not in compliance with this requirement.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court find that the DEA is not in compliance with existing Orders of this Court; issue a relief Order that includes the relief specified in the attached Proposed Order, including all unpaid attorneys' fees and costs; and issue an Order to Show Cause Why Defendants Should Not Be Held In Contempt for their continuing violation of existing orders.

Respectfully submitted,

_____/s/_____
Steven F. Cherry, D.C. Bar # 431473
Jennifer M. O'Connor, D.C. Bar # 460352
Marc E. Johnson, D.C. Bar # 976490
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

DATE:  March 3, 2010                         *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of March, 2010, a copy of the foregoing

Plaintiffs' Motion for Compliance and to Show Cause Why Defendants Should Not Be Held in

Contempt and Memorandum and Points of Authorities in Support Thereof was filed

electronically with the Clerk of the Court.  This electronic filing prompted automatic service of

the filing to all counsel of record in this case who have obtained CM/ECF passwords.


_____/s/_____
Marc E. Johnson

27