UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HENRY W. SEGAR, *et al.,*  )<br><br>Plaintiffs,  )<br><br>v.  )<br><br>WILLIAM P. BARR,  )<br><br>Defendant.  ) | Civil Action No. 77-0081 (EGS) |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR AWARD OF
ATTORNEYS' FEES AND COSTS**

In this Title VII litigation, Plaintiffs, represented *pro bono* by Wilmer Cutler Pickering

Hale and Dorr LLP ("WilmerHale"), seek an interim award of attorneys' fees and costs for the

period between June 1, 1996, and June 25, 2019.  *See* Pls.' Mot. for Award of Attorneys' Fees and

Costs ("Pls.' Mot."), ECF No. 432.   Specifically, Plaintiffs request a total award of

$12,684,593.04, representing $11,913,741.67 in attorneys' fees and $770,851.37 in costs.  *Id.* at

1.  Although Defendant does not dispute that Plaintiffs are a "prevailing party" and entitled to *some*

award, the fees and costs that Plaintiffs request in their motion are excessive and not sufficiently

supported.  Thus, any award of fees and costs to Plaintiffs should be significantly reduced for all

of the reasons explained below.

**STANDARD OF REVIEW**

Where a party prevails in a Title VII lawsuit, as Plaintiffs have done here, the Court has

discretion to award that party reasonable attorneys' fees and costs.  *See* 42 U.S.C. § 2000e-5(k).

Plaintiffs bears the burden of establishing entitlement to the award by documenting the appropriate

hours billed and the reasonableness of the rates.  *Covington v. Dist. of Columbia*, 57 F.3d 1101,

1107 (D.C. Cir. 1995) (citing *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).  A "reasonable fee is one that is adequate to attract competent counsel, but that does not produce a windfall to attorneys."  *West v. Potter,* 717 F.3d 1030, 1033 (D.C. Cir. 2013).

In analyzing the reasonableness of the fee request, the Court typically begins by determining the lodestar amount – the number of hours reasonably expended multiplied by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Covington,* 57 F.3d at 1107 (quoting *Save Our Cumberland Mountains, Inc., et al. v. Hodel ("SOCM")*, 857 F.2d 1516 (D.C. Cir. 1988)).  Even then, the lodestar amount may be reduced based upon a number of factors.  *Hensley*, 461 U.S. at 436.  To establish the reasonableness of hourly rates, a plaintiff must submit evidence of the attorneys' billing practices; their skill, experience, and reputation; and the prevailing market rates in the relevant community for similar services.  *Covington,* 57 F.3d at 1107*; see also Salazar ex rel. Salazar v. Dist. of Columbia*, 809 F.3d 58, 62 (D.C. Cir. 2015); *Eley v. Dist. of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015).  Once a reasonable hourly rate is determined, the Court must next consider whether the total hours expended in litigation were reasonable.  Courts should exclude from fee calculations "hours that were not 'reasonably expended,'" or are "excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434. Courts may also reduce fee awards for inadequate billing judgment, hours billed for unrelated matters, for non-reimbursable time, or for double-billing.  *Shaw v. Dist. of Columbia*, 210 F. Supp. 3d 46, 51 (D.D.C. 2016) (internal citations omitted); *see also*, *Craig v. Dist. of Columbia*, 197 F. Supp. 3d 268, 275 (D.D.C. 2016).

## ARGUMENT

As noted above, Plaintiffs seek an award of $12,684,593.04 in attorneys' fees and costs. But, as explained in greater detail below, this amount is both inadequately supported and otherwise excessive.  To start, Plaintiffs request that this Court apply significant hourly rates for all attorneys

and staff, but provide no basis for the Court to conclude that the rates they proffer are, in fact, reasonable.  Furthermore, while Plaintiffs supply hundreds of pages of billing records, many of the time entries are impermissibly vague and inadequately detailed, rendering it impossible to discern the reasonableness or unreasonableness of the time expended.  This problem is compounded by the fact that many of the entries also block-bill time, such that many different tasks are aggregated together in a single time entry.  But even in those places where an evaluation is possible, it is clear that Plaintiffs seek compensation for excessive, redundant, or unnecessary expenditures of time.  It is also clear that Plaintiffs are seeking compensation for purely clerical tasks performed by both attorneys and staff that are not properly compensable on a motion for attorneys' fees.

Plaintiffs' request for costs is similarly unsupported and excessive.  Indeed, of the $770,851.37 that Plaintiffs request, approximately half of that amount is attributable to about 60 charges for expert and professional fees.  These charges appear as line items in the more-than 20,000 individual cost entries and most of which seek thousands or tens of thousands of dollars.  Yet, Plaintiffs offer no documentation supporting these charges, and the vast majority of the cost entries themselves are entirely devoid of any description of the work performed.  Thus, there is no basis from which one could conclude that the charges are reasonable.  Plaintiffs also seek approximately $200,000 for printing and copying expenses, but it appears that, for several years, counsel charged these expenses at rates exceeding the customary rates in this jurisdiction.

For all of these reasons, this Court should reduce any award of attorneys' fees and costs to Plaintiffs.

I.      **PLAINTIFFS HAVE NOT ESTABLISHED THE REASONABLENESS OF THEIR HOURLY RATES AND THEREFORE THIS COURT SHOULD INSTEAD APPLY THE RATES ESTABLISHED IN THE LSI *LAFFEY* MATRIX.**

A.      **Plaintiffs Have Not Met Their Burden of Establishing The Reasonableness of The Rates That They Are Seeking.**

Plaintiffs bear the ultimate burden of establishing the reasonableness of the rates charged by their attorneys for services rendered in the underlying proceedings.  *Eley*, 793 F.3d at 100. "Whether an hourly rate is reasonable turns on three sub-elements: (1) 'the attorney's billing practices,' (2) 'the attorney's skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Id.* (*quoting Covington*, 57 F.3d at 1107).  In this case, Plaintiffs seek to use the current "standard billing rates that WilmerHale charges to clients," but apply a single rate for all partners and counsel ($800 per hour), senior associates ($700 per hour), associates ($470 per hour) and staff ($235 per hour), regardless of anyone's relative skill, experience, or reputation.  *See* Pls.' Mot. at 5-7 & Exhibit 4.  Plaintiffs, however, provide hardly any basis to conclude that these are reasonable rates to apply in this case.  Indeed, Plaintiffs give only very short shrift to justifying their proposed rates under any of the relevant elements to be considered in this Circuit.

