**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HENRY W. SEGAR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 77-0081 (EGS) |
| MERRICK GARLAND, | ) | |
| Attorney General, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION
FOR AN AWARD OF ATTORNEYS' FEES AND COSTS**

Defendants' opposition is the latest example of their persistent failure to take responsibility for their decades-long record of proven race discrimination.  Defendants *say* they have repented (a claim that is easy to make), but even the very recent history of this case belies that claim.  They also seek to excuse their discrimination as resulting from the Drug Enforcement Administration ("DEA") being "in its infancy" when the case was filed (Opp.2), as though new federal agencies are legally or morally entitled to treat their Black employees worse than their white ones.  And it certainly does not excuse defendants' decades of continued discrimination and defiance of this Court's orders.  It is these highly suspect assertions (along with others) that underpin defendants' attacks on plaintiffs' fees motion:  Defendants seek to use their fictional claim that DEA long ago "moved far beyond the conduct alleged in this case" to trivialize the work of plaintiffs' counsel as merely "voluminous discovery requests," non-dispositive motions practice, and settlement negotiations concerning race discrimination confined to the distant past. *Id.*

Both parts of this narrative—about defendants' conduct and about plaintiffs' counsel's work—are demonstrably false and should be rejected.  For starters, the notion that the DEA has now seen the error of its ways and reformed is fanciful.  As a threshold matter, to the extent DEA has "substantially altered its employment philosophies and processes" (Opp.2), it has done so unwillingly—and only because of this lawsuit and plaintiffs' counsel's dogged efforts to end the DEA's discrimination and enforce compliance with this Court's orders.  That aside, it was just *last year* that DEA stopped using promotion procedures for GS-14 and -15 positions that were known to discriminate against Black applicants.  And it has yet to be confirmed that the new procedures are any better, which is why this Court has ordered four years of monitoring.  That order, however, came over defendants' strenuous objections that the case should instead be closed immediately.  Such resistance to transparency is the opposite of what a genuinely reformed litigant would do, which is to welcome (if not affirmatively seek) monitoring, so that it could prove that things really had changed.  Defendants' actions opposing reform, openness, and compliance with the law speak far louder than their words about their supposedly changed ways.

Those actions, moreover, starkly illustrate why defendants' carping about plaintiffs' fees motion is so galling.  Plaintiffs' counsel have been required to spend the thousands of hours on this case that their fees motion covers only because DEA—*for over forty years now*—has never fully complied with the Court's order to end discrimination.  That bears repeating (if only because defendants plainly want this Court to ignore or forget it):  DEA has spent upwards of half a century refusing to comply with this Court's order to stop discriminating against the agency's Black employees.  And the tireless work that plaintiffs' counsel have had to undertake because of that decades-long refusal has yielded significant successes, resolving plaintiffs' claims of discrimination in many of the areas initially at issue in this litigation.  Having forced

counsel to do all that work in order to end their unlawful mistreatment of Black Special Agents (or at least most aspects of it), defendants should not be heard to gripe now about the fees to which the law entitles plaintiffs for that work.  As noted in plaintiffs' motion, both the Supreme Court and the en banc D.C. Circuit have made clear that a defendant "'cannot litigate tenaciously and then … complain about the time necessarily spent by [plaintiffs] in response.'" *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (quoting *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980) (en banc)).  That is just what defendants—who notably have nothing to say about this binding precedent—are doing here.  This Court should not countenance it.

That is particularly true given the weakness of defendants' arguments regarding the fees motion (and the strength of the many arguments in the motion that defendants ignore).  As to plaintiffs' requested hourly fees, for example, defendants ignore that there is a presumption in this circuit that an attorney's usual billing rate is reasonable.  The declarations plaintiffs submitted with the motion, and the substantial voluntary reductions plaintiffs made to most attorneys' requested hourly rates, easily defeat any claim that that presumption is overcome here. Defendants criticize those declarations, but only by (1) pretending that fee matrices and surveys alone constitute sufficient supporting evidence—D.C. Circuit precedent is to the contrary—and (2) making unreasonable demands (again with no basis in case law) about additional work plaintiffs' declarants should have performed.  In addition, despite urging the use of their preferred matrix, defendants notably do not specify a proposed hourly rate for any of the attorneys covered by the motion, apparently expecting this Court to do their work for them.  That is not and should not be the law.

Defendants' arguments regarding the number of hours expended are equally infirm.  As a threshold matter, defendants seek to portray plaintiffs' hours as excessive by claiming that little

of substance happened in the case over the 23 years in question.  That is outrageously false.

Plaintiffs did enormous amounts of substantive work (achieving significant successes) over those

years.  Moreover, the hours requested are entirely unsurprising, if not outright modest, given

defendants' knee-jerk tenacious opposition to virtually all of plaintiffs' efforts to end defendants'

discrimination throughout the 23 years.  Defendants also all but ignore the fact that plaintiffs

proactively made very large voluntary reductions to the hours requested.  Given those, none of

defendants' proposed reductions (many of which are duplicative of the reductions already made)

is warranted.

At bottom, defendants seek with their extensive nitpicking to turn this into precisely what

the D.C. Circuit and the Supreme Court have said a fees motion should *not* be, which is its own

protracted and burdensome proceeding.  Plaintiffs sought to avoid that—i.e., avoid saddling this

Court with having to expend resources poring over billing records and otherwise dealing with

such nitpicking—via their substantial voluntary reductions to both rates and hours.  Those

reductions more than offset any actual shortcomings there may be with the motion and ample

supporting documentation.  Defendants' requests for further reductions should thus be rejected

and the amounts requested granted in full.

