**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

HENRY SEGAR, *et al.*,

      Plaintiffs,

      v.

MERRICK B. GARLAND,[1]
as U.S. Attorney General,
*et al.*,

      Defendants.

Civ. Action No. 77-0081 (EGS)

---

## MEMORANDUM OPINION

Over four decades ago, the Court held that the Drug Enforcement Agency ("DEA") discriminated against African-American special agents in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See Segar v. Smith*, No. 77-81, 1982 WL 214, at *1 (D.D.C. Feb. 17, 1982). Since then, the parties have engaged in various forms of litigation to effectuate the Court's order enjoining the DEA from engaging in discriminatory practices and requiring the DEA to implement nondiscriminatory systems. *See Segar v. Barr*, No. 77-81, 2019 WL 2605591, at *1 (D.D.C. June 25, 2019).

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current Attorney General for the United States, Merrick B. Garland, is substituted as Defendant for former Attorney General of the United States, William P. Barr. *See* Fed. R. Civ. P. 25(d).

Pending before the Court is Plaintiffs' Motion for Attorneys' Fees and Costs for the period of litigation from June 1, 1996, to June 25, 2019. *See* Pls.' Am. Mot. for Award of Att'ys' Fees and Costs ("Pls.' Mot."), ECF No. 485 at 1.[2] Upon careful consideration of the motion, the opposition, the reply thereto, the applicable law, and the entire record herein, the Court **GRANTS** in part Plaintiffs' Motion for Attorneys' Fees and Costs in the amount of $14,689,565.23.

## I. Background[3]

In 1981, the Court found that the DEA discriminated against African-American agents with respect to promotions, enjoined the agency from engaging in those discriminatory practices, and required the agency to implement nondiscriminatory promotion systems for certain Grade levels of agents. *See Segar*, 2019 WL 2605591, at *1. The parties created a "Working Group" to develop and recommend promotion systems that would comply with the Court's order. *See id.* The Court also ordered the creation of

---

[2] When citing electronic filings throughout this Opinion, the Court cites to the ECF header page number, not the page number of the filed document.

[3] This Background focuses on the procedural developments in the case for the time period at issue in the current fee request—June 1, 1996, to June 25, 2019. *See* Pls.' Mot., ECF No. 485 at 1. More comprehensive descriptions of the case's full history can be found in previous opinions. *See, e.g.*, *Segar*, 2019 WL 2605591, at *1-3; R. & R., ECF No. 395 at 1-5 (recounting procedural history from 1977 onward to contextualize "outstanding issues" discussed in Magistrate Judge's Report and Recommendation).

the Equal Employment Opportunity Monitoring Committee to monitor the DEA's compliance with the Court's order. *See id.* at *2.

Thereafter, the parties engaged in several rounds of litigation over enforcement of and compliance with the Court's order. In 1997, Plaintiffs sought to enjoin the DEA's new promotion system, alleging that it "continue[d] to discriminate against African-American agents in violation of law and th[e] Court's Order." *See* Op., ECF No. 35 at 2. The Court held a hearing on the motion in late 1997 and in 1999 enjoined certain parts of the DEA's new promotion system, holding that the DEA was "obligated to implement a Career Development Program to reduce the acknowledged disparate impact" of their processes. *See id.* at 22-23.

In 2004, Plaintiffs again sought to enjoin the DEA's promotion process for a specific branch of the agency, culminating in briefing, oral argument, and a ten-day bench trial. *See* Mem. Op., ECF No. 281 at 1. In March 2006, the Court denied Plaintiffs' Motion for an Injunction but ordered new restrictions on Defendants' promotion processes, *see id.;* and Defendants appealed, *see* Notice of Appeal, ECF No. 288 at 1. The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") vacated and remanded. *See Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007).

In 2010, Plaintiffs filed a motion for compliance and to

show cause why Defendants should not be held in contempt based on their alleged failures to adhere to the Court's injunctions regarding the DEA's discriminatory promotion processes. *See* Pls.' Mot. for Compliance and to Show Cause Why Defs. Should Not be Held in Contempt, ECF No. 303 at 1. The motion and several other issues pending in the case were referred to Magistrate Judge Facciola for resolution. *See* Minute Order (Aug. 22, 2014). Magistrate Judge Facciola held an evidentiary hearing to resolve the issues in late 2014, *see* Minute Entry (Oct. 27, 2024); and subsequently prepared a Report and Recommendation regarding the promotion processes at issue, the status of the Working Group, the availability of a third-party vendor capable of validating future promotions procedures, the continued oversight of the DEA's compliance with previous court orders, the calculation of awards for individual relief, and the award for attorney's fees, *see* R. & R., ECF No. 395 at 5-14. In 2019, this Court adopted in part Magistrate Judge Facciola's Report and Recommendation and granted Plaintiffs' motion for a compliance order. *See* Order, ECF No. 423 at 1. Relevant to the current motion, the Court also ordered Plaintiffs to prepare and provide to Defendants "a detailed request for attorney's fees from the period of June 1996 to present." *Id.*

In January 2020, the parties filed a joint status report updating the Court on the open issues in the case, including that the parties were unable to come to a global settlement that would also resolve the issue of attorney's fees. *See* Joint Status Report, ECF No. 430 at 3. Plaintiffs filed an Amended Motion for Attorneys' Fees with attached exhibits on June 19, 2020. *See* Pls.' Mot. for Leave to File an Am. Mot. for Award of Att'ys' Fees and Costs, ECF No. 443. In April 2023, the Court granted Plaintiffs leave to file the amended motion. *See* Minute Order (Apr. 26, 2023).[4] Defendants filed their opposition the following month. *See* Defs.' Opp'n to Pls.' Am. Mot. for Award of Att'ys' Fees and Costs ("Defs.' Opp'n"), ECF No. 487. And Plaintiffs filed their reply thereafter. *See* Reply in Supp. of Pls.' Am. Mot. for an Award of Att'ys' Fees and Costs ("Pls.' Reply"), ECF No. 488. The motion is now ripe and ready for adjudication.[5]

---

[4] The original Amended Motion, filed in 2020, was docketed at ECF No. 443 with attached exhibits. A new motion and copy of the previous memorandum (without the original exhibits) was docketed at ECF No. 485, in 2023 when this Court granted Plaintiffs' request for leave. For clarity, the Court will only refer to ECF No. 485 when referencing the substance of Plaintiffs' motion but will refer to the attached exhibits from the original motion when necessary.

[5] In May 2023, pursuant to this Court's directive, Plaintiffs also submitted briefing on the individual relief owed to class members due to Defendants' discriminatory actions. *See* Pls.' Opening Brief on Individual Relief Owed to Class Members for Defs.' Race Discrimination, ECF No. 486. In April 2024, Defendants notified the Court that the parties have reached an

## II. Legal Standard for Attorney's Fees and Costs

Title VII allows a "prevailing party" to recover "a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k). A "reasonable fee" is one that is "adequate to attract competent counsel, but that does not produce windfalls to attorneys." *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (internal quotation marks omitted). Even when attorneys undertake Title VII representation pro bono, they may recover a reasonable attorney's fee. *See Copeland v. Marshall*, 641 F.2d 880, 900 (D.C. Cir. 1980) (en banc) ("Nor is it relevant that a law firm . . . originally undertook representation *pro bono publico*. We see nothing inconsistent in prosecuting a case in the public interest, agreeing not to charge one's *own* client a fee and thereafter seeking fees from the losing *defendant*." (internal quotation marks omitted)).