With respect to billing practices, Plaintiffs' counsel merely states that the firm's "customary practice is to charge an hourly basis for work performed by firm attorneys and staff, and to bill the client for that amount."  Smith Decl. ¶ 13.  But it is not sufficient to merely state what counsel "bills" to private, fee-paying clients.  Rather, counsel must demonstrate more specifically, what rates are *actually paid* by clients or realized by the firm.  *See Nat'l Assoc. of Concerned Veterans v. Sec. of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982) ("A fee applicant should be required to state the rate at which he actually billed his time in other cases during the period he was performing the services for which he seeks compensation from defendant.  This rate is not

what he [the attorney] would have liked to receive, or what the client paid in a single fortunate case, but what on average counsel *has in fact received*." (emphasis added)).  Indeed, "[f]irms frequently discount their standard rates and, even after discounting, lower the effective rate further by writing off a portion of their billed hours to reflect attorney inefficiency and other considerations." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 80 F. Supp. 3d 1, 5 (D.D.C. 2015) (hereinafter "*CREW I*") (noting discounts, fee caps, and write-offs of first-year associate work).  Even then, "firms do not always collect 100 percent of the fees they ultimately bill" and thus, for all of these reasons, "reported rates surely overstate the actual fees that law firms are paid—and expect to be paid—for their services."  *Id.*; *see also Nat'l Assoc. of Concerned Veterans*, 675 F.2d at 1326 ("It is obvious that where counsel customarily exercises billing judgment by not billing at the market rate or for the full amount of time expended this fact must be considered in calculating counsel's true billing rate.").  Thus, Plaintiffs mere assertion that counsel bill their time at set hourly rates does not satisfy Plaintiffs' burden of establishing their billing practices or a reasonable hourly rate to be applied here.

Plaintiffs likewise devote very little effort to explaining the skill, reputation, or experience of the attorneys who worked on this case.  While Plaintiffs seek compensation for work performed by 36 different attorneys, they provide background information for only three—two partners and one counsel.  *See* Smith Decl. ¶¶ 3-5, 22.  For everyone else, they merely provide a name, most recent job title, a simple assurance that they are all "highly qualified" generally, and a suggestion that they are all "similarly qualified" to the two named partners.  Smith Decl. ¶¶ 22-23.  But Plaintiffs do not provide even the most basic kinds of information typically used to determine proper rates, such as the attorneys' experience litigating these kinds of matters or even when any

of the attorneys graduated from law school.   Thus, one can hardly evaluate the level of experience—and thus an appropriate rate—for the 33 other attorneys who billed time to this matter.

Perhaps most striking, however, is Plaintiffs' failure to provide any evidence whatsoever concerning the "prevailing market rates for similar services" in the Washington, D.C., market.  To establish the prevailing market rate, a plaintiff must "'produce satisfactory evidence – *in addition* to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Eley*, 793 F.3d at 104 (*quoting Blum*, 465 U.S. at 895 n.11 (emphasis in original)); *Jordan v. U.S. Dep't of Justice, 691 F.2d 514, 521 (D.C. Cir. 1982)* ("[F]ee claimants must provide the court with specific evidence of the prevailing community rate.").

But, in this regard, Plaintiffs offer nothing.  Indeed, the only evidence in the record is counsel's own declaration stating that he "believe[s] WilmerHale's hourly billing rates are consistent with rates charged by similarly situated lawyers in Washington, D.C." and he "believe[s] the rates charged by staff members—including paralegals and project assistants—at [his] firm to be similar to those for comparable services by staff members at competing firms in Washington, D.C."  Smith Decl. ¶ 14.  Plaintiffs, however, make no attempt to substantiate that subjective belief with any evidence whatsoever—which is plainly insufficient.  *See Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326 ("The District Court's task is to determine the approximate market rate.  Its inquiry is aided little by an affidavit which just offers one attorney's conclusory and general opinion on what that rate is.  Nor is it helpful if the affiant simply states that he is familiar with the attorney and the litigation and that he thinks the fee request is reasonable.  What is needed are some pieces of evidence that will enable the District Court to make a reasonable determination of the appropriate hourly rate.").

Instead of offering evidence of the relevant prevailing market rate, Plaintiffs merely argue that this Court should presume, without evidentiary foundation, that WilmerHale's current billing rates are in line with those rates.  Pls.' Mot. at 5-6.  To support this notion, Plaintiffs point to Judge Lamberth's 2008 decision in *Miller v. Holzmann*, 575 F. Supp. 2d 2 (D.D.C. 2008), a *qui tam* case where the Court found that WilmerHale's rates at that time aligned with the established rates for that type of work in the D.C. legal community.  *Id.* at 13.  But there are key differences between the fee petition at issue in *Miller* and the fee petition at issue here.  To start, the rates at issue in *Miller* that WilmerHale charged over a decade ago are not the same rates that it is seeking today, and nothing in that opinion suggested that WilmerHale's future, higher rates would be deemed forever reasonable without need for additional evidence.[1]  And critically, in *Miller*, unlike Plaintiffs here, the relator actually supplied evidence of billing rates in the prevailing community beyond the declaration provided by his counsel.  Indeed, the relator in that case also provided declarations from local attorneys who undertook an analysis of WilmerHale's rates and compared them to multiple benchmarks.  *Id.* at 12-13.  Only upon consideration of this evidence did Judge Lamberth conclude that the relator had satisfied his burden to show that the rates then-charged by WilmerHale aligned with the prevailing rate in the D.C. community and was willing to utilize those rates in granting an award of attorneys' fees.  *Id.* at 13.