## ARGUMENT

Defendants do not deny that plaintiffs are the prevailing parties here for fee-shifting

purposes and therefore are entitled to recover reasonable attorneys' fees and costs.  Defendants

instead attack the amount plaintiffs request.  But all of their arguments fail.

### A.    Hourly Rates

1.     As plaintiffs' amended fees motion explained (at 5-6), plaintiffs are entitled to

seek fees at WilmerHale's standard, undiscounted rates.  That is because in this circuit, "an

attorney's usual billing rate is presumptively the reasonable rate." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993).  That presumption exists, the D.C. Circuit has explained, because "*[i]n almost every case, the firms' established billing rates will provide fair compensation*," and hence "when fixed market rates exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding." *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 24, 32 (D.C. Cir. 1984), *overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc); *see also Wilcox v. Sisson*, 2006 WL 1443981, at *2-5 (D.D.C. May 25, 2006) (deeming a law firm's charged rates presumptively reasonable).  Defendants do not respond to this argument—which means they have conceded it:  As this Court and the D.C. Circuit have explained, "'if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.'" *Dieng v. American Institutes for Research in Behavioral Sciences*, 412 F.Supp.3d 1, 5 n.3 (D.D.C. 2019) (Sullivan, J.) (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)).  And applying the D.C. Circuit's presumption, Judge Lamberth held in *Miller v. Holzmann*, 575 F.Supp.2d 2 (D.D.C. 2008), that WilmerHale's "established billing rates" are reasonable and "align with the established rates of lawyers of reasonably comparable skill, experience, and reputation in the D.C. legal community," *id.* at 13.  In doing so, he observed that WilmerHale's "zealous, polished, and astute advocacy justifies, and is reflected in, their established billing rates." *Id.* at 22.  All that is equally true here.

Defendants assert, however (Opp.5-7), that plaintiffs' counsel have not provided sufficient evidence to "establish[] their billing practices or a reasonable hourly rate."  But defendants act as though matrices and rate surveys are the only appropriate evidence of market

rates.  That is incorrect in several respects.  To begin with, the D.C. Circuit has looked more dimly on matrices than defendants suggest, stating that although a matrix "may provide a useful starting point in calculating market rates," a "matrix's proponent usually cannot stop there" because "such matrices are somewhat crude."  *DL v. District of Columbia*, 924 F.3d 585, 589 (D.C. Cir. 2019) (quotation marks omitted).  Moreover, although defendants assert (Opp.3) that prevailing parties "[t]ypically" rely on a matrix to establish the reasonableness of their fees, they cite no authority to support that assertion.  Indeed, contrary to defendants' suggestion that only surveys and matrices suffice, the D.C. Circuit has squarely held that "[n]o particular type of evidence can be considered gospel," i.e., that "evidence of the prevailing market rate can take many forms," *Eley v. District of Columbia*, 793 F.3d 97, 104 n.5 (D.C. Cir. 2015), including attorney affidavits like those plaintiffs submitted here.  That is why Judge Lamberth in *Miller*, in awarding fees at WilmerHale's established rates, relied on an expert declaration submitted with the fees motion stating that the rates sought were "comparable to the prevailing market rates and well within the reasonable range of rates for a law firm such as WilmerHale undertaking matters of the magnitude and complexity of those involved here."  575 F.Supp.2d at 17.  Plaintiffs submitted similar opinions in this case.  Dkt. 443-3, Mot. Ex. 2 ("Freedman Decl.") ¶¶3-4, 7; Dkt. 443-4, Mot. Ex. 3  ("Green Decl.") ¶¶3-5, 7-8; *see also Miller*, 575 F.Supp.2d at 17.  No further evidence is needed to defeat defendants' efforts to overcome the presumption of reasonableness.

Seemingly recognizing that *Miller* (like the D.C. Circuit precedent cited above) largely if not entirely dooms their hourly-rate arguments, defendants make several efforts to distinguish it. None has merit.

For example, defendants say (Opp.6) that the rates *Miller* approved "were consistent with the rates in the then-existing *Laffey* matrix," whereas "now, WilmerHale's rates far surpass those set forth in market-based fee matrices." But defendants do not even identify the matrices that WilmerHale's rates allegedly "surpass." They do not specify a single rate appearing in *any* matrix, much less offer any actual comparison between plaintiffs' requested rates and the rates in a particular matrix. Defendants instead apparently expect this Court to do that work for them. That is not this Court's job. In any event, *Miller*'s holding did not depend on the *Laffey* matrix; to the contrary, Judge Lamberth explained that "simple reference to the *Laffey* matrix cannot defeat the presumption of reasonableness accorded relator's requested rates." 575 F.Supp.2d at 15. He also stressed that although "evidence may include the *Laffey* matrix," it "may also consist of comparable fee awards *or* affidavits from knowledgeable local practitioners." *Id.* at 16 (emphasis added).