"The basic formula for calculating an attorney fee award" is to multiply "the number of hours reasonably exp[e]nded in

---

"agreement in principle regarding Plaintiffs' request for individual relief," and were waiting on "formal approval" before presenting the agreement to this Court. Third Notice Regarding Pl.'s Notice of Updated Amount of Individual Relief, ECF No. 498. Plaintiffs subsequently updated the Court that this pending agreement did "not encompass the parties' separate dispute over the payment of fees and costs for the work that plaintiffs' counsel ha[d] done on this case over the past quarter-century." Resp. to Notice Regarding Agreement in Principle, ECF No. 499. Accordingly, this Opinion only addresses the parties' dispute over attorneys' fees and does not address any arguments about individual relief owed to class members.

litigation by a reasonable hourly rate," the total of which is known as the "lodestar." *DL v. District of Columbia*, 924 F.3d 585, 588 (D.C. Cir. 2019) (internal quotation marks omitted). The reasonableness of an hourly rate is determined by three elements: (1) "attorney[] billing practices," (2) "attorney[] skill, experience, and reputation," and (3) "prevailing market rates in the relevant community." *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015) (internal quotation marks omitted). An attorney's "usual billing rate is presumptively the reasonable rate," if that rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Kattan ex rel. Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (internal quotation marks omitted).

In establishing the prevailing market rates, a fee applicant bears the burden of "produc[ing] satisfactory evidence—*in addition to* the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Eley*, 793 F.3d at 100 (internal quotation marks omitted). However, "[n]o particular type of evidence can be considered gospel; 'evidence of the prevailing market rate can take many forms.'" *DL*, 924 F.3d at 589 (quoting *Eley*, 793 F.3d at 104 n.5).

7

To establish that a fee applicant's reported hours are reasonable, "[s]upporting documentation must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 970 (D.C. Cir. 2004) (internal quotation marks omitted). Hours that are "excessive, redundant, or otherwise unnecessary" should be excluded from the fee submission. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *see also id.* ("Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." (internal quotation marks omitted)).

A fee applicant "bears the burden of establishing entitlement to an award . . . and justifying the reasonableness of the rates." *DL*, 924 F.3d at 588 (internal quotation marks omitted). If the fee applicant can clear that hurdle, then the claimed fee is "presumed to be the reasonable fee" and "the burdens shifts to the defendant to present equally specific countervailing evidence if it seeks a different (presumably lower) rate." *Id.* at 588-89 (internal quotation marks omitted).

The Supreme Court has warned that "the determination of fees 'should not result in a second major litigation.'" *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley*, 461 U.S. at 437). And a court's goal should be to "do rough justice, not

. . . achieve auditing perfection." *Id.; see also id.* (observing that "trial courts need not, and indeed should not, become green-eyeshade accountants" and "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time").

A prevailing party's attorney may also recover "reasonable" costs as part of their attorney's fee. *See Castle v. Bentsen*, 872 F. Supp. 1062, 1068 (D.D.C. 1995) ("[T]he question is whether the costs asserted are reasonable."); *see also Holbrook v. District of Columbia*, 305 F. Supp. 2d 41, 46 (D.D.C. 2004) ("An attorney . . . is entitled to all expenses associated with the litigation that [she] would normally expect to pass on to fee paying clients, provided such costs are reasonably incurred and reasonable in amount." (internal quotation marks omitted)). Costs such as "copying, faxing, and postage, are traditionally considered part of a reasonable attorney's fee." *Holbrook*, 305 F. Supp. 2d at 46.

## III. Analysis

Plaintiffs seek $14,234,016.55 in attorneys' fees and $770,750.91 in costs— a total request of $15,004,767.46—for the 23-years of litigation at issue. *See* Pls.' Mot., ECF No. 485 at 1. Defendants oppose the motion, challenging the reasonableness of Plaintiffs' proposed rates, the reasonableness of Plaintiffs' documented hours, and the reasonableness of some of Plaintiffs'

claimed costs. *See* Defs.' Opp'n, ECF No. 487 at 9, 17, 30. Specifically, Defendants argue that Plaintiffs' fees are "excessive" and "unsupported by the billing entries, which reflect non-substantive clerical work, duplicative billing, and overstaffing on routine projects." *Id.* at 7. Plaintiffs respond that all their claimed hours, rates, and costs are reasonable and that their "voluntary reductions . . . more than offset any actual shortcomings there may be with the motion and ample supporting documentation." Pls.' Reply, ECF No. 488 at 4.

The Court agrees fully with Plaintiffs' arguments on the reasonableness of their proposed rates and their costs. However, with respect to the reasonableness of Plaintiffs' documented hours, the Court concludes that two small reductions must be made to account for: (1) excessive billing in Plaintiffs' hours related to preparing the current fee petition and (2) hours billed by both attorneys and professional staff for work that was purely clerical in nature.

## A. Fees

### 1. Reasonableness of Rates

Defendants challenge the reasonableness of Plaintiffs' rates and argue that "the Court should instead adopt the rates set forth in the Fitzpatrick Matrix." Defs.' Opp'n, ECF No. 487 at 9-10. Turning to the three relevant factors of Plaintiffs' billing practices; the skill, experience, and reputation of its

firm's attorneys; and the prevailing market rates for similar litigation in the Washington, D.C. area, *see Eley*, 793 F.3d at 100; the Court agrees with Plaintiffs that the proposed rates are reasonable.

As Plaintiffs note, an attorney's "usual billing rate is presumptively the reasonable rate," if that rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Kattan*, 995 F.2d at 278 (internal quotation marks omitted). Defendants do not challenge the skill, experience, or reputation of Plaintiffs' attorneys. *See* Defs.' Opp'n, ECF No. 487 at 10 (arguing that WilmerHale is "not a typical law firm" but rather is "one of the largest firms in the world" that "can command sky-high rates for its services when it has clients that are willing to pay for them"). Rather, Defendants argue that Plaintiffs fail to "provide any evidence of the prevailing market rates for 'similar services'—i.e., average rates for multi-plaintiff employment discrimination suits or even generic complex litigation—in the Washington D.C. market." Defs.' Opp'n, ECF No. 487 at 13. Within its argument, Defendants discredit Plaintiffs' declarations from two partners at similarly large law firms, arguing that "neither attorney supports [their] position with comparable examples, or any example[s] at all of fees earned in similar litigation." *Id.; see also id.* at 14

("[N]either declaration provides any discussion of even a single 'pro bono' employment discrimination case or the rates actually recovered from a civil rights client or approved by a court in any case.").

However, Defendants misapply the applicable standard for establishing the "prevailing market rates in the relevant community." *Eley*, 793 F.3d at 100 (internal quotation marks omitted). The D.C. Circuit has repeatedly stated that "'evidence of the prevailing market rate can take many forms'" and "[n]o particular type of evidence can be considered gospel." *DL*, 924 F.3d at 589 (quoting *Eley*, 793 F.3d at 104 n.5). The declaration from John A. Freedman ("Mr. Freedman"), a partner and Senior Pro Bono Counsel at Arnold & Porter, concluded that Plaintiffs' "hourly rates requested [in this litigation] are well below the prevailing market rates in the District of Columbia for experienced counsel who handle complex civil litigation." Pls.' Ex. 2 ("Freedman Decl."), ECF No. 443-3 ¶¶ 3, 22. Mr. Freedman based his opinion on his extensive experience with "pro bono civil rights litigation, including in the area of employment discrimination" and his "deep understanding of how large law firms staff litigation matters and how they bill for such matters using hourly rates." *Id.* ¶¶ 3-4; *see also id.* ¶ 3 (noting his familiarity with Arnold & Porter's "hourly rates for the firm's attorneys" in his capacity as a partner and Senior