But where, as here, Plaintiffs offer no evidence whatsoever of the prevailing rates in the D.C. legal market for this kind of Title VII litigation, it is inappropriate to accord any firm a blanket presumption that its rates are reasonable.  For example, in *Eley*, the D.C. Circuit reversed the

---

[1] Furthermore, Plaintiffs' burden is to demonstrate that the rates being charged are "in line with those prevailing in the community *for similar services*," *Eley*, 793 F.3d at 105, but *Miller* involved *qui tam* litigation, not Title VII litigation.  Plaintiffs offer no reason why this Court should consider the services provided in these two different kinds of cases to be similar.

decision of the district court and held that "the district court erred in not requiring [plaintiff] to demonstrate that her suggested rate was in line with those prevailing in the community for similar services." *Eley*, 793 F.3d at 105 (internal citation and quotation marks omitted); *see also Kattan by Thomas v. Dist. of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) ("[A]n attorney's usual billing rate is presumptively the reasonable rate, *provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'*") (quoting *Blum*, 465 U.S. at 896 n.11) (emphasis added).

For these reasons, Plaintiffs have failed to establish the reasonableness of the hourly rates that they seek to apply in this case.

### B.       The Court Should Apply The Rates Established in the LSI-*Laffey* Matrix.

Because Plaintiffs fail to justify the rates that they seek to apply in this case, this Court should instead apply the rates established by the *Laffey* Matrix, as updated by the Legal Services Index (the "LSI *Laffey* Matrix").  *See Urban Air Initiative, Inc. v. EPA*, Civ. A. No. 15-1333 (ABJ), 2020 WL 956587, at *15 (D.D.C. Feb. 27, 2020) (applying defendant's requested fee matrix where plaintiff's evidence was "insufficient to establish that 'the requested [hourly] rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation'" (quoting *Blum*, 465 U.S. at 896 n. 11)); Exhibit A (LSI *Laffey* Matrix Rates).

Fee matrices are frequently used to establish appropriate rates for attorneys' fees and, in this jurisdiction, the most commonly used fee matrix is the "*Laffey* Matrix."  *See Salazar ex rel. Salazar*, 809 F.3d at 62.  The original *Laffey* matrix was first approved in a Title VII class-action lawsuit like this one, called *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354, 371–375 (D.D.C. 1983), *aff'd,* 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds by SOCM,* 857 F.2d at 1525.  That matrix presented a grid establishing hourly rates for lawyers of differing levels of

experience during the period from June 1, 1981, through May 31, 1982.  The Court of Appeals accepted the 1981–1982 matrix in *SOCM,* 857 F.2d at 1525, and the parties to that case updated it through May 31, 1989, as part of a settlement.  *Covington v. Dist. of Columbia,* 839 F. Supp. 894, 898 (D.D.C. 1993).  Since then, the *Laffey* matrix has been updated periodically to reflect inflation, resulting in two competing *Laffey* matrices—the LSI *Laffey* Matrix and the United States Attorney's Office *Laffey* Matrix, with the LSI *Laffey* Matrix representing higher rates.  *See DL v. Dist. Of Columbia*, 924 F.3d 585, 589-91 (D.C. Cir. 2019); *Eley*, 793 F.3d at 101–02 (elaborating on the differences between the LSI and the USAO *Laffey* Matrices).  Courts in this jurisdiction have now relied on these updated *Laffey* matrices for decades to determine appropriate fee awards in cases involving "complex federal litigation," *Salazar v. Dist. of Columbia*, 123 F. Supp. 2d 8, 13 (D.D.C. 2000), including in many actions involving Title VII, *see e.g.*, *Makray v. Perez*, 159 F. Supp. 3d 25, 49, 56 (D.D.C. 2016); *Craig v. Mnuchin*, No. CV 14-1340 (RC), 2018 WL 6079512, at *17 (D.D.C. Nov. 21, 2018).

As noted above, a "reasonable fee is one that is adequate to attract competent counsel, but that does not produce a windfall to attorneys."  *West,* 717 F.3d at 1033.  Although perhaps imperfect, the D.C. Circuit and other courts in this jurisdiction have approved the rates set in the LSI *Laffey* Matrix as a reasonable measure of the prevailing rate for complex litigation in Washington, D.C., market, with rates that serve to adequately compensate seasoned and experienced counsel.  *See DL*, 924 F.3d at 591; *Salazar ex rel. Salazar*, 809 F.3d at 65.  For example, in *Makray v. Perez*, 159 F. Supp. 3d 25, 49, 56 (D.D.C. 2016), Chief Judge Howell held that, in a Title VII case, the LSI-*Laffey* rates properly compensated counsel with "deep experience in the field of employment discrimination, including a number of favorable verdicts at trial, over the course of his nearly forty year career litigating in this jurisdiction and federal courts across the

country."  Likewise, in *Blackman v. District of Columbia*, 677 F. Supp. 2d 169, 175 (D.D.C. 2010), a class action lawsuit where Plaintiffs were represented by a large international law firm, Judge Friedman declined to apply the firm's customary billing rates, concluding that "[c]alculating the amount of fees to be awarded to [counsel] based on the hourly rates in the *Laffey* matrix will fairly compensate for the excellent work those lawyers have performed on behalf of the plaintiff class, at the same time recognizing the firm's commitment to *pro bono publico.*"

Thus, because Plaintiffs have failed to justify adequately the rates that they seek in their fee petition, this Court should instead apply the LSI *Laffey* rates.  Applying these rates would insure that Plaintiffs' counsel are adequately compensated without providing a windfall to counsel who are otherwise representing their clients on a *pro bono* basis.[2]  *See Craig v. Mnuchin*, Civ. A. No. 14-1340 (RC), 2018 WL 6079512, at *17 (D.D.C. Nov. 21, 2018) ("While this Court does not believe that public interest attorneys should be penalized for their lack of a profit motive, it also does not believe that they should receive the windfall of the rates charged only by the nation's largest, full-service commercial law firms, rather than rates more in line with those typically charged by both large and small private, for-profit firms for complex federal litigation in this market.").