Again, that is what plaintiffs provided here: declarations from outside experts who together have been representing clients in complex civil litigation cases in Washington for over 50 years (even longer than defendants have been flouting this Court's order to stop their discrimination against Black agents). *See* Freedman Decl. ¶3; Green Decl. ¶3. These declarations aver personal knowledge of the rates charged by lawyers at similar large firms litigating civil rights cases of similar complexity in the D.C. market. Freedman Decl. ¶¶3-4, 7, 10-11; Green Decl. ¶¶3-5, 7-10. And they do not "merely state what counsel bills to its corporate clients" (Opp.5) or offer "the mere assertion that counsel bill their time at set hourly rates" (Opp.6). Rather, they opine that the rates plaintiffs *actually seek* here (rates that were heavily discounted voluntarily) are at or below the prevailing market rates for similar cases. Freedman Decl. ¶¶21-22; Green Decl. ¶¶13-17. Under D.C. Circuit precedent—and contrary to

defendants' faulting of the declarants for not conducting extensive surveys or other research (Opp.7-8)—such declarations suffice to support a requested rate so long as the declarant's analysis "is based upon personal knowledge about specific rates charged by other lawyers or rates for similar litigation." *Jordan v. U.S. Department of Justice*, 691 F.2d 514, 521 (D.C. Cir. 1982) (quotation marks omitted).  The declarations, that is, need not be "otherwise fil[l]ed with minute details." *Id.*  Indeed, had the declarants conducted a "statistically reliable, well-documented, and extensive survey of the rates clients pay for a certain sub-market of legal services" (Opp.8-9), or any of the other work defendants demand (though again defendants cite no authority for their argument that any such work is required), that would have increased the amount of reimbursement to which plaintiffs were entitled—and defendants no doubt would have complained in response to the next fees motion that the work was "excessive."  Defendants, in other words, should not be heard to complain both about the work plaintiffs' counsel *did* and about the work they (or their declarants) *didn't* do.

Defendants next attempt to distinguish *Miller* by noting (Opp.6) that "this is not a False Claims Act *qui tam* suit," as *Miller* was.  But defendants do not explain why that matters—no doubt because their own opposition likewise cites numerous cases involving subjects other than Title VII.  That includes the lone case defendants cite as endorsing use of their preferred Fitzpatrick matrix (*J.T. v. District of Columbia*, 2023 WL 355940 (D.D.C. Jan. 23, 2023), which was a case under the Individuals with Disabilities Education Act, *see id.* at *1; *see also infra* pp.11-12 (discussing *J.T.*).  What matters is that *Miller*, like this case, involved WilmerHale attorneys based in Washington D.C. performing significant (and highly successful) work in a large, complex, years-long litigation.  Defendants cannot brush that aside with any random unexplained distinction they happen to spot.

Defendants likewise go astray in asserting (Opp.6) that "a principal reason the [*Miller*]

Court blessed WilmerHale's fees in that False Claims Act suit was the commercial nature of its

relationship with its client, which is completely lacking here."  Defendants, in other words, claim

that *Miller* is inapposite because:

> When a paying client is assessing what type of attorney to hire—a big-firm
> WilmerHale attorney charging top dollar rates, or perhaps counsel at a specialized
> employment discrimination firm charging more modest sums—that paying client
> is making an economic choice of which representation to seek—i.e., do I pay
> more for a firm with more resources or do I pay somewhat less for a firm with
> specialized expertise but with fewer resources.

Opp.7. There is so much wrong with this argument (yet another for which defendants cite

no authority) that it is difficult to know where to begin.

For one thing, defendants' suggestion that a large firm like WilmerHale brings

less "specialized expertise" than a small firm is baseless.  WilmerHale attorneys have

extensive experience both with large protracted complex litigations in general and with

Title VII cases in particular.  Indeed, *Miller* noted that what it called "mega-law firm

rates" are justified because of "counsel's mega-law firm-quality representation."  575

F.Supp.2d at 16; *see also id.* at 51 (describing the WilmerHale lawyers who litigated that

case as "superstars").  That representation includes top-level "expertise" (Opp.4).

Next, defendants' description of *Miller* as involving a client who made a

conscious decision to pay a large firm's "top dollar rates" (Opp.7) is just wrong.

WilmerHale's client in *Miller* (the relator) made no decision to pay such rates because the

case was handled on a contingency basis.  575 F.Supp.2d at 49.  Not only that, but when

the relator first brought the case, he was represented not by WilmerHale but by a much

smaller firm, Wiley Rein.  *Id.* at 17-18.  (His lead counsel moved to WilmerHale during

the pendency of the case.)  Defendants know all this, both because it is in the *Miller*

opinion they cite and because the United States intervened in *Miller* and hence the Justice

Department litigated the case for years alongside WilmerHale—even providing a

declaration in support of WilmerHale's fee petition there, *see id.* at 16.  In any event,

there is simply nothing in *Miller* (or any other case, to plaintiffs' knowledge) supporting

defendants' novel proposal that a large law firm be allowed to recoup its actual rates

through fee-shifting only if the client did a conscious "cost-benefit" analysis in deciding

to hire the firm.

Defendants' argument also conflicts with the rationale of fee-shifting provisions, which is

to encourage lawyers to take on meritorious cases so that violations of the law by the government

(or private parties) will not go unredressed.  *Shelby County v. Holder*, 43 F.Supp.3d 47, 64-66

(D.D.C. 2014) (collecting cases).  Defendants agree, repeatedly quoting D.C. Circuit precedent

holding that a "reasonable fee is one that is adequate to attract competent counsel," *West v.

Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013), *quoted in* Opp.2, 9.  And large firms may

sometimes be the only ones capable of handling the biggest and most challenging cases; the

Justice Department itself told the district court in *Miller*, for example, that WilmerHale's work

"was essential in meeting the overwhelming demands of discovery and ultimately of the trial in

this matter," 575 F.Supp.2d at 22.  That is clearly the case here as well:  Absent the resources of

a large firm like WilmerHale, plaintiffs would have been hard-pressed to continue to pursue their

claims in the face of defendants' decades of continued discrimination and resistance to

complying with this Court's orders.  But large firms will not have as robust an incentive to take

on those cases if they cannot recover their standard fees simply because a client did not engage

in "cost-benefit" analysis.  While defendants may prefer such a regime, as it could only reduce

the frequency with which unlawful conduct by the government is stopped and redressed through

litigation, Congress's enactment of fee-shifting provisions, including in Title VII, shows that it had a different view.

In short, plaintiffs' evidence establishes that WilmerHale's 2019 standard hourly rates are presumptively reasonable.  (Indeed, under Supreme Court precedent, the Court could in its discretion award fees using plaintiffs' 2023 hourly rates.  *Missouri v. Jenkins*, 491 U.S. 274, 283-284 (1989).)  Nevertheless, to avoid precisely the type of protracted fee litigation in which defendants have now engaged, plaintiffs—as their motion explained—voluntarily discounted their rates, requesting reimbursement at the lowest hourly rate charged for each level of attorney (associate, senior associate, counsel, and partner), including a 30% discount from WilmerHale's median partner rates.  Dkt. 443-2, Mot. Ex. 1 ("Smith Decl.") ¶¶19-22.  Defendants deride these reductions as "arbitrary" (Opp.5), but that is wrong.  Again, all reductions were to the firm's actual lowest hourly rate for each level of attorney; those lowest hourly rates are set by free-market forces.  The discounted rates plaintiffs seek here, moreover are amply supported by the expert declarations, Freedman Decl. ¶3; Green Decl. ¶3, and they more than account for any variances (*see* Opp.4-6, 8-9) between the rates billed and those that WilmerHale is ultimately paid, Freedman Decl. ¶¶14-22; Green Decl. ¶¶7-17.  Precedent in this district supports refusing to further lower those voluntarily reduced rates.  *See Wilcox*, 2006 WL 1443981, at *5.[1]

2.    Because plaintiffs have established the reasonableness of their requested rates, the Court need not reach defendants' proffered alternative, the Fitzpatrick matrix (which did not even exist when plaintiffs filed their fees motion).  In any event, defendants point to only a single

---

[1] Defendants quote (Opp.5) one court's observation about fee petitioners "asking to conceal their hourly rates and the work done from public view."  Defendants never actually suggest that plaintiffs here are doing anything similar, because any such suggestion would be frivolous in light of the voluminous evidence submitted with the petition—including "more than 500 pages of time records," Opp.11—evidence about both "hourly rates and the work done," Opp.5.

case in which the matrix has been used—a case quite different from this one, involving a solo practitioner representing a single plaintiff in two administrative proceedings over just a six-year period.  *See J.T.*, 2023 WL 355940, at *1-4; *see also McNeil v. District of Columbia*, 342 F.Supp.3d 156, 161 (D.D.C. 2018) (providing background on the plaintiff's counsel in *J.T.*).  In that case, moreover, the Court considered only whether the Fitzpatrick matrix or the *Laffey* matrix was superior.  *See, e.g.*, *J.T.*, 2023 WL 355940, at *8.  (Defendants are thus wrong in stating (Opp.10) that *J.T.* deemed the Fitzpatrick matrix "superior to other available matrices" (plural)).  And *J.T.* deemed the Fitzpatrick matrix better than the *Laffey* matrix after noting that the former matrix was both much more recent, *see* 2023 WL 355940, at *15, and focused on "the correct market," namely the District of Columbia, *id.* at *16.  Here, plaintiffs do not rely on the *Laffey* matrix but rather, as discussed, on expert declarations.  And those declarations speak directly to the *J.T.* Court's concerns about the *Laffey* matrix's age and market focus.  One of plaintiffs' experts, for example, explains that "[a]s a result of my experience …, I am quite familiar with the applicable rates lawyers charge *in the Washington, D.C. market*."  Green Decl. ¶8 (emphasis added).  And his opinion is based on knowledge not about outdated hourly rates (as with the *Laffey* matrix) but with current ones, discussing what the "prevailing hourly rate for [large law firm] partners *today* is typically."  *Id.* ¶14 (emphasis added).  In short, defendants' lone cited case is far too thin a reed to overcome the well-established presumption—validated here by expert declarations—that plaintiffs' standard hourly rates best reflect what Judge Lamberth, as noted, called WilmerHale "counsel's mega-law firm-quality representation," *Miller*, 575 F.Supp.2d at 16.