Pro Bono Counsel for the firm). Similarly, the declaration from
Jeffrey T. Green ("Mr. Green"), a partner and Firmwide Chair of
the Pro Bono Committee at Sidley Austin, concluded that "the
rates requested by WilmerHale are well within reasonable
bounds." Pls.' Ex. 3 ("Green Decl."), ECF No. 443-4 ¶¶ 3, 13. He
based his opinion on his "broad experience, spanning many years,
with the market rates charged by counsel in Washington, D.C."
*Id.* ¶ 7; *see also id.* ¶¶ 7-8 (describing his experience as
including "review[ing] invoices from counsel" at large law firms
and "setting and charging clients [Sidley Austin's] own hourly
rates"). These types of declarations, which are based on an
attorney's extensive personal knowledge of the prevailing market
rates for legal services in the relevant community, have been
consistently accepted as evidence supporting a reasonable
billing rate. *See, e.g.*, *Jordan v. U.S. Dep't of Just.*, 691 F.2d
514, 521 (D.C. Cir. 1982) (accepting "affidavit[] attesting to
the prevailing market rate" as long as the "affiant avow[ed]
that the quoted rate is based upon personal knowledge about
specific rates charged by other lawyers or rates for similar
litigation" (internal quotation marks and footnotes omitted));
*Miller v. Holzmann*, 575 F. Supp. 2d 2, 13 (D.D.C. 2008)
(according firm's "established billing rates" "a presumption of
reasonableness" based on two attorney declarations from partners
at other "large, international law firm[s]" regarding "rates of

13

lawyers of reasonably comparable skill, experience, and reputation in the D.C. legal community"), *amended and vacated in part on other grounds sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 786 F. Supp. 2d 110 (D.D.C. 2011). *Cf. Cobell v. Norton*, 407 F. Supp. 2d 140, 170 (D.D.C. 2005) (rejecting proposed rate where suggestion was not supported by an "affidavit by an attorney or law firm knowledgeable in the activities litigated by plaintiffs").

Defendants attempt to discredit the declarations by pointing out that "neither attorney supports [their] position with comparable examples, or any example at all of fees earned in similar litigation." Defs.' Opp'n, ECF No. 487 at 13. However, declarations about the prevailing market rate for similar services do not require such detail. *See Jordan*, 691 F.2d at 521 (specifically noting that "[t]here is no requirement that the affidavit be replete with names of other attorneys or firms or otherwise filed with minute details" (internal quotation marks omitted)).

Defendants also fault the declarations for failing to "undert[ake] any survey of prevailing rates for employment discrimination work, or even complex civil litigation work, in the D.C. metropolitan area," and instead simply using "identified points of reference" from "their own AmLaw 100 firms." Defs.' Opp'n, ECF No. 487 at 13-14. The Court is

unpersuaded by this argument. First, fee applicants are not required to provide surveys of prevailing market rates to establish the reasonableness of their requested rates. Providing surveys or matrices of prevailing rates for services in a certain area is one way of establishing the prevailing market rate, but as the D.C. Circuit has stated, "[n]o particular type of evidence can be considered gospel." *DL*, 924 F.3d at 589. Second, the prevailing market rate is based on the rates "in the community for *similar services by lawyers of reasonably comparable skill, experience and reputation*." *Eley*, 793 F.3d at 100 (emphasis added) (internal quotation marks omitted). Accordingly, given Plaintiffs' firm's status as an AmLaw 100 firm and the credentials and reputation of its lawyers as such, *see* Pls.' Ex. 4, ECF No. 443-5; the declarations from partners familiar with services provided by lawyers of that caliber and quality is especially relevant to establishing the reasonable rates in this case. The Court therefore accepts the declarations as "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *Eley*, 793 F.3d at 100; and rejects Defendants' argument that Plaintiffs "fail[ed] to provide any evidence of the prevailing market rates for 'similar services,'" Defs.' Opp'n, ECF No. 487 at 13.

15

Plaintiffs frequently reference *Miller v. Holzmann,* 575 F. Supp. 2d 2 (D.D.C. 2008) in support of their claim that their requested rates are reasonable, and in particular that their evidence is sufficient to establish the prevailing market rate for similar services. *See, e.g.*, Pls.' Mot., ECF No. 485 at 9-11. In *Miller*, a district court in this circuit concluded that WilmerHale's "established billing scale" supplied "reasonable hourly rates," based in part on "affidavits from knowledgeable local practitioners." *See Miller*, 575 F. Supp. 2d at 16-17. Defendants argue that *Miller* is distinguishable on two grounds: (1) that *Miller* involved a "*qui tam* action brought under the False Claims Act" and (2) that WilmerHale, in the present case, "has provided its services on a *pro bono* basis." Defs.' Opp'n, ECF No. 487 at 12. As explained below, the Court concludes that neither of Defendants' arguments have merit.

First, on the *qui tam* nature of *Miller*, the court specifically stated that "defendants ha[d] failed to demonstrate that for purposes of calculating a reasonable hourly rate, *qui tam* litigation differs in any meaningful way from other complex, civil litigation that occurs in federal court." *See Miller*, 575 F. Supp. 2d at 14-15. And courts have consistently considered the litigation at issue in this case—Title VII litigation—complex, civil litigation. *See Craig v. District of Columbia*, 197 F. Supp. 3d 268, 276-77 (D.D.C. 2016) (collecting cases).

Furthermore, Defendants do not argue that this case would not fall under the umbrella of complex, civil litigation. Therefore, the fact that *Miller* was a *qui tam* suit based on the False Claims Act does not render it irrelevant to the fee petition at issue in this case because both types of litigation—although quite different in substance—have been classified as complex, civil litigation for the purposes of determining appropriate fees.

Furthermore, within its *qui tam* argument, Defendant states that in *Miller*, the requested rates "were consistent with the rates in the then-existing *Laffey* matrix," whereas in the present case, "WilmerHale's rates far surpass those set forth in market-based fee matrices." Defs.' Opp'n, ECF No. 487 at 12. However, in *Miller*, the Court specified that it was "merely not[ing]" that the requested rates were in-line with the *Laffey* matrix rates but that it "[did] not adopt this methodology." *See Miller*, 575 F. Supp. 2d at 13 n. 21. In fact, the Court reasoned that "[i]f non-conformity with updated USAO *Laffey* rates could doom a petitioner's request," this would be inconsistent with Supreme Court precedent requiring fee applicants to produce satisfactory evidence of prevailing rates in the market. *See id.* at 16. Therefore, a close reading of *Miller* reveals that not only did the court not rely on the rates' consistency with a fee matrix for its holding, but also expressly disavowed using a

matrix to create a "ceiling on the rates courts can award pursuant to fee-shifting statutes." *See id.*

Second, Defendants attempt to distinguish *Miller* because WilmerHale's work in the current case was provided "on a *pro bono* basis." Defs.' Opp'n, ECF No. 487 at 12. Within this argument, Defendants claim that "a principal reason the Court blessed WilmerHale's fees in [*Miller*'s] False Claims Act suit was the commercial nature of its relationship with its client." *Id.* However, the court in *Miller* never made such a distinction. On the pages cited by Defendants, the court in *Miller* rejected the proposed presumption of creating a ceiling for rates based on the *Laffey* matrix and went on to praise the "'mega-law firm'-quality representation" of WilmerHale's lawyers. *Miller*, 575 F. Supp. 2d at 16; *see also id.* ("By this Court's assessment, relator's counsel—particularly the more junior trial team members—acquitted themselves admirably."). Nowhere within this analysis does the court discuss the commercial nature of the case or suggest that the rate should be different if the case had been taken on a *pro bono* basis.