---

[2]        Defendant does not dispute that the application of current *Laffey* rates, rather than historical rates, is appropriate under the circumstances of this case.  The rationale for applying current rates "does not, however, justify awarding rates based on the level of experience the attorneys have now, as opposed to their experience at the time."  *Lewis v. Dist. Of Columbia*, Civ. A. No. 15-521 (JEB), 2018 WL 6308722, at *11 (D.D.C. Dec. 3, 2018).  Thus, in calculating appropriate attorneys' fees, the current LSI *Laffey* rates should be applied based on the level of experience that Plaintiffs' attorneys had at the time that they performed work on this matter.  *See id.* (holding that court would "use the current USAO Matrix but [] apply the experience level at the time of billing"); *Young v. Sarles*, 197 F. Supp. 3d 38, 51-52 (D.D.C. 2016) (providing for reimbursement rates based on experience at time of billing); *Kelsey v. Dist. of Columbia*, 219 F. Supp. 3d 197, 204 (D.D.C. 2016) ("This Court has found appropriate the application to pending requests for attorney's fees of the current *Laffey* Matrix rates for the level of an attorney's experience at the time of billing.").

### C.     The Applicable Billing Rates Should Be Discounted By 15% To Account For Differences Between Reported Billing Rates And Actual Billing Realization.

Regardless of which rates this Court ultimately applies, this Court should reduce the applicable rates by 15% to account for differences between reported billing rates and actual billing realization.  As noted above, "[f]irms frequently discount their standard rates and, even after discounting, lower the effective rate further by writing off a portion of their billed hours to reflect attorney inefficiency and other considerations." *CREW I*, 80 F. Supp. 3d at 5.  Even then, "firms do not always collect 100 percent of the fees they ultimately bill" and thus, for all of these reasons, "reported rates surely overstate the actual fees that law firms are paid—and expect to be paid—for their services."  *Id.*  Accordingly, this Court should reduce the applicable billing rates to account for discrepancies between published rates and billing realization.  *See id.* (reducing rates "by 15 percent [] to account for the differences between reported rates and actual law firm billing realization"); *Westfahl v. District of Columbia*, 183 F. Supp. 3d 91, 98 (D.D.C. 2016) (applying "LSI-Laffey rates, reduced by a factor of 15% to reflect the realities of rate discounting and billing realization that are not taken into account by published standard attorney billing rates").

## II.     THIS COURT SHOULD REDUCE THE LODESTAR TO ACCOUNT FOR VAGUE BILLING ENTRIES, REDUNDANT, EXCESSIVE, OR UNNECESSARY TIME EXPENDITURES, AND PURELY CLERICAL WORK THAT IS NOT COMPENSABLE.

In this Circuit, a court may reduce fees "by a reasonable amount without providing an item-by-item accounting," and in this case such reductions are appropriate.  *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 973 (D.C. Cir. 2004) ("In view of all this—inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries—we will allow reimbursement for only fifty percent of the attorney hours that Role Models requests."). In support of their motion for attorneys' fees, Plaintiffs have appended more than 500 pages of time records, which consist of more than 10,000 individual billing entries.  As such, an item-by-

item accounting of all of Plaintiffs' time records is simply infeasible.  Nevertheless, a review of counsels' billing records demonstrates that reductions to the lodestar are warranted to account for use of impermissibly vague time entries, redundant, excessive, or unnecessary time expenditures, and entries seeking compensation for purely clerical work.

A.       **This Court Should Reduce The Lodestar by 10 Percent to Account for the Prevalence of Impermissibly Vague Time Entries.**

"Fee applicants bear the 'heavy obligation to present well-documented claims.'" *Kennecott Corp. v. E.P.A.*, 804 F.2d 763, 767 (D.C. Cir. 1986) (per curiam) (internal citation omitted) (reducing award to fee applicant by 15% for poor documentation).  "Supporting documentation 'must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended.'" *In re Donovan*, 877 F.2d 982, 994 (D.C. Cir. 1989) (quoting *United Slate Tile & Composition v. G & M Roofing,* 732 F.2d 495, 502 n.2 (6th Cir. 1984)); *see also Am. Petroleum Instit. v. EPA*, 72 F.3d 907, 915 (D.C. Cir. 1996) ("To satisfy its burden of showing that the hours claimed were reasonably expended on a case, a petitioner must submit 'sufficiently detailed information about the hours logged and the work done,' and 'it is insufficient to provide the . . . Court with very broad summaries of work done and hours logged.'" (quoting *National Ass'n of Concerned Veterans*, 675 F.2d at 1327 (modifications in original)).  "Satisfactory documentation in this Circuit consists of 'contemporaneous time records of hours worked . . . plus a detailed description of the subject matter of the work with supporting documents, if any.'" *Ashraf-Hassan v. Embassy of Fr. in the U.S.*, 189 F. Supp. 3d 48, 58 (D.D.C. 2016) (quoting *In re Donovan*, 877 F.2d at 994) (alteration in original).  Where the "documentation of hours is inadequate, the . . . court may reduce the award accordingly." *Hensley*, 461 U.S. 424, 433 (1983).

As such, courts frequently reduce fee awards when the billing descriptions supplied by counsel are overly vague.  For example, in *Michigan v. EPA*, 254 F.3d 1087, 1093–94 (D.C. Cir. 2001), the D.C. Circuit held that entries with nothing more listed than "Conferences calls," "Telephone conferences," or "write emails," were "wholly deficient" and must be eliminated entirely.  It also held that entries listing an action and a person, but otherwise "devoid of any descriptive rationale for their occurrence"—for example, "Telephone conference with client; conference with J. Knight"— were "inadequately detailed" and warranted an overall reduction of the total fee request.  *Id.* at 1095 ("Therefore, as we have done in similar circumstances in the past, after all other deductions have been taken we will make a further deduction of 10% of the remaining billings.").