In addition, although defendants urge application of the Fitzpatrick matrix, they do not specify what hourly rates they think would be appropriate under that matrix for *any* of plaintiffs'

attorneys.  Apparently, they would have this Court take on the substantial task of matching the numerous rates in the Fitzpatrick matrix with every one of the 36 attorneys who have provided services for plaintiffs in this case over the past quarter-century.  In fact, they forthrightly say that right up front: "[T]he Court should apply the Fitzpatrick Matrix to determine the appropriate billing rates."  Opp.1.  Again, that is not the Court's job—and defendants' decision to abdicate their responsibility to develop their arguments is an independent basis to reject their challenge to the requested hourly rates.  As a judge in this district has said (in rejecting an argument in a fees motion), "[i]t is not the obligation of this Court to research and construct the legal arguments available to the parties."  *Dobbins v. District of Columbia*, 2017 WL 7510879, at *10 (D.D.C. Oct. 24, 2017).  Indeed, indulging defendants' approach could only encourage other litigants to think that they can similarly foist much of the work required to oppose fee petitions off on courts.

Finally, defendants say (Opp.11 n.2) that when the Court does their work of "calculating appropriate attorneys' fees, the current Fitzpatrick rates should be applied based on the level of experience that Plaintiffs' attorneys had at the time that they performed work on this matter," rather than based on each attorney's current experience rate.  That approach would make the burden that defendants want to impose on this Court *much* greater, as the Court would have to determine multiple rates for the many attorneys who moved up one or more seniority levels during their time working on this case.  In any event, while the Fitzpatrick matrix should not be used for the reasons already given, this particular argument is forfeited because it is presented only in a footnote.  *See, e.g.*, *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 434 (D.C. Cir. 2022); *accord Shurtleff v. U.S. EPA*, 991 F.Supp.2d 1, 8 (D.D.C. 2013)

(Sullivan, J.) (citing *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc)).

### B.  Hours Worked

Defendants likewise raise a variety of objections to plaintiffs' request that their counsel be paid for the thousands of hours they had to spend in order to drag defendants closer to compliance with the law and bring an end to their race discrimination.  None of those objections has merit.

1.  Defendants urge reductions for work they deem "redundant, excessive, … unnecessary," or "purely clerical."  Opp.11.  Underlying all of those proposed reductions is defendants' claim (Opp.25) that plaintiffs' counsel billed too many hours to the case given that supposedly "very minimal time was spent litigating contested issues from 1996 to 2019."  That is, with all respect, preposterous.  Plaintiffs' amended fees motion summarized (at 2-3, 9-11) the work plaintiffs' counsel had to undertake during that 23-year period (again, because of defendants' continued discrimination, refusal to comply with this Court's orders, and insistence on fighting whenever called out for their unlawful behavior).  That summary of the work—a bench trial, multiple evidentiary hearings, TRO/PI proceedings, a D.C. Circuit appeal, nearly half a dozen rounds of settlement negotiations and mediations, and monitoring of DEA's employment practices alongside the EEOMC and in coordination with statistical experts and the Working Group—should have sufficed, given the Court's and defendants' familiarity with everything that has gone on in this case over two-plus decades.  But since defendants have urged the Court to turn a blind eye to the course of events, a more detailed recitation is in order.

It was clear by the 1990s, based on years of plaintiffs' monitoring and expert-assisted statistical analysis, that DEA was flouting this Court's 1982 injunction (affirmed on appeal in 1984) ordering the agency to stop its proven race discrimination.  In 1997, therefore, plaintiffs

spent significant time preparing and filing a motion for compliance to stop DEA from engaging in a GS-14 and -15 promotions practice that smuggled the highly subjective and discriminatory preferences of agency supervisors into the process.  Op. & Order at 1-3 (D.D.C. Sept. 27, 1999). In 1999, following an evidentiary hearing (which similarly required a significant investment of time by plaintiffs' counsel), this Court granted plaintiffs' motion and enjoined DEA from using the discriminatory procedures.  *Id.* at 12-13, 22-23.

DEA still refused to stop discriminating.  Over the next decade, plaintiffs' counsel repeatedly spent substantial time negotiating agreements with DEA for new GS-14 and -15 promotion procedures to replace the prior discriminatory one.  DEA refused to implement those procedures, however, reneging time and again on its promises to do so.  *See, e.g.*, Dkt. 303 at 2 (Mar. 3, 2010).

In 2010, therefore, with no prospect of a negotiated resolution (given DEA's unwillingness to honor its agreements) and with discriminatory, supposedly "interim" procedures having been in place for a decade, plaintiffs spent more time preparing and filing another motion for compliance and contempt.  *See* Dkt. 303.  After significant skirmishing between the parties over discovery and other issues (all of which required the investment of yet more time by plaintiffs' counsel), this Court referred the motion for contempt and compliance to Magistrate Judge Facciola for a report and recommendation.  *See* Dkt. 395 (Dec. 8, 2014).  And after extensive discovery, six months of expedited proceedings, and a full-day evidentiary hearing— proceedings that collectively required a tremendous investment of time by plaintiffs' counsel— Judge Facciola recommended that plaintiffs' motion be granted in full.  *Id.* at 9-13; *see also* Smith Decl. ¶9 (describing the extensive discovery).

Validating the many hours plaintiffs' counsel had to put into the motion for compliance over the preceding decade, this Court, after receiving briefing from the parties (briefing that itself required the expenditure of time by plaintiffs' counsel) largely accepted Judge Facciola's recommendation to grant that motion.  Dkt. No. 423 (June 25, 2019).  The Court ordered DEA to work with plaintiffs and the Working Group to develop a non-discriminatory "modified plan for promotions to GS-14 and GS-15 level positions."  *Id.* at 1-2.  It also held that plaintiffs were entitled to damages for past discrimination and attorneys' fees for counsel's work to bring DEA into compliance with Title VII and the Court's orders, and it directed plaintiffs to submit a damages model and request for attorneys' fees to DEA.  *Id.* at 2; *see also* Dkt. 424 at 16-23 (June 25, 2019).