Defendants also challenge Plaintiffs' evidence of the firm's billing practices. Defendants claim that Plaintiffs failed to "demonstrate what rates are actually paid by clients or realized by the firm," and instead only derived rates by "applying arbitrary discounts to its advertised billing rates

without citing any information or data on how often it realizes its advertised rates or what discounts it frequently provides clients on those high-dollar rates." Defs.' Opp'n, ECF No. 487 at 11. Turning to Plaintiffs' evidence on the firm's own billing practices, WilmerHale Counsel Brian C. Smith ("Mr. Smith") submitted a declaration describing the practices. *See* Pls.' Ex. 1 ("Smith Decl."), ECF No. 443-2. He states that "WilmerHale's general practice is to charge clients on a monthly basis at its standard hourly rates in effect at the time for work performed in the preceding month," although the clients in this case were not so charged because of the "pro bono nature" of the representation. *Id.* ¶ 13. Mr. Smith then explained how WilmerHale "significantly reduced the requested hourly rates" in this fee request "below the rates prevailing in the relevant market in 2019." *Id.* ¶ 18. He specified that Plaintiffs "are requesting only $940 dollars per hour for partner time, a 30% discount from WilmerHale's current median partner rates" and that for non-partners, "WilmerHale applied the lowest 2019 market hourly rate for each attorney in that category." *Id.* ¶¶ 19-20. He explained that this practice deviates from WilmerHale's normal billing practice of charging based on an associate's seniority by year and that the discounts applied in this case "resulted in significant reductions in some attorneys' requested hourly rates, sometimes as much as $100 per hour." *Id.*

¶ 21; *see also* Pls.' Ex. 5, ECF No. 443-6 (showing reduction rates as high as 24.7% and $180 an hour for some associates).

Defendants disregard this evidence, arguing that Plaintiffs fail to "demonstrate what rates are actually paid by clients or realized by the firm." Defs.' Opp'n, ECF No. 487 at 11. In particular, Defendants argue that firms often "discount their standard rates" and "do not always collect 100 percent of the fees they ultimately bill . . . [so] reported rates surely overstate the actual fees the law firms are paid." *Id.* at 12 (internal quotation marks omitted). However, within this critique, Defendants fail to acknowledge that Plaintiffs seek discounted rates and not the full "market rates for paying clients" that it usually charges. *See* Smith Decl., ECF No. 443-2 ¶ 21; Freedman Decl., ECF No. 443-3 ¶ 21 (describing "the decision to use the lowest hourly rate for each category of attorney" as evidencing "very conservative billing judgment"). Furthermore, as noted above, two practitioners with extensive knowledge about fees for similar services in Washington, D.C., have claimed that the fees Plaintiffs are *actually requesting* are more than reasonable and even on the lower end of the market for such services. *See* Freedman Decl., ECF No. 443-3 ¶ 21 (concluding that "the fees WilmerHale has requested represent heavily discounted rates, well below the prevailing market rate in the Washington, D.C. legal market, and below the amount the

firm would otherwise command in the market for similar legal services"); Green Decl., ECF No. 443-4 ¶ 14 ("The rates charged by WilmerHale for all timekeepers covered by this petition are comparable to—and in many instances significantly below—the prevailing market rates for attorneys of similar credentials and experience. Indeed, they are below *even discounted rates* that Sidley charges my clients." (emphasis added)). This evidence as a whole assuages any concern about Plaintiffs' advertised billing rate providing it a windfall over its normally recovered fees. *See Wilcox v. Sisson*, No. 2-1455, 2006 WL 1443981, at *5 (D.D.C. May 25, 2006) (refusing to further lower billing rate when attorney voluntarily lowered "the effective rates charged . . . by 22%"); *J.T. v. District of Columbia*, 652 F. Supp. 3d 11, 31 (D.D.C. 2023) (holding that plaintiffs met their initial burden of substantiating their fee request with sufficient evidence despite defendants' criticism of plaintiffs' evidence as "improperly focused on fees charged rather than payments received"). Overall, the Court's role is to assess whether Plaintiffs' requested rates are reasonable, not to police "data on how often [WilmerHale] realizes its advertised rates or what discounts it frequently provides clients on those high-dollar rates," Defs.' Opp'n, ECF No. 487 at 12. Therefore, the Court concludes that Plaintiffs' voluntary reductions in their advertised billing rates alongside the declarations from several

knowledgeable practitioners in the Washington, D.C. legal community attesting to the reasonableness of Plaintiffs' requested rates satisfies Plaintiffs' burden of producing sufficient evidence of their entitlement to the requested rate. *See Eley*, 793 F.3d at 100; *DL*, 924 F.3d at 588.

Since Defendants argue that the Fitzpatrick Matrix's rates should be used instead of Plaintiffs' claimed rates, the Court must now determine whether Defendants have "present[ed] equally specific countervailing evidence" supporting their proposed, lower rate. *DL*, 924 F.3d at 589 (internal quotation marks omitted). The Court concludes that Defendants have failed to meet this burden.

The Fitzpatrick Matrix is a fee matrix based on "rates that lawyers charged clients for litigating complex cases in [the D.C.] District Court as determined from publicly filed fee petitions and resulting court orders." Defs.' Opp'n, ECF No. 487 at 15-16 (citing Decl. of Brian T. Fitzpatrick ("Fitzpatrick Decl."), ECF No. 487-1 ¶ 5). The data used to compile the matrix included 419 unique lawyers in 84 unique cases from 2013 to 2020. *See* Fitzpatrick Decl., ECF No. 487-1 ¶ 11. Defendants note that in a recent case, the Fitzpatrick Matrix was determined to be superior to another, previously used matrix. *See* Defs.' Opp'n, ECF No. 487 at 16. In that case, *J.T. v. District of Columbia*, 652 F. Supp. 3d 11 (D.D.C. 2023), the district court

determined that the Fitzpatrick Matrix was superior to a previously used matrix for several reasons that are inapplicable in this case. For example, the Court in *J.T.* determined that the Fitzpatrick Matrix's "underlying dataset ha[d] the clear benefit of being much more recent," in comparison to the other matrix which was "almost 34 years" old. *Id.* at 32-33. However, in this case, Plaintiffs seek rates at the firm's 2019 billing rates—a much more recent and directly applicable data set. *See* Pls.' Mot., ECF No. 485 at 7 ("Plaintiffs seek reimbursement at WilmerHale's standard 2019 hourly rates—but with substantial discounts."). Additionally, the *J.T.* Court praised the "large sample size" of the Fitzpatrick Matrix in comparison to the other matrix. *See J.T.*, 652 F. Supp. 3d at 33. But in this case, which involves lawyers from, as Defendants put it, "one of the largest firms in the world" that "markets itself as one of the most preeminent law firms in the wor[l]d," *see* Defs.' Opp'n, ECF No. 487 at 10; that large sample size is not necessarily indicative of a similar quality of work, skill, experience, or reputation. The Fitzpatrick Matrix takes into account the average rate of a number of lawyers with varying credentials and at varying types of firms to create its matrix. *See* Fitzpatrick Decl., ECF No. 487-1 at ¶¶ 5-11. In contrast, the declarations Plaintiffs provided in support of its proposed fees focused on the work of firms and lawyers of similar caliber and reputation.

*See, e.g.*, Freedman Decl., ECF No. 443-3 ¶ 16 ("I have compared the specific hourly rates requested by WilmerHale to my firm's hourly rates, because Arnold & Porter competes in the same market with WilmerHale for complex civil litigation."); Green Decl., ECF No. 443-4 ¶ 14 ("The rates charged by WilmerHale . . . covered by this petition are comparable to—and in many instances significantly below—the prevailing market rates for attorneys of *similar credentials and experience*." (emphasis added)). Defendants fail to justify why a matrix that encompasses a large variety of lawyers over a longer time period provides "equally specific countervailing evidence" as declarations specific to lawyers of a similar caliber of representation using 2019 rates. *See DL*, 924 F.3d at 589. Therefore, the Court concludes that Defendants fail to meet their burden and accepts Plaintiffs' requested rates as reasonable.

### 2. Reasonableness of Hours

Defendants also challenge the reasonableness of Plaintiffs' claimed hours. Specifically, Defendants argue that Plaintiffs' documented hours should be reduced because of: (1) "vague" billing entries; (2) "redundant, excessive, or unnecessary" time expended on several projects in particular and the case as a whole; (3) the prevalent use of block-billing throughout the time entries; and (4) the billing of time for "purely clerical

work." *See* Defs.' Opp'n, ECF No. 487 at 17. Plaintiffs respond that Defendants' proposed reductions are not appropriate "in light of the numerous reductions in hours plaintiffs made to their fee request voluntarily," Pls.' Reply, ECF No. 488 at 19; and that most, if not all, of Defendants' arguments "are . . . meritless," *id.* at 21.