In this case, there are numerous examples of inadequately detailed billing entries.  Attached hereto as Exhibit B is a non-exhaustive selection of representative examples pulled from Plaintiffs' billing records.  As Exhibit B shows, there are many entries akin to those at issue in *Michigan v. EPA*, where counsel only vaguely describe meetings, conferences, and other communications, but provide no explanation whatsoever for their occurrence.  Examples include: "Thompson Telecon," "Adams Meeting," "meet with Ms. Gelfond," "O'Flanagan email," "email to Lake re litigation," "Tcon W/ Beaver; Fax To Same; Email To Segar Team," and "communicate with various team members re case status."  Such vague statements are plainly insufficient to satisfy a petitioner's burden of proving the reasonableness of their billings and thus courts routinely discount such entries.[3]  *See Dickens v. Friendship-Edison P.C.S.*, 724 F. Supp. 2d 113, 124–25 (D.D.C. 2010)

---

[3] Many of Plaintiffs' communication-related entries are further objectionable because they make reference to meetings or communications with various named individuals, but Plaintiffs do not describe who those people are or what their relationship to this matter has been.  Without this information, it is not possible to evaluate the reasonableness of those charges.  *In re Donovan*, 877 F.2d 982, 995 (D.C. Cir. 1989) (deducting charges incurred when attorneys held conferences and

([T]there are a number of entries inadequately detailed, with descriptions such as: 'Conference with parent;' 'Discussion with child's attorney;' 'Telephone call to DCPS staff;' and 'Prepared documents for child's advocate,'" which "make reasonable a reduction of 10% from the overall award[.]"); *Miller,* 575 F. Supp. 2d at 35-36 (collecting cases).

Plaintiffs' counsel also include many time entries that only vaguely describe substantive work, such as entries that say only "Research," "Title VII Research," "read cases" "Research procedural issues," "Research reply brief," "Research/draft portion of reply brief," "draft reply brief," "trial prep," and "prepare for trial."  *See* Exhibit C (examples of inadequately detailed Time entries involving substantive work).  Again, these types of vague entries do not enable the court to determine with a high degree of certainty that the time spent was reasonably expended.  *See e.g., Role Models Am., Inc.*, 353 F.3d at 973 (holding that "generic entries" such as "[r]esearch and writing for appellate brief" are "inadequate to meet a fee applicant's 'heavy obligation to present well-documented claims'"); *DL v. Dist. of Columbia,* 256 F.R.D. 239, 246 (D.D.C. 2009) (reducing lodestar by 10% for vague time entries, such as "draft reply brief"); *Miller* (reducing WilmerHale's lodestar for vague time entries, such as "reviewing and revising memorandum to file; research on bid-rigging cases"); *Cobell v. Norton*, 407 F. Supp. 2d 140, 158 (D.D.C. 2005) ("Entries such as: 'research read cases; searched Westlaw'; 'meet with attys' ; 'prepare for trial'; 'further trial preparation and document review;' and 'trial preparation'; and 'preparation for trial,' are so vaguely generic that the Court can not determine with certainty whether the activities they purport to describe were necessary and reasonable."). *U.S. ex rel. Miller v. Bill Harbert Int'l Const. Inc.*, 601 F. Supp. 2d 45, 51–52 (D.D.C. 2009), *amended in part, vacated in part*, 786 F. Supp. 2d

---

teleconferences with two individuals when "[t]he application fail[ed] to document who these individuals are or the nature of their relationship to the investigation").

110 (D.D.C. 2011) (reducing lodestar by 10% to account for vague entries such as "Research re: posttrial issues," "Review posttrial motion research memos"; "Work on responses to post-trial motions" and "Edit sections of post-trial motion"); *Craig v. Dist. of Columbia*, 197 F. Supp. 3d 268, 280 (D.D.C. 2016) ("[Plaintiff's] billing entries only vaguely describe 'preparing for trial,' and provide no detail or specificity from which the Court could ascertain whether the preparations were reasonably expended or, instead, were unnecessarily duplicative."); *A.C. ex rel. Clark v. Dist. of Columbia*, 674 F. Supp. 2d 149, 158–59 (D.D.C. 2009) (holding that entries such as "preparation for hearing" and "preparation for telephone conference" lack sufficient detail).

In short, based on the prevalence of vague, inadequately detailed time entries in counsels' billing records, and consistent with the approach taken by other courts in this Circuit, this Court should reduce the Plaintiffs' lodestar by 10 percent.

## B.    The Court Should Further Reduce the Lodestar by an Additional 10 Percent to Account for Excessive, Redundant, and Unnecessary Time Expenditures.

Although Plaintiffs have stated that they exercised billing judgment in crafting their fee request, they continue to seek compensation for work that is excessive, redundant, or otherwise unnecessary. Part of the problem can be traced to overstaffing, the natural consequence of which is the unreasonable expenditure of time. *In re Donovan*, 877 F.2d 982, 995 (D.C. Cir. 1989) (recognizing that courts should guard against overstaffing by scrutinizing entries for excessive, redundant, or otherwise unnecessary work). Because "[t]he amount of time actually expended is not the same as the amount of time reasonably expended, [] the Court may reduce an award for overstaffing." *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 52 (D.D.C. 2016).

As previously noted, Plaintiffs seek compensation for time billed by 36 different attorneys, many of whom served only limited roles. For example, Steve Charnovitz apparently worked on

the case for approximately one month at the end of 2002 and nearly all of his billings describe only "review[ing] files," "writ[ing] up summaries" and then reading and responding to internal emails. Likewise, Charles Beene apparently worked on this case for approximately one month in August 2010, but spent most of his time billing for "reviewing various case background materials." Thus, the inclusion of attorneys who ultimately had only limited roles in this matter clearly worked to increase the billings unnecessarily.