In addition to this string of litigation victories, plaintiffs during the relevant period had to spend time litigating a TRO/PI, a bench trial, and a D.C. Circuit appeal to stop yet another discriminatory practice, this one involving procedures for promoting DEA agents to the Senior Executive Service ("SES").  That additional work by plaintiffs' counsel arose from stipulated procedures this Court approved in 2002 for such promotions, procedures to which DEA assured plaintiffs and the Court it would adhere.  *See* Dkt. 104, Stipulation Implementing a Promotion Process for Selecting DEA Criminal Investigators for Position in the Senior Executive Service (Mar. 12, 2002).  But in 2003, the then-DEA administrator ignored the procedures, including by appointing to an SES position a personal friend who not only hadn't applied for the role but also was not even eligible to apply.  Dkt. 130 at 7-8 (Mar. 12, 2004).  Plaintiffs' counsel promptly moved for a temporary restraining order to block the unlawful appointment—which was itself detected only because of plaintiffs' time-intensive monitoring.  *Id.*  And here again, plaintiffs largely prevailed, including on appeal before the D.C. Circuit, as this Court ultimately held that

any future SES promotions must be drawn from the list of those candidates ranked best-qualified, in accordance with the stipulated SES promotion process.  *See* Minute Order Granting Unopposed Motion for Reconsideration (Mar. 22, 2008); *see also Segar v. Mukasey*, 508 F.3d 16, 17-18, 28 (D.C. Cir. 2007).

Finally, throughout the entire 23-year period that is subject of the fees motion, plaintiffs' counsel have had to coordinate with plaintiff class representatives, the *Segar* Working Group, and other experts to monitor defendants' compliance with this Court's orders and to develop non-discriminatory promotions procedures.  Smith Decl. ¶9.

Defendants' attempt to minimize these decades-long (and largely successful) efforts as "largely limited to issuing voluminous discovery requests and filing various non-dispositive motions" (Opp.2) is astounding and offensive.  Plaintiffs' counsel's work is orders of magnitude greater than that.  In fact, even the lengthier recap just given does not begin to fully convey the time plaintiffs' counsel have had to invest in this case, because of defendants' repeated insistence (seemingly driven by animosity toward the EEOMC) to oppose plaintiffs at virtually every turn.  To take just one example, in the last few months plaintiffs have had to engage in a repeated back-and-forth with defendants just to obtain contact information for all members of the class so that the EEOMC, this Court's appointed class representative, could communicate with the people it represents regarding this litigation.  Like so much else plaintiffs have had to do, that extended back-and-forth should not have been necessary.  But defendants chose to make it necessary, i.e., made it necessary for plaintiffs' counsel to spend the time enforcing this Court's orders.  Having done so, it is simply absurd—and as noted in conflict with binding precedent, *see supra* p.3—for them to complain about plaintiffs' counsel having spent that time.  (That the back-and-forth just

mentioned occurred very recently further belies defendants' hollow claim that they have turned over a new leaf.)

Lastly, although defendants deride plaintiffs' requested hours as excessive, they ignore the fact that in *Miller*, Judge Lamberth ruled that WilmerHale had reasonably spent roughly the same number of requested here even though a much shorter time period, twelve years, was involved.  Similarly, in stating that the requested fees "exceed potential damages to the class" (Opp.1), defendants ignore the important non-monetary, prospective relief counsel has obtained for the class, including multiple injunctions prohibiting defendants from continuing to use various discriminatory promotions procedures and instead to implement validated, non-discriminatory procedures.

Put simply, defendants' complaints about plaintiffs' requested hours constitute Monday-morning quarterbacking that should—given defendants' status as the basic cause of those hours—be met with profound skepticism.  After twenty-plus years of doggedly refusing to comply with this Court's orders, defendants have no sound basis to quibble with the amount of time it has taken plaintiffs' counsel to get DEA to stop discriminating against Black Special Agents.  To conclude otherwise would reward defendants for a legacy of discriminatory practices that defied reason, the law, and this Court's orders.[2]

2.      In addition to grossly mischaracterizing the history of this case (and the volume of work plaintiffs' counsel have had to do on it during the relevant time period), defendants'

---

[2] In seeking to minimize the work plaintiffs' counsel have done, defendants also make arguments that are just bizarre.  For example, they assert (Opp.2) that "since 2014, the only 'litigation' [in this case] has consisted of settlement negotiations."  Apparently, defendants do not regard the briefing that the parties submitted to this Court regarding whether the Court should adopt Judge Facciola's report and recommendation, i.e., briefing regarding how the Court should rule on plaintiffs' motion for contempt and compliance, as "litigation."  That is, to put it mildly, a curious definition of the word.

opposition fails to explain why their substantial proposed hourly reductions are appropriate in light of the numerous reductions in hours plaintiffs made to their fee request voluntarily— reductions that exclude over 5,650 hours of work.  *See* Mot.11-12.  In fact, defendants repeatedly ignore that their proposed reductions overlap with specific ones that plaintiffs have already made.  For example, in arguing for an additional 10% reduction to the lodestar because of hours they deem excessive, defendants contend (Opp.15) that "the inclusion of attorneys who had only limited roles in this matter worked to increase fees unnecessarily"—without ever acknowledging that plaintiffs' counsel proactively eliminated a total of 580 hours by omitting all time incurred by any attorney or staff member who worked fewer than 15 hours on the matter.  Mot.11. (Defendants highlight (Opp.15) two attorneys who were not excluded, but those two attorneys each worked more than 15 hours on the matter.)  Likewise, defendants seek a 10% reduction to the lodestar in light of block billing, yet never mention that plaintiffs' counsel did the work of identifying time entries that were block-billed and reduced those entries by 10% themselves. These requests for largely duplicative reductions should be rejected for several reasons.