Beginning with the issue of block-billing, Defendants argue that the lodestar should be reduced by 10 percent because "Plaintiffs' attorneys engaged in systemic block-billing." Defs.' Opp'n, ECF No. 487 at 24. As the D.C. Circuit has noted, block-billing, or "time records lump[ing] together multiple tasks," can make "it impossible to evaluate their reasonableness." *Role Models*, 353 F.3d at 971. However, as several courts in this circuit have acknowledged, "a party can recover for block-billed tasks if there is 'sufficient detail' to 'evaluate what the lawyers were doing and the reasonableness of the number of hours spent on those tasks.'" *Pursuing Am.'s Greatness v. FEC*, 463 F. Supp. 3d 11, 20 (D.D.C. 2020) (quoting *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 158 (D.D.C. 2006)). The problem of block-billing is not simply lumped time entries, but lumped time entries that "make it difficult to determine the accuracy and reasonableness of billing entries," often resulting from "inadequate description[s]" of time expended. *Smith*, 466 F. Supp. 2d at 158; *see also id.* (refusing

to reduce fee petition with block-billing because "sufficient detail ha[d] been provided so that [the Court] can evaluate what the lawyers were doing and the reasonableness of the number of hours spent on those tasks"); *Role Models*, 353 F.3d at 971 (reducing fee award where block-billing entries also "lack[ed] adequate detail").

Turning to the fee petition here, the Court agrees that many of Plaintiffs' time entries present a problem not simply of lumping tasks together, but lumping tasks together in such a way that the Court cannot evaluate the reasonableness of the hours spent on those tasks. *See Smith*, 466 F. Supp. 2d at 158. For the most egregious examples, lawyers spent entire days on a variety of vague tasks with a single time entry. *See, e.g.*, Pls.' Ex. 8 ("Full Time Entries"), ECF No. 443-9 at 6 (logging 11.61 hours with the entry "EDIT MOTION AND DRAW UP TRO/PI PAPERS; COMPLETE DRAFT TRO/PI PAPERS; MULTIPLE CONFS W/LAKE AND BUTLER RE FILINGS; TELECON WITH AUSA NYLAND RE SAME; EXAMINE FAX FROM NYLAND; SEND LETTER TO SAME RE FILING; COMPLETE PAPERS AND ASSEMBLE EXHIBITS"); *id.* at 15 (logging 8.70 hours with the entry "CONFS W/HOLMES RE BRIEF; EXAMINE DRAFT OF SAME; WORK ON BRIEF; TCON W/HOLMES AND SISKIN RE SAME; DRAFT/EDIT PORTIONS OF BRIEF.").

Although the Court agrees that these examples of block-billing are indicative of the impermissible billing practices

that make it impossible for courts to examine the reasonableness
of a fee request, the Court also concludes that Plaintiffs'
voluntary reductions have accounted for the issue. In an
exercise of billing judgment, Plaintiffs proactively combed
through over 480 pages of billing records and "reduced by ten
percent 'block billed' time entries." *See* Pls.' Mot., ECF No.
485 at 14; Smith Decl., ECF No. 443-2 ¶ 25. This voluntary
reduction is identical in percentage to the reductions imposed
by courts that have reduced fees for systemic block-billing
concerns. *See, e.g.*, *Miller*, 575 F. Supp. 2d at 38 (reducing
lodestar by 10 percent for block-billing). Accordingly, the
Court declines to impose additional reductions for Plaintiffs'
block billing. *See Wye Oak Tech., Inc. v. Republic of Iraq*, 557
F. Supp. 3d 65, 90 (D.D.C. 2021) (declining "to impose a
further, across-the-board reduction" given that fee applicant
had previously "agreed to reduce its fee request"); *Driscoll v.
George Washington Univ.*, 55 F. Supp. 3d 106, 116 (D.D.C. 2014)
(concluding that "any insufficient documentation has been
sufficiently accounted for by plaintiffs' counsel's voluntary
reduction of the final lodestar figure by 5%").

Turning to Defendants' related objection regarding "vague"
billing entries, Defendants appear to make a two-fold argument
about Plaintiffs' billing practices. First, Defendants argue
that various entries "only vaguely describe meetings,

conferences, and other communications, but provide no explanation whatsoever for their occurrence." Defs.' Opp'n, ECF No. 487 at 19. Second, Defendants argue that entries regarding "substantive work" are also insufficient because of their vague descriptions. *See id.*

Beginning with Defendants' argument regarding communications, the Court agrees that many of the entries Defendants identify in their attached Exhibit 1 are "entries akin to those" criticized by the D.C. Circuit in *Michigan v. EPA*, 254 F.3d 1087 (D.C. Cir. 2001). *See* Defs.' Opp'n, ECF No. 487 at 19; *Michigan*, 254 F.3d at 1093-94 (concluding that billing "entries for conference calls with individuals" who were named but "not further identified in the petition" were insufficient because "the reasonableness of these calls . . . cannot be determined"). These entries discuss meetings or calls with individuals without noting the nature or purpose of those communications, making it difficult for the Court to determine whether those communications were reasonable in light of the case overall. *See, e.g.*, Defs.' Ex. 1, ECF No. 487-2 at 2 ("E-MAIL W/GOLDSTEIN"); *id.* at 4 ("TELECONS WITH GILL AND GELFOND"). However, these issues are not so prevalent as to warrant a reduction of the lodestar for several reasons. First, most of the entries identified have already been voluntarily discounted by Plaintiffs for block-billing concerns or "time billed by

partners that could be characterized as supervising junior attorneys," Pls.' Mot., ECF No. 485 at 14. *See* Defs.' Ex. 1, ECF No. 487-2 at 2-5. Furthermore, when the Court aggregates the hours identified in Exhibit 1, the total is slightly over 100 hours. *See* Defs.' Ex. 1, ECF No. 487-2.[6] These hours therefore represent less than half of 1 percent of the total hours documented by Plaintiffs in this fee petition. *See* Full Time Entries, ECF No. 443-9 at 482 (listing total hours as 24,446.50 hours). Since the Supreme Court has discouraged trial courts from becoming "green-eyeshade accountants" in pursuit of "auditing perfection," *see Fox*, 563 U.S. at 838; the Court concludes that even though Plaintiffs have, on occasion, failed to adequately document the substance of their meetings, the problem is not so rampant as to warrant a reduction of the

---

[6] Although Defendants argue that Exhibit 1 provides a "non-exhaustive selection of representative examples pulled from Plaintiffs' billing records," Def.'s Opp'n, ECF No. 487 at 19; the Court notes that the entries in Exhibit 1 seem to cover the entire timespan of requested attorneys' fees, with the latest entry from May 2019, *see* Def.'s Ex. 1, ECF No. 487-2 at 5. Furthermore, a brief overview of Plaintiffs' billing records reveals that most communications were documented with sufficient detail for the Court to determine what the subject of the communications were and therefore evaluate the reasonableness of the time spent. *See, e.g.*, Full Time Entries, ECF No. 443-9 at 55 ("TELECONS WITH FENNER RE 6/14 MEETING WITH ADMINISTRATOR."); *id.* at 202 ("TELECONFERENCE WITH JACOBS AND WATERS RE HEARING AND BRIEFING SCHEDULE."); *id.* at 433 ("E-MAILS WITH TEAM MEMEBRS RE ASKING DEFENDANTS FOR SUMMARY NARATIVE OF THEIR LIVE WITNESSES' TESTIMONY AT UPCOMING HEARING"). Thus, the Court concludes that Exhibit 1 provides a fair estimate of the full extent of the problem Defendants identify.

lodestar and has otherwise been adequately remedied by
Plaintiffs' voluntary reductions.