But the effect of overstaffing and other excessive billing practices is not limited only to the inclusion of attorneys who worked briefly on this case. One good example of the excessive nature of the billings can be seen in connection with a joint status report filed by the parties in June 2017. This is the kind of routine filing that should ordinarily require, at most, a couple hours of time for one or two attorneys, but, in this case, resulted in numerous hours being spent by eight attorneys. In May 2017, this Court entered a short minute order requesting that the parties submit a joint status report. *See* Minute Order (May 25, 2017). Despite the fact that the Minute Order was only two sentences long, Andrew Mendrala, a senior associate, apparently billed nearly half an hour to reviewing it—at a rate of $700 per hour. *See* Exhibit D (time entries involving work on June 2017 Joint Status Report). A few days later, on May 30, 2017, Plaintiffs' counsel apparently held a team meeting to discuss the status report. *Id.* Six attorneys participated at that meeting—two counsel, two senior associates, and two associates—none of whom billed the same amount of time for it. *See id.* Depending on the entry that you look at, this meeting about a joint status report lasted between 0.7 hours and 1.3 hours. *See id.* Thereafter, counsel spent many more hours drafting, revising, reviewing, commenting, and communicating about this report. *See id.*

When all was said and done, eight attorneys—including two partners, two counsel, two senior associates, and two associates—billed more than 30 hours devoted to a single joint status

report and now seek more than $20,000 for that effort.  *Id.*  What could have been a relatively straight-forward filing and prepared by far fewer attorneys in much less time, was apparently dragged out into something much more significant.  While "[e]xtensive preparation is, of course, a good thing, . . . Defendants should not be required to foot the bill for preparation above and beyond what was reasonably necessary."  *Am. Oversight v. U.S. Dep't of Justice*, 375 F. Supp. 3d 50, 71 (D.D.C. 2019); *see also Salazar v. Dist. Of Columbia*, 991 F. Supp. 2d 39, 53–54 (D.D.C. 2014) (reducing billing entries for inter-office conferences "in which 3, 4, or 5 lawyers attended, and presumably participated" because "this is unnecessary").

One additional example demonstrating the excessive and duplicative nature of some of counsels' work involves the drafting of multiple fee petitions.  Since 1996, Plaintiffs have filed only one petition for attorneys' fees and costs—the petition filed in January 2020.  *See* ECF No. 432.  Plaintiffs, however, apparently seek compensation for researching and drafting motions for attorneys' fees multiple times.  For example, between April and June 2005, Steven Cherry, David Cohen, Eacata Gregory, and others billed considerable time[4] to researching, drafting, and revising a fee petition and supporting materials, which was apparently "finalize[d]" on June 1, 2005, but ultimately never filed.  *See* Exhibit E (selection of time entries involving work on fee petitions). In the years that followed, additional work, including research and drafting, was periodically billed for work involving attorneys' fees.  *See, e.g.* ECF No. 432-4 at 345-46 (Entries for Christina Zaroulis Milnor (Feb. 3-4, 2010)).  In early 2015, a new, sustained effort apparently began in earnest.  *See* Exhibit E.  This effort involved a largely new cast of attorneys and support staff, but entailed a significant devotion of time and effort on more research and more drafting, revising, and

---

[4] Because many of the entries describing these activities are block-billed with other tasks and do not delineate the amount of time spent on each activity, it is impossible to know exactly how much time was devoted to this work.

internal communications about a fee petition and supporting materials. This effort lasted nearly two years—through November 2016. *See id.* But, yet again, this work produced no fee petition that was submitted to the Court. Given that nothing ever became of either of these two earlier petitions, it is hardly appropriate to charge DEA for this work.

But even if one assumed that the work performed on the two prior iterations of this petition informed the motion that Plaintiffs ultimately filed in 2020, it would still be difficult to fathom how the time sought to be compensated was entirely reasonable.[5] To start, one could hardly believe that there was not duplication of effort between the researching and drafting of even the two earlier iterations of the fee petition. But, even if one made such an incredible assumption and, furthermore, only looked at the work performed between 2015 and 2016, one would still conclude that Plaintiffs' billings were excessive. Indeed, in that time, it appears that Plaintiffs billed at least 414 hours to researching and preparing a fee petition and now request more than $200,000 for that work. *See* Exhibit E. Such an expenditure of time is plainly unreasonable. *See, e.g. Fabi Constr. Co. v. Sec'y of Labor*, 541 F.3d 407, 413 (D.C. Cir. 2008) (finding that 236.8 hours of attorney time to prepare the fee application was per se unreasonable and reducing award by 50%); *Am. Wrecking Corp. v. Sec'y of Labor*, 364 F.3d 321, 331 (D.C. Cir. 2004) (finding that 118 hours of attorney time billed to prepare the fee petition was unreasonable and reducing award 50%); *Goos v. Nat'l Ass'n of Realtors*, 997 F.2d 1565, 1572–73 (D.C. Cir. 1993) (affirming reduction of 50% for fees incurred while preparing the fee petition because the hours were "grossly excessive").

---

[5] The billing records supplied by Plaintiffs do not appear to include time entries reflecting the preparation of the current fee petition, however, Defendant fully expects that Plaintiffs will seek compensation for that work in future requests for attorneys' fees.

In short, counsels' billing entries clearly evince significant instances of redundant, excessive, or otherwise unnecessary work for which Defendant should not be required to pay. Accordingly, this Court should further reduce the lodestar by 10 percent.

### C.   The Court Should Further Reduce the Lodestar Because Plaintiffs Are Not Entitled to Compensation for Purely Clerical Work.