First, they should be rejected precisely because they are largely duplicative.  For instance, granting defendants' request for a 10% reduction due to block billing would actually mean a nearly 20% reduction—twice what the case law that defendants themselves cite deems appropriate (Opp.21)—because plaintiffs already made a 10% reduction to the entries that were actually affected by the block-billing problem.  Given that voluntary reduction, there is no reason to impose an additional one reaching time entries that were *not* block-billed.  Indeed, plaintiffs' voluntary reduction distinguishes this case from *Miller*, the only one defendants cite (Opp.21) in requesting their 10% reduction to the total lodestar.  When plaintiffs in other cases have made similar voluntary reductions, courts in this district have "decline[d] to impose a further, across-

the-board reduction"—even where a "non-negligible number" of billing statements were "subpar." *Wye Oak Technology, Inc. v. Republic of Iraq*, 557 F.Supp.3d 65, 89-90 (D.D.C. 2021); *see also Driscoll v. George Washington University*, 55 F.Supp.3d 106, 116 (D.D.C. 2014) ("[T]he Court is satisfied that any insufficient documentation has been sufficiently accounted for by plaintiff's counsel's voluntary reduction of the final lodestar figure by 5%."). This case law is consistent with D.C. Circuit precedent, which instructs that a "fee application need not present the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) (per curiam). "The essential goal," the Supreme Court has explained, "is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

Second (and relatedly), defendants' additional reductions should be rejected because defendants ignored plaintiffs' explanation that they had made voluntary reductions. *See Wannall*, 775 F.3d at 428 (a motion's arguments left unaddressed in an opposition can be deemed waived). Indeed, plaintiffs explained (Mot.12) that they did so partly to avoid burdening this Court with having to engage in precisely the detailed review of two decades' worth of timesheets that defendants now demand. That demand flies in the face of binding precedent holding that there should not be a "second major litigation" over fees. *Laffey*, 746 F.2d at 18; *Fox*, 563 U.S. at 838. Such "major litigation" would in fact likely become much more common if defendants' proposed additional reductions were made, as that would strongly discourage future plaintiffs from making voluntary reductions at all. To avoid that outcome (and for the other reasons given), the Court should instead hold that any insufficient documentation has been amply accounted for by the large voluntary reductions plaintiffs proactively made.

3.      Many of defendants' proposed reductions are also meritless for additional

reasons.

a.      For one thing, defendants repeatedly portray what are at most isolated instances as

examples of a larger problem.  For instance, defendants seek (Opp.12-15) a 10% lodestar

reduction based on purportedly vague time entries.  But the entries they identify are nowhere

*near* 10% of plaintiffs' total request.  *See* Opp. Exs.1-2.  The same is true of defendants'

proposed 10% reduction for time they deem "redundant, excessive, or unnecessary" (Opp.15;

Opp. Exs.3-4) and the 5% reduction for attorney time they deem to be "purely clerical" (Opp.21;

Opp. Ex.5).  Defendants say that their examples are "non-exhaustive" (Opp.13), but that is

dubious given that their examples span the entire 23-year period at issue.  When the time entries

are examined in full, "the "deficiencies [are] not so systemic or egregious that the Court [is]

unable to generally assess the reasonableness of the hours expended," *Wye Oak*, 575 F.Supp.3d

at 90—particularly when the Court accounts for the broader context of the litigation and the

extensive efforts plaintiffs have had to undertake over the years to secure DEA's compliance

with the Court's orders.  As the Supreme Court has said, "trial courts may take into account their

overall sense of a suit." *Fox*, 563 U.S. at 838.  As explained earlier, the "overall sense" of this

suit, and in particular of the 23 years at issue, should be that plaintiffs' counsel have been

enormously successful, despite tenacious opposition, in ending most aspects of defendants'

pervasive race discrimination.  That enormous success should be borne in mind in awarding

fees—including in considering defendants' complaints about "overstaffing" and "excessive"

billing (if the Court even reaches them despite the substantial voluntary reductions plaintiffs

already made).  It was only plaintiffs' devotion of substantial personnel and time that made their

string of successes against defendants possible.

b.      Particular aspects of defendants' "excessiveness" argument also merit further response.  As an initial matter, defendants' "overstaffing" complaint (Opp.15), i.e., that plaintiffs' request includes time billed by 36 attorneys, falls flat given the length of the period at issue (which as noted, is a direct result of DEA's continued discrimination and refusal to comply with the Court's orders).  As Judge Lamberth explained in rejecting a similar complaint in *Miller*, "both partners and associates frequently change firms or move between public and private practice; consequently, one would expect some turnover in assigned personnel over the course of twelve years."  575 F.Supp.2d at 41.  That is even more true of the 23-year period at issue here.