Moving next to Defendants' argument about inadequate
documentation of substantive work, the Court also concludes that
the issue does not warrant reduction of the lodestar.
Defendants, in their Exhibit 2, provide the Court with "examples
of inadequately detailed time-entries involving substantive
work." *See* Defs.' Opp'n, ECF No. 487 at 19. However, most of
Defendants' chosen examples are not indicative of the kind of
time entries that "make[] it impossible for the court to verify
the reasonableness of the billings, either as to the necessity
of the particular service or the amount of time expended on a
given legal task." *In re Sealed Case*, 890 F.2d 451, 455 (D.C.
Cir. 1989). In *Role Models America, Inc. v. Brownlee*, 353 F.3d
962 (D.C. Cir. 2004), the D.C. Circuit held that certain time
records "lack[ed] adequate detail" when attorneys "billed simply
for 'research' and 'writing' . . . the purposes of which [tasks
were] not provided." *Id.* at 971; *see also Cobell*, 407 F. Supp.
2d at 158 (criticizing entries "such as: 'research read cases;
searched Westlaw' . . . ; 'prepare for trial' . . . ; 'further
trial preparation and document review' and 'trial preparation'"
for providing "little or no reference to the substance of the
work claimed" (internal quotation marks omitted)); *Craig*, 197 F.
Supp. 3d at 280 (criticizing "billing entries only vaguely

describe[d as] 'preparing for trial'" as "provid[ing] no detail
or specificity from which the Court could ascertain whether the
preparations were reasonably expended or, instead, were
unnecessarily duplicative"). In Exhibit 2, some entries clearly
fall into the category of deficient entries described in *Role
Models*. *See, e.g.*, Defs.' Ex. 2, ECF No. 487-3 at 2 ("RESEARCH
REPLY BRIEF."); *id.* at 4-5 ("TRIAL PREP." and "PREPARE FOR
TRIAL"). However, many more meet the required level of detail to
allow the Court to assess the nature and reasonableness of the
work documented. For example, time entries like "RESEARCH RE
DISPARATE IMPACT," "READING DEA REPORTS AND RESEARCHING EEOC
PROVISIONS," and "REVIEW O'FLANAGAN'S REPLY RE MOTION FOR NON-
BINDING ARBITRATION; FIND STATUTE ON WESTLAW AND E-MAIL TO
O'FLANAGAN," *id.* at 1-2; all describe, at the very least, the
general subject of the substantive work the attorneys engaged
in. *See Nat'l Assoc. of Concerned Veterans v. Sec'y of Def.*, 675
F.2d 1319, 1327 (D.C. Cir. 1982) ("[A] fee application need not
present the exact number of minutes spent nor the precise
activity to which each hour was devoted nor the specific
attainments of each attorney." (internal quotation marks
omitted)). Furthermore, similar to Defendants' examples from
Exhibit 1, about half of the time entries have already been
voluntarily discounted by Plaintiffs for block-billing. *See*
Defs.' Ex. 2, ECF No. 487-3 at 1-5. Therefore, when looking at

the entries the Court agrees do not provide sufficient detail
and also have not already been voluntarily discounted by
Plaintiffs, the Court calculates that these entries amount to,
at best, less than half of the hours identified in Exhibit 2—or
roughly 150 hours. These hours then amount to less than 1% of
the total hours sought by Plaintiffs. *See* Pls.' Mot., ECF No.
485 at 11. Since a brief review of the full billing records show
that this is not a systemic problem, the Court concludes that an
across the board reduction of the lodestar is not warranted. *Cf.*
*Craig*, 197 F. Supp. 3d at 278 ("A fixed, percentage reduction
may be warranted when a large number of billing entries suffer
from one or more deficiencies."); *Role Models*, 353 F.3d at 973.
Rather, it appears that these isolated issues of insufficient
descriptions in the larger context of the full fee petition and
the fact that the Court does not find the overall award to be
excessive, have already been largely accounted for in
Plaintiffs' voluntary reductions. Therefore, the Court will not
issue additional reductions in search of "auditing perfection."
*Fox*, 563 U.S. at 838.

Defendants next challenge Plaintiffs' hours for "excessive,
redundant, or otherwise unnecessary" time expended in general
and on several matters in particular. *See* Defs.' Opp'n, ECF No.
487 at 21. Looking to Defendants' general concern first,
Defendants argue that Plaintiffs' counsel "staffed the cases

inefficiently," billing for "36 different attorneys, many of whom had only limited roles." *Id.* In the full context of the case, the Court disagrees. Plaintiffs' fee request covers over two decades of litigation. As another court in this district noted, "one would expect some turnover in assigned personnel" when cases are unusually long and a firm's "ability to leverage additional human resources as the case's demands change[] may actually have rendered its representation *more* efficient." *Miller*, 575 F. Supp. 2d at 41. Furthermore, in this case, Plaintiffs voluntarily excluded from the hours total, "any attorney or staff member who worked fewer than 15 hours on the matter" as well as time "for any summer associate," which in total accounted for over 800 hours of time. Pls.' Mot., ECF No. 485 at 13; Smith Decl., ECF No. 443-2 ¶¶ 23-24. Defendants in particular point to two attorneys who only worked on the case for a single month each in 2002 and 2010 respectively, criticizing their hours as unnecessary because much of the time was spent reviewing and writing summaries of the case. *See* Defs.' Opp'n, ECF No. 487 at 21. While the Court would not ordinarily consider such time productive in an easier or shorter case, the two-decades long litigation at issue here presents different considerations. The Court expects that such litigation, given its time and complexity with the ongoing monitoring of the injunction, would require attorneys new to the

case to devote some time to reviewing and later summarizing for other attorneys, the case's history. Furthermore, Plaintiffs have proactively accounted for any inefficient staffing by eliminating over 800 hours of work and "exclude[ing] time spent transitioning lawyers on and off the matter." Pls.' Mot., ECF No. 485 at 13; Smith Decl., ECF No. 443-2 ¶ 25. Therefore, the Court does not agree that Plaintiffs' staffing created inefficiencies and lead to redundant or excessive work. *See Miller*, 575 F. Supp. 2d at 42 ("[W]ithout evidence of duplication, the Court will not speculatively second-guess Wilmer Hale's staffing decisions in the invited manner.").

Next, Defendants argue that "[m]uch of the billing [was] also excessive." Defs.' Opp'n, ECF No. 487 at 21. However, Defendants' sole example of time spent responding to the Court's Minute Order from May 25, 2017, is poorly chosen. As Plaintiffs point out, although the "Minute Order was only two sentences long," Defs.' Opp'n, ECF No. 487 at 22; this Court asked the parties for a "joint status report informing the Court which objections to the [Magistrate Judge's most recent] Report and Recommendation remain at issue for resolution" and "whether supplementary briefing is necessary in view of the notices filed." *See* Minute Order (May 25, 2017). Furthermore, the final joint status report revealed that the "parties ha[d] different views as to which issues remain to be resolved" and so presented

their views separately, with Plaintiffs providing a comprehensive list of remaining issues and brief, yet informative context for several of the concerns. *See* Joint Status Report, ECF No. 416 at 1-3. Given the level of coordination required—both internally among Plaintiffs' team and externally with Defendants—to produce this information, the Court does not agree that the time spent on the report was "beyond what was reasonably necessary." Defs.' Opp'n, ECF No. 487 at 22 (internal quotation marks omitted).