Further reductions of Plaintiffs' lodestar are warranted to reflect the fact that both attorneys and staff members have billed time performing work that is purely clerical in nature.  It is well settled that a prevailing party entitled to reasonable attorneys' fees may not recoup fees for time spent performing purely clerical tasks. *See Role Models Am., Inc.*, 353 F.3d at 973 ("[P]urely clerical or secretarial tasks should not be billed at a paralegal rate regardless of who performs them."); *In re Meese,* 907 F.2d 1192, 1203 (D.C. Cir. 1990) ("The court . . . deducts those charges by both paralegals and law clerks for such tasks as 'delivering' or 'picking up' various documents as well as photocopying" because "such tasks are 'purely clerical or secretarial' and thus cannot be billed at paralegal or law clerk rates.").  This is so because clerical work "ought to be considered part of normal administrative overhead."  *Michigan v. EPA,* 254 F.3d 1087, 1095–96 (D.C. Cir. 2001).

Purely clerical tasks include, for example, time spent making copies, faxing documents, making and updating case files, setting up meetings, organizing documents, filing motions, and preparing shipping labels.  *See id.* (excluding charges described as "[f]ile documents at U.S. Court of Appeals for J. Knight" "[r]eproduce and fed ex documents to EPA personnel for J. Knight" "[o]btain documents from the EPA" and "obtain a Federal Register notice" (internal quotation marks omitted)); *Driscoll v. George Washington Univ.*, 55 F. Supp. 3d 106, 117 (D.D.C. 2014) ("[F]iling motions on the electronic case management system and preparing shipping labels, while necessary, are not compensable under fee-shifting statutes."); *Jackson v. Dist. of Columbia,* 603

F. Supp. 2d 92, 98 (D.D.C. 2009) (denying reimbursement for charge described as "create file; made copies; faxed document"); *U.S. ex rel. Miller v. Bill Harbert Int'l Const. Inc.*, 601 F. Supp. 2d 45, 52–53 (D.D.C. 2009), *amended in part, vacated in part*, 786 F. Supp. 2d 110 (D.D.C. 2011) ("tasks such as the copying and storage of pleadings, updating the qualifications of various attorneys for submission in the fee petition, and making copies and tabs are not compensable"); *Beckwith v. Dist. of Columbia.*, 254 F. Supp. 3d 1, 5 (D.D.C. 2017) ("Some of the work listed clearly constitutes non-compensable clerical tasks, such as filing documents, setting up meetings, and faxing documents."); *Bridges Pub. Charter Sch. v. Barrie*, 796 F. Supp. 2d 39, 50–51 (D.D.C. 2011) (excluding "any clerical work, such as entries saying 'update case file' and 'organize case documents,' [that] was billed by [a] paralegal or administrative assistant").

Although counsel claim that they have excluded all time spent on "administrative matters, such as coordinating calls and meetings" and "time spent by project assistants on purely clerical matters," Pls.' Mot. at 9, the billing records still include numerous instances of both attorneys and staff billing time for non-compensable clerical tasks.  Attached hereto as Exhibit F is a non-exhaustive selection of representative examples of these entries.  Some of these examples include attorneys billing time for: "attend[ing] to various administrative tasks related to Segar case issue," "fill[ing] out paperwork to get access to ECF," "fil[ing] motion for discovery and to stay and proposed order," "organiz[ing] files," "re-organiz[ing] electronic binder of documents to be taken to mediation," "fax[ing] to Beaver," "finaliz[ing] mailing," and "revis[ing] plaintiff class mailing labels."  *See* Exhibit F (examples of time entries reflecting purely clerical work).  Tasks such as these are not properly billed at any rate, let alone attorney rates.

Clerical tasks appear to be even more prevalent in the professional staff billing entries. Indeed, while counsel claim that such entries have already been excluded, the vast majority of time

billed by project assistants appears to be purely clerical in nature.  This includes tasks, such as: "copy and review docs per Currie," "organize and review docs" "data entry per Currie," "organize docs per Lindsay," "copy, copy check and organize docs," "PDF defendants' production letters and distribute to team," "prepare and label folders for depositions transcripts," "update pleadings and correspondence indices," "create box inventory index for retrieval of case files," "update master discovery and filings binders," and "file maintenance."  Exhibit F.  Paralegals likewise billed for things like: "organize and copy documents for production and attorney review," "save, print, and collate pleadings pertaining to the motion to terminate for attorney team review," "revise index to timeline binders," "review boxes left by departing attorney and arrange for return of nonessential files to legal key," "file electronic case materials," "copy and assemble deposition binders per S. Gill," "copy organize and prepare pleadings and case files for messenger deliver to Walker re E. Gregory."  *See* Exhibit F.

Because these kinds of purely clerical tasks are not compensable on a motion for attorneys' fees, this Court should reduce the lodestar appropriately.  *See Copeland v. Dist. of Columbia*, Civ. A. No. 13-0837 (CRC/DAR), 2016 WL 5342702, at *5–6 (D.D.C. Aug. 29, 2016), *report and recommendation adopted*, 208 F. Supp. 3d 255 (D.D.C. 2016) (reducing lodestar by five percent to account for billing of "certain 'clerical tasks' such as scheduling conferences/meetings and placing meeting dates on the calendar; requesting records; scanning documents; forwarding correspondence; numbering, copying, and assembling documents; downloading files; and obtaining contact information.").  Based on the prevalence of time entries devoted to purely clerical work, this Court should further reduce the lodestar of project assistants and paralegals by 50 percent and reduce the lodestar for attorneys by five percent.

### III.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE THE REASONABLENESS OF MANY COSTS FOR WHICH THEY SEEK COMPENSATION.

In addition to their request for attorneys' fees, Plaintiffs also seek $770,851.37 in costs. Although much of that amount is attributable to "expert & professional fees," Plaintiffs have submitted little to no documentation from which this Court can discern the reasonableness or of those charges. Accordingly, the Court should not award those costs to Plaintiffs. Another large portion of the costs for which Plaintiffs seek compensation relates to charges for printing and photocopying. However, for many years, counsel apparently billed at rates in excess of the customary rates charged in this District. Thus, those charges were excessive and should be reduced.

### A.   The Court Should Exclude Plaintiffs' Request for Expert and Professional Fees Because Plaintiffs Have Failed to Supply Adequate Documentation Necessary To Establish The Reasonableness of the Fees That Are Sought.