Moreover, defendants' chief examples of purportedly "excessive" work are nothing of the sort, and certainly nothing that warrants a 10% reduction to the entire lodestar.  First, defendants highlight (Opp.16) that plaintiffs' counsel billed 32 hours related to a June 2017 joint status report that defendants characterize as "simple."  Those hours were reasonable in light of the substantive nature of what the Court requested: a discussion of the objections to Magistrate Judge Facciola's report and recommendation that remained at issue for resolution, and the parties' positions on whether supplemental briefing was necessary.  Minute Order (May 25, 2017).  Indeed, determining how to respond was apparently sufficiently complicated from defendants' perspective that they at one point proposed an eight-day extension.  *See* Opp.Ex.3 (Volchok June 1 time entry).

Second, defendants highlight time spent preparing fee motions that were not filed.  But as defendants themselves acknowledge (Opp.17), the earlier work on motions "contributed to the petition Plaintiffs ultimately filed in January 2020."  The amount of time billed for the fee petition is not unreasonable.  Defendants try to make it appear so by pretending (*id.*) that

plaintiffs submitted only a motion "less than 13 pages long."  In reality, plaintiffs also submitted "more than 500 pages of time records," (Opp.11) multiple expert declarations, and more—all covering a time period of nearly a quarter-century.  It is entirely reasonable that assembling, preparing, and filing all of that, including making the substantial voluntary reductions to plaintiffs' requested hours, took a substantial amount of time.  And once more, it was only because of defendants' unlawful and recalcitrant conduct that so much time was spent on the underlying case and thus on the petition.  None of the cases defendants cite concerning fee petitions (Opp.17-18) involve remotely analogous circumstances.  As those cases show, moreover, even if the amount of time that plaintiffs' counsel had incurred preparing the fee petition were excessive, the proper course of action would be to reduce *those* fees by 50%.  *See Fabi Construction Co. v. Secretary of Labor*, 541 F.3d 407, 414 (D.C. Cir. 2008); *American Wrecking Corp. v. Secretary of Labor*, 364 F.3d 321, 331 (D.C. Cir. 2004) (per curiam); *Goos v. National Association of Realtors*, 997 F.2d 1565, 1572-1573 (D.C. Cir. 1993).  Here, that would result in a reduction to the lodestar of less than 1%, nowhere close to defendants' requested reduction (excessive, one might say) of 10%.  *See* Opp. Ex.4 (identifying $249,324 worth of work).  But again even that is unwarranted given all the voluntary reductions plaintiffs' counsel made before filing the motion.

c.     Finally, defendants ask the Court to reduce the lodestar for project assistants and paralegals by an astounding 50%, claiming that the fee request "still includes numerous instances" of "non-compensable clerical tasks" (Opp.22).  That is wrong.  Many of the entries defendants identify involved tasks like "index[ing] defendant production docs," various "deposition preparation" activities, and "updat[ing] and organiz[ing] binder[s]."  Those tasks required specialized knowledge of the case and were not purely clerical.  *See Robinson v.*

*District of Columbia*, 61 F.Supp.3d 54, 67 (D.D.C. 2014) (work that "required evaluation of individual documents and separating useful documents from non-useful documents" did not "equate to mere clerical work").

In short, even if all of defendants' proposed hourly reductions weren't unwarranted because of plaintiffs' substantial voluntary reductions (and defendants' failure to acknowledge those voluntary reductions), defendants' arguments for additional cuts suffer from numerous significant flaws.

### C.   Costs

Of the $770,750.91 in costs that plaintiffs seek, defendants object (Opp.24-25) only to the $205,451.16 spent to print and photocopy documents.  Those objections should be rejected.  The reasonableness inquiry for costs turns in large part on whether the costs are passed on in similar amounts to paying clients.  *Holbrook v. District of Columbia*, 305 F.Supp.2d 41, 46 (D.D.C. 2004).  Contrary to defendants' assertions, WilmerHale has not charged more than $0.20 per page for standard printing and copying costs throughout the relevant period.  Before 2005, WilmerHale charged $0.20 per page; after that, it was $0.15 per page.  And all of the challenged printing and photocopying costs reflect the expenses WilmerHale actually incurred and routinely passed along to paying clients.  Smith Decl. ¶¶29-31.  The fact that "printing and photocopying" charges fluctuate merely reflects that the price of those services, as explained, "decreased" over the 23-year period at issue.  *Id.* ¶31.  That provides no basis for any reduction.

### CONCLUSION

Plaintiffs amended motion for an award of attorneys' fees and costs should be granted, with plaintiffs awarded $14,234,016.55 in attorneys' fees and $770,750.91 in costs for the legal services rendered between June 1, 1996, and June 25, 2019.

Dated: June 13, 2023                Respectfully submitted,

                                    /s/ Daniel S. Volchok
                                    Steven F. Cherry, D.C. Bar #431473
                                    Daniel S. Volchok, D.C. Bar #497341
                                    WILMER CUTLER PICKERING
                                       HALE & DORR LLP
                                    2100 Pennsylvania Avenue N.W.
                                    Washington, D.C. 20037
                                    Tel.:  202.663.6000
                                    Fax:  202.663.6363