Additionally, although Defendants note that Plaintiffs had "[s]ix attorneys" participate in a meeting to discuss the report, Defs.' Opp'n, ECF No. 487 at 22; that level of participation seems to be an isolated incident. Plaintiffs specified that part of its discounting of hours included only accounting for "two lawyers' attendance at any meeting, deposition, or hearing that more than two lawyers attended, even though the additional lawyers' attendance was, in counsel's view, often if not always necessary and reasonable." *See* Pls.' Mot., ECF No. 485 at 14; Smith Decl., ECF No. 443-2 ¶ 25. It appears that this single instance of billing for six attorneys was an isolated incident that was overlooked by Plaintiffs in their own pursuit of avoiding excessive or redundant billing in the fee petition. As the billing entries of the attorneys were small—varying from 0.7 to 1.3 hours—the Court does not conclude

that this oversight warrants reduction of the overall lodestar, *see Fox*, 563 U.S. at 838; and Defendants do not point to any other instances of potentially excessive staffing to suggest that this example was indicative of a larger problem despite Plaintiffs' claims of combing through its billing records and accounting for the issue. Therefore, the Court does not agree that the lodestar should be reduced to account for Plaintiffs' alleged excessive staffing.

Defendants next challenge Plaintiffs' hours for "nonproductive work," specifically, the hours spent on the current fee petition. Defs.' Opp'n, ECF No. 487 at 22. The Court agrees that the hours presented for work on the current fee petition are excessive and will reduce the identified amount by two-thirds.

Defendants' Exhibit 4 presents a list of hours Plaintiffs' counsel dedicated to the fee petition. *See* Defs.' Ex. 4, ECF No. 487-5. The entries begin in 2005 and conclude in 2016, totaling 520.1 hours and $307,537.10. *See id.*[7] Defendants note that this total alone is excessive, citing cases where fee petitions that took less than half the amount of time were deemed excessive and

---

[7] In Exhibit 4, Defendants provide a total for only the hours and corresponding cost for time spent on the fee petition from December 9, 2014, until November 14, 2016. *See* Def.'s Ex. 4, ECF No. 487-5 at 11. The Court's totals reflect the full time spent on the fee petition from April 14, 2005, to November 14, 2016.

reduced by 50%. *See* Defs.' Opp'n, ECF No. 487 at 23-24. As Plaintiffs point out, neither of the cited cases involved decades long litigation, and thus neither fee petition required combing through decades of attorney hours. Although the Court agrees that Plaintiffs' petition would be expected to account for some extra time combing through years of attorney billing records, the over thirteen weeks of attorney time billed is still excessive even in the context of the case as a whole.

Another troubling aspect of Plaintiffs' hours is that a substantial amount of the work in preparation for the current fee petition is not documented. Plaintiffs state that they are currently seeking fees for "litigation between June 1, 1996, and June 25, 2019 (inclusive)." Pls.' Mot., ECF No. 485 at 1. However, the amended fee petition was filed in June of 2020. *See* Pls.' Mot. for Leave to File an Am. Mot. for Award of Att'ys' Fees and Costs, ECF No. 443. And the declarations supporting the motion were executed in June of 2020 as well. *See, e.g.*, Smith Decl., ECF No. 443-2 at 10. Plaintiffs' request to amend their original fee petition explains that the updated petition "provides additional documentation to support certain aspects of their fee request" and "corrects a clerical error in the original motion that led to the lodestar being calculated based on WilmerHale's 2016 rates instead of discounted rates based on its 2019 rates." *See* Pls.' Mot. for Leave to File an Am. Mot.

for Award of Att'ys' Fees and Costs, ECF No. 443 at 1. These changes seem to have required a significant amount of additional work. *See id.* (explaining that the "amended motion attaches: (1) declarations explaining that plaintiffs' requested hourly rates are reasonable; (2) an exhibit with additional detail about the WilmerHale attorneys who have worked on this matter; and (3) invoices with additional detail on expert costs that plaintiffs incurred in seeking to enforce this Court's orders"). In this context, the request for more than 500 hours of work on the petition is indeed excessive.

Nevertheless, the hours in Defendants' Exhibit 4 show some work that contributed to the preparation of the current fee petition. For example, time was spent reviewing billing records over several years and preparing exhibits for the petition. *See, e.g.*, Defs.' Ex. 4, ECF No. 487-5 at 4 ("Review[ing] 2015 billing records for fee petition"); *id.* at 6 ("Prepare exhibits re requested costs and expenses; draft templates for exhibits re fees"). Some time was also spent strategizing how to exercise billing judgment—including deciding on the discounts that have now eased the Court's own process in assessing the fee petition. *See, e.g., id.* at 8 ("Edit fee petition to reflect using the lowest current billing rates and edit the spreadsheet for clarity"). Therefore, the Court will allow Plaintiffs to recover one-third of their requested hours in relation to the

preparation of the fee petition, which amounts to $102,512.37, but will not otherwise reduce the lodestar.[8]

Defendants' last contention on the issue of reasonable hours is the "billed time performing work that is purely clerical in nature." Defs.' Opp'n, ECF No. 487 at 27. Although Plaintiffs claimed that they excluded "time spent on administrative matters, such as coordinating calls and meetings" and "time spent by project assistants on purely clerical matters that did not require knowledge of the facts or law of the case," Pls.' Mot., ECF No. 485 at 13 (citing Smith Decl., ECF No. 443-2 ¶ 25), Defendants argue that "the billing records still include numerous instances of both attorneys and staff billing time for non-compensable clerical tasks," Defs.' Opp'n, ECF No. 487 at 28. Defendants also compiled a list of "non-exhaustive . . . representative examples of these entries" as its Exhibit 5. *Id.* Defendants ask this Court to "reduce the lodestar of project assistants and paralegals by 50% and reduce the lodestar for attorneys by 5%" to account for the issue. *Id.* at 30. After reviewing the billing records, the Court concludes that such a high reduction is not warranted. Rather, the Court will reduce the time identified in Exhibit 5 by 25%.

---

[8] For computational clarity, the Court will simply reduce the total fees by two-thirds of the claimed amount from Exhibit 4—a reduction of $205,024.73.

Beginning with the extent of the issue, Defendants argue that Exhibit 5 is a "non-exhaustive" list of examples of time entries where support staff and attorneys billed for purely clerical work. *See* Defs.' Opp'n, ECF No. 487 at 28. Upon a comprehensive review of the timesheets, the Court disagrees. In the vast majority of entries, the time billed by paralegals and project assistants was more than merely clerical work, requiring specialized knowledge of the case and making decisions based upon that knowledge. *See, e.g.*, Full Time Entries, ECF No. 443-9 at 5 (paralegal billing entry for "REVEW MATERIALS ON PROMOTIONS; PREPARE SYNOPSIS AND STATUS CHART."); *id.* at 99 (paralegal billing entry for "QUALITY CHECK MULTIPLE SETS OF DEFENDANTS 4TH DOCUMENT PRODUCTION; CHRON AND DISTRIBUTE SAME TO TEAM; UPDATE PLEADINGS FILE AND INDEX."); *id.* at 223 (project assistant billing entry for "UPDATE DISCOVERY AND FILINGS BINDER WITH PROPOSED ORDERS FILED BY ORDER OF THE COURT AT 4/12 HEARING."). Furthermore, Exhibit 5 provides examples up until 2016 and the Court's independent review does not suggest that the problem stems far beyond the examples provided. The Court therefore concludes that Exhibit 5 provides a strong estimate of the scope of the problem at issue.

Turning to the substance of Exhibit 5, the examples add up to 706 hours and $260,710. *See* Defs.' Ex. 5, ECF No. 487-6. This amounts to about 3% of the total hours requested in the

petition. *See* Pls.' Mot., ECF No. 485 at 11 ("seek[ing] reimbursement for just over 19,479 hours of attorney time and 4,966 hours of support-staff time"). However, not all of the examples from Exhibit 5 indicate non-compensable hours spent on purely clerical work. For example, many of the billing entries are also blocked time entries, with clerical tasks amounting to only some of the time billed. *See, e.g.*, Defs.' Ex. 5, ECF No. 487-9 at 2 (associate billing entry for "DRAFT QUESTIONNAIRE FOR PLAINTIFF CLASS; FAX SAME TO BEAVER"); *id.* at 4 (associate billing entry for "REVIEW DOCUMENTS FOR DOCUMENT RELEVANT TO UPCOMING DEPOSITIONS; ATTEND TO VARIOUS ADMINISTRATIVE TASKS; COMMUNICATE WITH GIL RE: RESPONSES TO INTERROGATORIES."); *id.* (associate billing entry for "REVIEW DOCUMENTS FROM DEFENDANTS' LATEST PRODUCTION; PREPARE WITNESS FILES; ATTEND TO CASE ADMINISTRATIVE MATTERS."). Deficiencies in these entries have already been reduced by Plaintiffs for block-billing.