Although Plaintiffs seek hundreds of thousands of dollars for expert and professional fees, they offer little to no documentation supporting the work that was performed.[6] Title VII permits a district court, in its discretion, to award "expert fees.'" 42 U.S.C. § 2000e-5(k). But "Title VII requires that the expert fees be reasonable, and if the moving party did not present the court with adequate documentation, there would be no basis for the court to decide whether the fee was reasonable." *Howe v. City of Akron*, 705 F. App'x 376, 384 (6th Cir. 2017) (internal quotation marks and citations omitted); *see also Fabi Const. Co.*, 541 F.3d at 414 (reducing award of costs because "the list of costs and expenses [was] inadequately detailed").

---

[6] Although Exhibit 5 of Plaintiffs motion suggests that they are seeking $281,246.61 in "expert & professional fees," it is not entirely clear which cost entries Plaintiffs have included to arrive at this figure. Nevertheless, by Defendant's calculation, the actual amount that Plaintiffs seek in expert and professional fees is closer to $380,000.00. *See* Exhibit G.

In this case, the only documentation that Plaintiffs provide is a single spreadsheet identifying all of the costs for which Plaintiffs seek payment.   *See* ECF No. 432-6.  In the more than 20,000 entries listed in that document, there are about 60 charges that appear to pertain to expert services, many of which seek thousands or tens of thousands of dollars.  *See* Exhibit G (Plaintiffs' expert & professional fees).  But the vast majority of those entries do not describe the work that was performed with any degree of detail.  For example, the single greatest cost entry for which Plaintiffs seek compensation is for $34,722.50, yet the only description that is provided for that charge is:

> BLDS, LLC; INV: 1857(Jul 31 2013); INVOICE FOR WORK DONE BY BLDS FROM JULY 1, 2013 TO JULY 31, 2013 IN REGARDS TO THE MATTER -- BLACK EMPLOYEES AGAINST DISCRIMINATION IN THE DRUG ENFORCEMENT ADMINISTRATION

*See* Exhibit G.  This is no isolated entry.  Indeed, nearly all of the other entries relating to expert fees are similarly devoid of any detail or description whatsoever.  *See* Exhibit G.  But, with entries like this, it is impossible to determine the reasonableness or unreasonableness of the expert fees being sought.  And in the very few instances were any attempt is made to describe the work performed, the entries lack sufficient detail.  For example, Plaintiffs seek nearly $20,000 for an expert fee involving: "Materials review; analysis and prep for deposition; deposition and prep; trial prep; hearing with magistrate."  There is however, no explanation about what individual or individuals were involved, how many hours were spent on any task, any rate that was being charged, or any other information that might help inform whether this is a reasonable charge.

Thus, in view of the plainly inadequate documentation supplied by Plaintiffs, this Court should deny Plaintiffs' request for expert and professional fees.  *See Howe,* 705 F. App'x at 384 (holding district court did not abuse its discretion in denying expert fees for inadequate

documentation when invoices supplied by Plaintiff identified work performed as "[d]eposition" and "[d]eposition preparation").

### B. The Court Should Reduce Any Award of Printing and Duplicating Costs Because The Rates That Plaintiffs Have Charged For Several Years Were Excessive.

Plaintiffs also seek more than $200,000 for photocopying and printing expenses. *See* Pls.' Exhibit 5. Review of Plaintiffs' supporting charges, however, reveals that the rates Plaintiffs charged for many of these billings was excessive. In this District, the customary charge for copying and printing is $0.15 per page and $0.25 per page for color copying and printing. *See Salazar v. Dist. of Columbia,* Civ. A. No. 93-0452 (GK), 2014 WL 12695696, at *15 (D.D.C. Jan. 30, 2014); *Johnson v. Dist. of Columbia*, 850 F. Supp. 2d 74, 82 (D.D.C. 2012); *McClam v. Dist. of Columbia*, 808 F. Supp. 2d 184, 191 (D.D.C. 2011); *Copeland*, No. Civ. A. No. 13-0837 (CRC/DAR), 2016 WL 5342702, at *6.

The rates charged by Plaintiffs, however, exceed these traditional printing and copying rates for many years. For printing, it appears that counsel charged $1.10 per page between June 1996 and January 2003[7] and then $0.20 per page between January 2003 and November 2004. Similarly, counsel's charges for "duplicating" reveal that counsel charged $0.20 per page between June 1996 and October 2004. It was not until the end of 2004 that Plaintiffs began charging $0.15 per page for both copying and printing. For "printing color," "color duplicating," and "photocopy color," it appears that counsel has always charged $1.00 per page. These rates are excessive, and Plaintiffs have made no attempt to justify them. Thus, this Court should reduce the rates for

---

[7] In the documentation provided by Plaintiffs, there are no charges specifically identified as "printing" between 1996 and 2005. Instead, there are charges for "Network Services / Word Processing." These charges persist until approximately May 2005, when it was apparently replaced with a charge called "document printing." Adding these two categories together, appears to yield the approximately $57,000 that Plaintiffs claim for "printing" expenses.

copying and printing to $0.15 per page and lower the rates for color printing to $0.25 per page.

*See e.g., Salazar*, 2014 WL 12695696, at *15 (reducing plaintiff's rates for copying, printing and

scanning from $0.20 per page to $0.15 per page and lowering rate of color copying from $1.00 per

page to $0.25 per page).

## CONCLUSION

In short, this Court should reduce the amount of any interim award of attorneys' fees and

costs to Plaintiffs for all of the reasons stated herein.

Dated: May 7, 2020

Respectfully submitted,

TIMOTHY J. SHEA, D.C. Bar #437437
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division


By: */s/ Derek S. Hammond*
    DEREK S. HAMMOND
    Assistant United States Attorney
    555 Fourth Street, NW
    Washington, DC 20530
    202-252-2511

*Attorneys for the United States of America*