However, some of the entries suffer from a lack of clarity, such that the Court cannot determine whether the task was purely administrative or not. For example, many of the support staff entries involve organizing various documents, but the entries are not clear as to whether that organization required specialized knowledge of the case. *See, e.g.*, *id.* at 5 (project assistant billing entry for "ORGANZE PLEADINGS BINDER AND UPDATE PLEADINGS INDEX."); *id.* at 6 (paralegal billing entry for "COPY,

ORGANIZE AND PREPARE RYAN DEPOSITION EXHIBITS PER E. GREGORY.").
*Cf. Robinson v. District of Columbia*, 61 F. Supp. 3d 54, 67
(D.D.C. 2014) (concluding that task which "required evaluation
of individual documents and separating useful documents from
non-useful documents" as "not . . . mere clerical work"). Even
if the work conducted was beyond clerical work, these entries
fall short of Plaintiffs' obligation to provide the Court with
"well-documented claims." *Kennecott Corp. v. EPA*, 804 F.2d 763,
767 (D.C. Cir. 1986) (internal quotation marks omitted).
Nevertheless, as noted previously in this section's discussion
about vague time entries, the majority of these entries have
already been discounted for block-billing or otherwise accounted
for in Plaintiffs' voluntary reductions.

Finally, Exhibit 5 does list a few entries that are clearly
only clerical in nature. *See, e.g.*, Defs.' Ex. 5, ECF No. 487-6
at 8 (senior associate billing entry for "FILL OUT PAPERWORK TO
GET ACCESS TO ECF"); *id.* (senior associate billing entry for
"CONDUCT FILING OF REPLY"). *See also Michigan*, 254 F.3d at 1095-
96 (concluding that tasks like filing documents at courthouse
"could be undertaken by clerical, not legal personnel" and thus
should be deducted from the fee award).

Thus, looking at Exhibit 5 as a whole, the Court concludes
that roughly a quarter of the time documented represents time
spent on purely clerical tasks that have not already been

discounted by Plaintiffs through their voluntary reductions. The Court will therefore subtract one-quarter of Exhibit 5's total compensation amount—$65,177.50—from the lodestar. *See Beckwith v. District of Columbia*, 254 F. Supp. 3d 1, 5 (D.D.C. 2017) (choosing to reduce fee award for time billed by certain personnel by a set percentage when parties did not "parse out which tasks [billed were] clerical and which [were] not . . . [r]ather than 'nit-pick' through every time entry or deny reimbursement for every charge").

**B. Costs**

Plaintiffs seek $770,750.91 in costs for the over two decades of litigation at issue. Pls.' Mot., ECF No. 485 at 15. Defendants challenge the reasonableness of Plaintiffs' claimed costs only for "printing and photocopying," which Defendants argue were "billed at rates in excess of the customary rates charged in the District" for years. Defs.' Opp'n, ECF No. 487 at 30. Specifically, Defendants argue that Plaintiffs charged "$1.10 per page between June 1996 and January 2003" for printing, $0.20 per page between June 1996 and October 2004 for copying, and $0.20 per page between January 2003 and November 2004 for printing. *Id.* at 31. Defendants also state that Plaintiffs have "always charged $1.00 per page" for printing and copying in color. *Id.* Defendants argue that such rates are clearly excessive since courts in this circuit have determined

that $0.15 per page suffices for printing and copying expenses,
raising the rates to $0.25 for the same services in color. *Id.;
see Salazar v. District of Columbia*, No. 93-452, 2014 WL
12695696, at *15 (D.D.C. Jan. 30, 2014) (reducing
"copying/scanning/printing rates to .15/page" based on other
district courts in the circuit).

The Court rejects Defendants' argument because their claims
about Plaintiffs' charges are not supported by the evidence.
Plaintiffs' Exhibit 10 provides a detailed, over 650-page list
of charges that accrued to accumulate Plaintiffs' total request
for over $770,000 in costs. *See* Pls.' Ex. 10 ("Pls.' Costs"),
ECF No. 443-11. As Defendants note, Plaintiffs do not charge
specifically for "printing" between 1996 and 2005, instead
charging for "Network Services/Word Processing." *See* Defs.'
Opp'n, ECF No. 487 at 31 n.5; Pls.' Costs, ECF No. 443-11 at 514
(charge of "NETWORK SERVICES/WORD PROCESSING" changed to
"DOCUMENT PRINTING" in early May 2005). Defendants argue that
this charge amounted to between $0.20 to $1.10 per page of
printing services between June 1996 to November 2004. *See* Defs.'
Opp'n, ECF No. 487 at 31. However, the details from Exhibit 10
show that the "Network Services/Word Processing" charge does not
come with a specific number of pages associated with each
charge. *See, e.g.*, Pls.' Costs, ECF No. 443-11 at 130
(describing services from 11/12/2002 as "NETWORK SERVICES/WORD

PROCESSING – WORD PROCESSING CHARGES FOR 11/12/2002”).
Furthermore, multiple charges of varying amounts accrued on the
same date, suggesting that each entry is not an entry for each
page printed. *See, e.g.*, *id.* (charging between $1.10 and $3.30
for eight charges of “NETWORK SERVICES/WORD PROCESSING” on
11/12/2002). Similarly, although Defendants argue that
Plaintiffs charged $0.20 for standard copying services between
June 1996 and October 2004, *see* Defs.’ Opp’n, ECF No. 487 at 31;
the charges for “DUPLICATING” during this time period both
varied and did not have a page number associated with each
charge. *See* Pls.’ Costs, ECF No. 443-11 at 130 (charging between
$0.80 to $67.80 for “DUPLICATING” services provided on
11/12/2002). The same is also true for color printing services.
The charges for color printing began in earnest in 2007, but
again, the charges do not specify a number of pages and the
amounts varied in each entry. *See, e.g.*, *id.* at 559 (charging
between $25.00 and $153.00 for “DOCUMENT PRINTING COLOR”
services provided on 09/05/2007). Thus, the evidence from
Plaintiffs’ Exhibit 10 does not clearly support Defendants’
claim that Plaintiffs overcharged for copying and printing
services. And Plaintiffs, in their reply brief, specifically
assert that they charged “not . . . more than $0.20 per page for
standard printing and copying costs throughout the relevant
period.” Pls.’ Reply, ECF No. 488 at 24. Finally, looking at the

ultimate question of reasonableness of Plaintiffs' claimed

costs, the Court does not conclude that $205,451.16 in printing

expenses for over two decades of litigation is per se

unreasonable. *See Holbrook*, 305 F. Supp. 2d at 46 (approving

costs claimed by plaintiff when "they appear[ed] modest and

reasonable on their face"). Therefore, the Court rejects

Defendants' argument and will allow Plaintiffs the full amount

of their claimed costs.

## IV. Conclusion

For the foregoing reasons the court **GRANTS** in part

Plaintiffs' motion for attorneys' fees and costs, *see* ECF No.

485. The Court slightly reduces Plaintiffs' proposed amount of

$15,004,767.46 for excessive billing in preparing the fee

petition and instances of billing entries representing purely

clerical work. Those reductions are for $250,024.73 and

$65,177.50, respectively. The Court will allow Plaintiffs to

recover a total of $14,689,565.23. An appropriate Order

accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**            United States District Judge**
**            September 27, 2024**